# EXHIBIT 1

UNITED'S COPY

UNITED CONTRACT
108536

STANDARD GROUND HANDLING AGREEMENT

between:   ALL NIPPON AIRWAYS CO., LTD.

and:       UNITED AIR LINES, INC.

The agreement consists of:

MAIN AGREEMENT, and, as required,

ANNEX A (description of services)

ANNEX(ES) B (locations(s), agreed services and charges)

Contents of Main Agreement

ARTICLE 1      PROVISION OF HANDLING FACILITIES AND SERVICES

ARTICLE 2      FAIR PRACTICES

ARTICLE 3      SUB-CONTRACTING OF SERVICES

ARTICLE 4      CARRIERS REPRESENTATION

ARTICLE 5      STANDARD OF WORK

ARTICLE 6      REMUNERATION

ARTICLE 7      ACCOUNTING AND SETTLEMENT

ARTICLE 8      LIABILITY AND INDEMNITY

ARTICLE 9      CHOICE OF LAW

ARTICLE 10     ASSIGNMENT

ARTICLE 11     DURATION, MODIFICATION AND TERMINATION

MAIN AGREEMENT

An Agreement made between:          UNITED AIR LINES, INC., a Delaware Corporation,

having its principal office at:  P.O. Box 66100
                                 Chicago, Illinois 60666

hereinafter referred to as "Seller" or "UNITED"


and:                              ALL NIPPON AIRWAYS CO., LTD.

having its principal office at:  1-6-6 Haneda Airport, Ota-Ku, Tokyo 144, Japan

hereinafter referred to as "Buyer" or "ALL NIPPON AIRWAYS CO., LTD."


WHEREBY THE PARTIES AGREE AS FOLLOWS:


ARTICLE 1

PROVISION OF HANDLING FACILITIES AND SERVICES
Seller hereby agrees to perform the services described herein for Buyer at the
price(s) and location(s) described in this Agreement.


1.1.    Conditions of Service

        No provision of this Agreement shall be construed to impose upon Seller
        the obligation to add or retain manpower, equipment or supplies at any
        airport location beyond that reasonably necessary to provide the services
        contemplated hereunder.  The performance of any service shall be subject
        to Seller's applicable airport use or lease agreements and to all
        applicable federal, state and local laws, statues, ordinances, rules and
        regulations.


1.2.    Independent Contractors

        The relationship of the parties hereto is solely that of independent
        contractors.  This Agreement is strictly a contract for services.  The
        parties expressly agree that this Agreement shall not confer upon Seller
        any control over or obligation of bailment with respect to any aircraft or
        other equipment owned or operated by Buyer.

1.3.    Scheduled Flights

1.3.1.  Seller shall have no obligation to provide ground handling services
        or facilities for any of Buyer's schedule at the locations(s)
        described in the Annex(es) B unless and until Buyer has received
        written approval from Seller of the proposed flight schedule.  Buyer
        agrees to provide thirty (30) days advance written notice to Seller
        of (a) any schedule change in the number of flights, (b) or changes
        of aircraft types, or (c) changes in arrival or departure times.
        Said notice to be submitted to:

                        Manager of Contract Services
                        United Air Lines, Inc.
                        P.O. Box 66100
                        Chicago, Illinois 60666

        With a copy to United's Manager of Station Operations at the
        appropriate airport location(s).

1.3.2.  Unless and until Buyer has received written approval Seller shall not
        provide ground handling services and facilities for any proposed
        changes.

1.3.3.  It is understood and agreed by both parties that Seller has
        preferential rights to the full use of its gates, holdrooms and
        jetways, and that upon thirty (30) days advance notice from Seller
        that Seller requires the use of said gates, holdrooms or jetways in a
        manner which conflict with Buyer's use, Buyer will take whatever
        action is necessary to eliminate the conflict within the thirty (30)
        day period.  Seller will make reasonable efforts to accommodate any
        schedules of Buyer that have to be adjusted, subject to the
        availability of time and space in Seller's facilities.


1.4.    Special Flights

1.4.1.  Requests for handling services for other than approved scheduled
        flights at the locations described in Annex(es) B will be made
        in advance directly to Seller's local manager who will determine
        Seller's capability to provide such services.


1.5.    Priority

1.5.1.  In case of multiple handling, priority shall, as far as possible, be
        given to aircraft operating on schedule.

1.6.     Special Assistance (emergency cases)

1.6.1.     In case of emergency such as forced landings, accidents or acts of violence, the Seller shall, without delay and without waiting for instructions from Buyer, take all reasonable and possible steps to assist passengers and crew and to safeguard and protect from loss or damage, baggage, cargo and mail carried in the aircraft.

1.7.     Additional Services

1.7.1.     Upon Buyer's request, Seller will provide additional services at the locations described in Annex(es) B subject to Seller's reasonable capability.

1.8.     Other Airports

1.8.1.     In case of occasional calls of Buyer's aircraft at airports not described in Annex(es) B where the Seller maintains a ground handling organization, the Seller, will on request, make every effort, subject to Seller's reasonable capability to furnish the requested services.

1.8.2.     The parties agree that Sub-Article 1.8 shall not confer upon Buyer any obligation to use Seller's services; and that Seller's services covered in this section will be performed only at Buyer's request.

1.9.     Deicing and Non-Routine Aircraft Maintenance

1.9.1.     Seller shall provide Deicing and Non-Routine Aircraft Maintenance services for Buyer's aircraft only at the specific request of Buyer's flight captain or other authorized representative, and then only when the requested services are, in Seller's sole discretion, within the capability of Seller's facilities, personnel, and materials available for such services having due regard for Seller's own requirements.

1.9.2.     Seller shall perform deicing services in accordance with Seller's FAA approved procedures and operating specifications. Seller shall perform such further deicing services as may be directed by Buyer's flight captain or other authorized representative. Seller will deice Buyer's aircraft to whatever degree Buyer's flight captain or other authorized representative so instructs, however, Buyer expressly agrees that Buyer's flight captain or other authorized representative shall be solely responsible to ensure that all deicing services provided by Seller are performed to Buyer's satisfaction in accordance with Buyer's FAA procedures and operating specifications.

1.9.3.  It is Buyer's sole responsibility to provide Seller with manuals,
        check cards, and any other forms necessary for Seller to perform the
        work requested. Seller will acknowledge and sign only for such work
        performed by Seller. It is the sole responsibility of Buyer to
        ensure that all services provided by Seller are performed in
        accordance with Buyer's FAA procedures and operating specifications,
        and to provide the necessary qualified personnel to sign a
        Maintenance Release or Air Worthiness form.

1.9.4   When work performed by Seller requires the use of materials or parts,
        they shall be supplied and delivered to Seller by Buyer. In the
        event Buyer has an aircraft parts agreement with Seller, Seller shall
        provide such parts in accordance with the terms and conditions of
        that agreement.

1.9.5   WARRANTY DISCLAIMER

        ANY PARTS, PRODUCTS OR MATERIALS PROVIDED TO BUYER BY SELLER
        HEREUNDER SHALL BE PROVIDED AS IS AND WITH ALL FAULTS AND BUYER
        HEREBY WAIVES AND SELLER EXPRESSLY DISCLAIMS ALL WARRANTIES,
        GUARANTEES OR REPRESENTATIONS, EITHER EXPRESS OR IMPLIED, ARISING BY
        LAW OR OTHERWISE, INCLUDING, BUT WITHOUT LIMITATION, ANY IMPLIED
        WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE,
        AND ANY IMPLIED WARRANTY ARISING FROM THE COURSE OF PERFORMANCE,
        COURSE OF DEALING OR USAGE OF TRADE IN CONNECTION WITH SUCH PARTS,
        PRODUCTS OR MATERIALS. IN NO EVENT SHALL SELLER'S LIABILITY UNDER
        THIS AGREEMENT INCLUDE ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL
        DAMAGES EVEN IF SELLER SHALL HAVE BEEN ADVISED OF THE POSSIBILITY OF
        SUCH POTENTIAL LOSS OR DAMAGE.

ARTICLE 2

FAIR PRACTICES

2.1     The Seller will take all practicable measures to ensure that sales
        information contained in Buyer's flight documents is made available
        for the purposes of the Buyer only.

ARTICLE 3

SUB-CONTRACTING OF SERVICES

3.1.    The Seller is entitled to delegate any of the agreed services to
        subcontractors with Buyer's consent, which consent shall not be
        unreasonably withheld, it being understood that, the Seller shall
        nevertheless be responsible to Buyer for the proper rendering of such
        services as if they had been performed by the Seller itself.  Any
        subcontracting of services will be recorded in the applicable
        Annex(es) B.

3.2.    Buyer shall not appoint any other person, company or organization to
        provide the services which the Seller has agreed to provide by virtue
        of this Agreement, except in such special cases as shall be mutually
        agreed between the parties.

ARTICLE 4

CARRIER'S REPRESENTATI

4.1.    Buyer may maintain at its own cost, its own representative(s) at the
location(s) designated in the Annex(es) B. Such representative(s)
and representative(s) of Buyer's head Office may inspect the
facilities and services furnished to Buyer by the Seller pursuant to
this Agreement, advise and assist the Seller and render to Buyer's
clients such assistance as shall not interfere with the furnishing of
services by the Seller.

4.2.    Buyer may, by prior written notice to the Seller and at its own cost,
engage an organization (hereinafter referred to as 'the Supervisor')
to supervise the services of the Seller at the location(s) designed
in Annex(es) B. Such notice shall contain a description of the
services to be supervised.

4.2.1.   The Supervisor shall have the same authority as defined above in
Sub-Article 4.1. for Buyer's own representative.

4.3.    Such assistance, when performed by Buyer's representative(s) and/or
Supervisor(s) will be the sole responsibility of Buyer, unless
requested by the Seller.

4.4.    The office equipment and premises, which may be made available by the
Seller to Buyer to enable Buyer's representative(s) and/or
Supervisor(s) to perform the above-mentioned activities, shall be the
subject of separate arrangement.

ARTICLE 5

STANDARD OF WORK

5.1.    In the case of absence of instructions by Buyer, the Seller shall
follow its own standard practices and procedures.

5.2.    All other services shall be provided in accordance with standard
practices and procedures usually followed by the Seller.
Nevertheless, the Seller will comply with reasonable requests of
Buyer as long as these do not conflict with the applicable orders
and regulations of the appropriate authorities or of the Seller.

5.3.    The Seller agrees to take all possible steps to ensure that, with
regard to contracted services, Buyer's aircraft, crews, passengers
and load receive treatment not less favourable than that given by the
Seller to other carriers or its own comparable operation at the same
location.

5.4..   Buyer shall supply the Seller with sufficient information and
instructions to enable the Seller to perform its handling properly.

5.5.    The Seller will report to Buyer's representative immediately all loss
of or damage, threatened or actual, to aircraft and loads noticed in
the course of the handling or which otherwise comes to the knowledge
of the Seller.

ARTICLE 6

REMUNERATION

6.1.    In consideration of Seller providing the services, Buyer agrees to
        pay Seller the charges set out in the respective Annex(es) B.  Buyer
        further agrees to pay Seller in accordance with the applicable rates
        listed in Seller's then current labor, materials and equipment price
        lists and to discharge all additional expenditure incurred for
        providing the services referred to Sub-Articles 1.6., 1.7., 1.8., and
        1.9.

6.2.    In the event Seller is required to pay overtime as the result of
        delayed or early arrival of flights operated by Buyer, Buyer shall
        reimburse Seller for the overtime payments to Seller's personnel
        assigned to perform the services at Seller's then applicable
        published overtime rates.  No other overtime work shall be undertaken
        unless authorized by Buyer's supervisor or authorized representative,
        if on duty.  Compensation for overtime furnished at Buyer's request
        will be for such minimum period as required by United's policy or
        union contracts.

6.3.    In addition to the price for services rendered or goods sold
        hereunder, Buyer shall pay and agrees to indemnify and hold Seller
        harmless from and against any and all taxes, of whatsoever kind or
        nature, including but not limited to attorney's fees, costs and
        expenses incurred in connection therewith but excluding income taxes,
        which are or may be assessed against, chargeable to or collectible
        from either Buyer or Seller by any taxing authority, federal, state
        or local, and which are based upon or levied or assessed with respect
        to the performance of this Agreement or the sale, delivery or
        furnishing of any goods or services hereunder.

6.4.    Buyer shall be responsible for its rent, telephone, utility or
        communications charges, landing fees and all other charges for
        airport use.  Buyer shall reimburse Seller for all licenses or other
        fees assessed against or imposed upon Seller as the direct result of
        services performed by Seller hereunder, provided that Seller shall
        notify Buyer thereof and afford Buyer the opportunity to contest the
        same.  Seller shall furnish reasonable assistance and support to
        obtain any funds or exemption therefrom which may be lawfully
        available.

ARTICLE 7

ACCOUNTING AND SETTLEMENT

7.1.    All services rendered or goods sold by Seller to Buyer shall be
        charged to and paid for by Buyer in accordance with this
        sub-Article.  Unless otherwise agreed in Annex(es) B, Seller shall
        calculate promptly at the end of each calendar month or on completion
        of the particular service, or at such other times as provided herein,
        the charges incurred by Buyer during said period and render an
        invoice to Buyer containing an itemized statement of all such
        charges.  Buyer shall remit the total amount of such invoices in
        United States funds within ten (10) days after receipt thereof to
        United Air Lines, Inc., P.O. Box 95091, Chicago, Illinois 60694.
        However, if both Buyer and Seller are active members/associate
        members of the Airline Clearing House, (ACH), such invoices will be
        submitted in total for payment through ACH in accordance with
        Section H of the ACH Manual of Procedures.

ARTICLE 6

REMUNERATION

6.1.    In consideration of Seller providing the services, Buyer agrees to
        pay Seller the charges set out in the respective Annex(es) B. Buyer
        further agrees to pay Seller in accordance with the applicable rates
        listed in Seller's then current labor, materials and equipment price
        lists and to discharge all additional expenditure incurred for
        providing the services referred to Sub-Articles 1.6., 1.7., 1.8., and
        1.9.

6.2.    In the event Seller is required to pay overtime as the result of
        delayed or early arrival of flights operated by Buyer, Buyer shall
        reimburse Seller for the overtime payments to Seller's personnel
        assigned to perform the services at Seller's then applicable
        published overtime rates. No other overtime work shall be undertaken
        unless authorized by Buyer's supervisor or authorized representative,
        if on duty. Compensation for overtime furnished at Buyer's request
        will be for such minimum period as required by United's policy or
        union contracts.

6.3.    In addition to the price for services rendered or goods sold
        hereunder, Buyer shall pay and agrees to indemnify and hold Seller
        harmless from and against any and all taxes, of whatsoever kind or
        nature, including but not limited to attorney's fees, costs and
        expenses incurred in connection therewith but excluding income taxes,
        which are or may be assessed against, chargeable to or collectible
        from either Buyer or Seller by any taxing authority, federal, state
        or local, and which are based upon or levied or assessed with respect
        to the performance of this Agreement or the sale, delivery or
        furnishing of any goods or services hereunder.

6.4.    Buyer shall be responsible for its rent, telephone, utility or
        communications charges, landing fees and all other charges for
        airport use. Buyer shall reimburse Seller for all licenses or other
        fees assessed against or imposed upon Seller as the direct result of
        services performed by Seller hereunder, provided that Seller shall
        notify Buyer thereof and afford Buyer the opportunity to contest the
        same. Seller shall furnish reasonable assistance and support to
        obtain any funds or exemption therefrom which may be lawfully
        available.

ARTICLE 7

ACCOUNTING AND SETTLEMENT

7.1.    All services rendered or goods sold by Seller to Buyer shall be
        charged to and paid for by Buyer in accordance with this
        sub-Article. Unless otherwise agreed in Annex(es) B, Seller shall
        calculate promptly at the end of each calendar month or on completion
        of the particular service, or at such other times as provided herein,
        the charges incurred by Buyer during said period and render an
        invoice to Buyer containing an itemized statement of all such
        charges. Buyer shall remit the total amount of such invoices in
        United States funds within ten (10) days after receipt thereof to
        United Air Lines, Inc., P.O. Box 95091, Chicago, Illinois 60694.
        However, if both Buyer and Seller are active members/associate
        members of the Airline Clearing House, (ACH), such invoices will be
        submitted in total for payment through ACH in accordance with
        Section H of the ACH Manual of Procedures.

ARTICLE 8

LIABILITY AND INDEMNITY

In this Article all references to the Carrier or the Handling Company shall include their employees, servants, agents and sub-contractors.

8.1.    The Carrier shall not make any claim against the Handling Company and shall indemnify it (subject as hereinafter provided) against any legal liability for claims or suits, including costs and expenses incidental thereto, in respect of:

a.   delay, injury or death or persons carried or to be carried by the Carrier; and

b.   damage to or delay or loss of baggage, cargo or mail carried or to be carried by the Carrier; and

c.   damage to or loss of property owned or operated by, or on behalf of, the Carrier and any consequential loss or damage;

arising from an act or omission of the Handling Company in the performance of this Agreement unless done with intent to cause damage, death, delay, injury or loss or recklessly and with the knowledge that damage, death, delay, injury or loss would probably result.

PROVIDED THAT all claims or suits arising hereunder shall be dealt with by the Carrier; and

PROVIDED ALSO THAT the Handling Company shall notify the Carrier of any claims or suits without undue delay and shall furnish such assistance as the Carrier may reasonably require.

PROVIDED ALSO THAT where any of the services performed by the Handling Company hereunder relate to the carriage by the Carrier of passengers, baggage or cargo direct to or from a place in the United States of American then if the limitations of liability imposed by Article 22 of the Warsaw Convention would have applied if any such act or omission had been committed by the Carrier but are held by a Court not to be applicable to such act or omission committed by the Handling Company in performing this Agreement then upon such decision of the Court the indemnity of the Carrier to the Handling Company hereunder shall be limited to an amount not exceeding the amount for which the Carrier would have been liable if it had committed such act or omission.

8.2.    The Carrier shall not make any claim against the Handling Company in respect of damage, death, delay, injury or loss to third parties caused by the operation of the Carrier's aircraft arising from an act or omission of the Handling Company in the performance of this Agreement unless done with intent to cause damage, death, delay, injury or loss or recklessly and with knowledge that damage, death, delay, injury or loss would probably result.

8.3.    a.   Notwithstanding the provisions of Sub-Article 8.1., in the case of claims arising out of surface transportation which is provided on behalf of the Carrier and is part of the operation of loading/embarking or unloading/disembarking and/or is covered by the Carrier's Contract of Carriage the indemnity shall not exceed the limits specified in the said Contract of Carriage.

       b.   In the case of claims arising out of surface transportation which is not provided on behalf of the Carrier and/or is not part of the operation of loading/embarking or unloading/disembarking and/or is not covered by the Carrier's Contract of Carriage the waiver and indemnity herein contained shall not apply.

8.4.    The Handling Company shall not make any claim against the Carrier and shall indemnify it (subject as hereinafter provided) against any legal liability for claims or suits, including costs and expenses incidental thereto, in respect of damage to or loss of property owned or operated by, or on behalf of, the Handling Company and any consequential loss or damage arising from an act or omission of the Carrier in the performance of this Agreement unless done with intent to cause damage, death, delay, injury or loss or recklessly and with knowledge that damage, death, delay, injury or loss would probably result.

## ARTICLE 9

CHOICE OF LAW

9.1    This agreement and any dispute arising under or in connection with this Agreement, including any action in tort, shall be governed by the laws of the State of Illinois, U.S.A.

## ARTICLE 10

ASSIGNMENT

10.1.    This Agreement shall not be assigned by either party without the prior written consent of the other, and in the event that it shall be assigned by either party, whether by operations of law or otherwise, without such written consent, the other party shall have the right to immediately terminate this Agreement by written notice to the assignor. Notwithstanding the foregoing, either party may, without such consent, assign this Agreement to any corporation with which it may merge or consolidate.

## ARTICLE 11

DURATION, MODIFICATION AND TERMINATION

11.1.    This Agreement shall be effective from September 1, 1991 and shall supersede any previous arrangements between the parties governing the provision of the services whether written or oral relating in any way to the services covered by this Agreement.

11.2.   Modification of or additions to this Agreement must be approved in writing by the parties.

11.3.   All notices given or required hereunder shall be deemed sufficient if sent via first class mail, telegram or cablegram, postage or other charges fully prepaid, to the respective addressees of Seller and Buyer specified in this Agreement, unless either party hereto shall specify to the other party a different address for the giving of such notice.

11.4.   Unless otherwise agreed in Annex(es) B, this Main Agreement shall continue in force until terminated by either party giving sixty days prior written notice to the other party.

11.5.   Notice of termination of all or any part of the services to be furnished at a specific location must be given by either party upon thirty days prior written notice unless otherwise agreed in the applicable Annex(es) B.

11.6.   In the event of part termination of handling services, either party may request an adjustment of charges for the remaining services at the applicable location, and if no agreement is reached, either party may terminate this Agreement as to that location upon sixty (60) days prior written notice.

11.7.   In the event of Seller's or Buyer's permit(s) or other authorization(s) to conduct its air transportation services, or to furnish the services provided for in the Annex(es) B, wholly or in part, being revoked, cancelled, or suspended by acts or orders of government authorities, that party may suspend or terminate the Agreement or the relevant Annex(es) B at the effective date of such revocation, cancellation or suspension by giving to the other party notice thereof within twenty-four hours after such event. Such suspension shall automatically end when such restrictions shall have been remedied and the party's normal operations restored.

11.8.   It is expressly agreed that except for any payments due hereunder, each party shall be relieved of its obligations hereunder in the event and to the extent that performance thereof is delayed or prevented by any cause reasonably beyond its control, including, but not limited to, acts of God, public enemies, war, civil disorder, fire, flood, explosion, labor disputes or strikes, or any acts or orders of any governmental authority.

11.9.   In the event any covenant, condition or provision herein contained is held to be invalid by any court of competent jurisdiction, the invalidity of such covenant, condition or provision shall in no way affect any other covenant, condition or provision herein contained; provided, however, that the invalidity of such covenant, condition or provision does not materially prejudice either party in its respective rights and obligations contained in the valid covenants, conditions or provisions of this Agreement.

11.10.  Either party may terminate this Agreement and its Annexes at any time if the other party becomes insolvent, makes a general assignment for the benefit of creditors or commits an act of bankruptcy or if a petition in bankruptcy or for its reorganization or the readjustment of its indebtedness be filed by or against it, provided the petition is found justified by the appropriate authority, or if a receiver, trustee or liquidator of all or substantially all of its property be appointed or applied for.

11.11.  If either party shall refuse, neglect or fail to perform, observe and keep any of the covenants, agreements, terms or conditions contained herein on its part to be performed, observed and kept and such refusal, neglect or failure shall continue for a period of thirty (30) days after written notice to either party by either party thereof (except in the case of non-payment of the price, wherein should such refusal, neglect or failure continue for a period of five (5) days after written notice to Buyer from Seller), either party shall have the right in addition to any other rights or remedies it may have to terminate this Agreement immediately upon written notice.

11.12.  The right of either party to require strict performance and observance of any obligations hereunder shall not be affected in any way by any previous waiver, forbearance or course of dealing. Exercise by either party of its right to terminate hereunder shall in no way affect or impair its right to bring suit for any default or breach of this Agreement.

11.13.  In the event of the Agreement or part thereof being terminated by notice or otherwise, such termination shall be without prejudice to the accrued rights and liabilities of either party prior to termination.

11.14.  This Agreement is conditioned upon the approval thereof, if necessary, by the appropriate government agency operating any airport location where this Agreement is to be performed. In the event any such approval is refused, or granted and later withdrawn, this Agreement shall automatically terminate with respect to such location.

11.15.  The Seller shall have the right at any time to vary the charges set out in the Annex(es) B upon giving to Buyer not less than thirty days previous notice specifying the revised charges which Seller proposes to introduce, together with the date (not earlier than the expiration of such notices) on which the new charges are to be brought into effect.

11.16.  Notwithstanding the foregoing, in the event that schedule changes made by Buyer affect Seller's cost in providing the services, Buyer shall provide Seller at least thirty (30) days advance notice and Buyer and Seller shall agree in advance to adjust the charges set forth in the applicable Annex B.

Signed the *7/23/91*

at Chicago, Illinois

for and on behalf of
UNITED AIR LINES, INC.

by

RICHARD I. FITZGERALD
DIRECTOR PURCHASING

Signed the    August 14, 1991

at           HANEDA, TOKYO

for and on behalf of
ALL NIPPON AIRWAYS CO., LTD.

by

DIRECTOR
ENGINEERING&MAINTENANCE
ADMINISTRATION

| DEPT | INITIAL |
|------|---------|
| SALES PP | X |
| USING | SEOGA SFOVU HANUMF |
| CREDIT | |
| MGR PP | |
| LAW | M |

UNITED CONTRACT
108536

ANNEX A - GROUND HANDLING SERVICES

to the Standard Ground Handling Agreement effective from   September 1, 1991

between     ALL NIPPON AIRWAYS CO., LTD.
            hereinafter referred to as the **Carrier** or **Buyer**

and:        UNITED AIR LINES, INC.
            hereinafter referred to as the **Handling Company** or **Seller**


This Annex A valid from:     September 1, 1991

and replaces:     New


## TABLE OF CONTENTS

GLOSSARY

SECTION 1        REPRESENTATION AND ACCOMMODATION

  1.1            General
  R.1.2          Disbursements
  R.1.3.         Accommodations


Section 2        LOAD CONTROL AND COMMUNICATIONS

  2.1            Load Control
  2.2            Communications


Section 3        UNIT LOAD DEVICE CONTROL

  R.3.1          Handling
  R.3.2          Administration


Section 4        PASSENGERS AND BAGGAGE

  4.1.           General
  4.2.           Departure
  4.3.           Arrival
  4.4.           Baggage Handling
  R.4.5          Town Terminal

Section 5      CARGO AND MAIL

    5.1.          Cargo Handling -- General
    5.2.          Export Cargo
    5.3.          Import Cargo
    5.4.          Transfer Cargo
    5.5.          Post Office Mail


Section 6      RAMP

    6.1.          Marshalling
    6.2.          Parking
    6.3.          Ramp to Flight Deck Communication
    6.4.          Loading and Unloading
    R.6.5         Starting
    6.6.          Safety Measures
    R.6.7         Moving of Aircraft


Section 7      AIRCRAFT SERVICING

    R.7.1.        Exterior Cleaning
    7.2.          Interior Cleaning
    7.3.          Toilet Services
    7.4.          Water Service
    R.7.5.        Cooling and Heating
    R.7.6         Snow and Ice Removal
    R.7.7.        Cabin Equipment


Section 8      FUEL AND OIL

    8.1.          Fuelling and/or Defueling.
    8.2.          Replenishing of Oils and Fluids


Section 9      AIRCRAFT MAINTENANCE

    9.1.          Routine Services
    R.9.2.        Non-routine Services
    R.9.3.        Material Handling
    R.9.4.        Parking and Hangar Space

Section 10       FLIGHT OPERATIONS AND CREW ADMINISTRATION

  10.1.          General
  10.2.          Flight Preparation at the Airport of Departure
  R.10.3.        Flight Preparation at a Point Different from airport of
                    departure
  10.4.          In-flight Assistance
  R.10.5.        Post-Flight Activities
  R.10.6.        In-flight Re-dispatch
  R.10.7.        Crew Administration


Section 11       SURFACE TRANSPORT

  11.1           General
  11.2           Special Transport


Section 12       CATERING SERVICES

  12.1.          Liaison and Administration
  R.12.2.        Catering Ramp Handling
  R.12.3.        Storage
  R.12.4.        Cleaning Services
  R.12.5.        Preparation


Section 13       SUPERVISION AND ADMINISTRATION

  13.1.          Supervisory Functions
  13.2.          Administrative Functions

GLOSSARY

For the sake of clarity, terms used in this Annex are defined hereunder:

AIRPORT TERMINAL means all buildings used for arrival and departure
handling of aircraft.

ARRANGE (OR MAKE ARRANGEMENTS FOR) implies that the Handling Company
may request an outside angency to perform the service in question.
The charge of the outside agency shall be paid by the Carrier. The
Handling Company assumes no liability toward the Carrier for such
arrangements.

CARGO includes the Carrier's service cargo and mail.

LOADS means baggage, cargo, mail and any aircraft supplies including
ballast.

PASSENGERS includes the Carrier's service and free passengers.

PROVIDE implies that the Handling Company itself assumes the responsibility for the provision of the service in question.

"R" denotes services which, unless explicitly included in Annex(es) B as part of the agreed services, may be performed on request and against additional charge. Once thus included in an Annex B for a certain location, such services are no longer considered as 'R' services at that location.

TECHNICAL LANDING is landing for other than commercial reasons where no physical change of load occurs.

TRANSIT FLIGHT is flight making an intermediate landing for commercial reasons where a change of load occurs.

TRUCK HANDLING means the handling to be given to a truck service from the moment the documents are handed to the Handling Company until the cargo is accepted to transfer or is accepted by the consignee/agent for clearance through customs; conversely, when transfer cargo from a flight is accepted or cargo is delivered at the warehouse by the shipper/agent "ready for carriage" until the truck is given clearance to leave the dock.

TRUCK SERVICE means a service operated by a truck on behalf of an airline as substitute for a flight, between airports, carrying cargo under air waybill(s) and manifested in accordance with the applicable IATA and/or ICAO rules, regulations and procedures.

In the Main Agreement and in Annex A, the word 'aircraft', will read as 'truck' and "flight" will read as 'truck service" when it concerns the handling of a truck as meant under the above definitions

TURNAROUND FLIGHT is aircraft terminating a flight and subsequently originating another flight following a change of load.

UNIT LOAD DEVICES (ULD) means a container or aircraft pallet (with or without net) designated to enable individual pieces of baggage, cargo or mail to be assembled and carried.

ANNEX A

SECTION 1.    REPRESENTATION AND ACCOMMODATION

1.1.    General

1.1.1.    If required, arrange guarantee or bond to facilitate the
Carrier's activities.  Cost for provisions of such guarantee
or bond may be recharged to the Carrier.

1.1.2.    Liaise with local authorities.

1.1.3.    Indicate that the Handling Company is acting as handling
agent for the Carrier.

1.1.4.    Inform all interested parties concerning movements of the
Carrier's aircraft.


R.1.2.    Disbursements

R.1.2.1.    As mutually agreed, pay, on behalf of the Carrier, airport,
customs, police and other charges relating to the services
performed.

R.1.2.2.    As mutually agreed, pay, on behalf of the Carrier,
out-of-pocket expenses, for example, accommodation, transport
and catering charges.

R.1.2.3.    As mutually agreed, pay Denied Boarding Compensation on behalf
of the Carrier.

R.1.3.    Accommodation

R.1.3.1.    Provide office space for accommodation of the Carrier's
representative(s).


SECTION 2.    LOAD CONTROL AND COMMUNICATIONS

2.1.    Load Control

2.1.1.    Convey and deliver flight documents between the aircraft and
appropriate airport buildings.

2.1.2.        (a) Prepare

              (b) Sign

              (c) Distribute

              (d) Clear

              (e) File

              as appropriate, documents, for example, loading instructions,
              loadsheets, balance charts, Captain's load information and
              manifests, in accordance with local or international
              regulations or as reasonably required by the Carrier.

2.1.3.        (a) Compile

              (b) Dispatch

              statistics, returns and reports, as mutually agreed.

2.2.          COMMUNICATIONS

2.2.1.        (a) Compile

              (B) Dispatch and receive

              all messages in connection with the services performed by the
              Handling Company, using the Carrier's originator code or
              double signature procedure, as applicable. Inform the
              Carrier's representative of the contents of such messages.

2.2.          Maintain a message file containing all above mentioned
              messages pertaining to each flight for ninety days.

R.2.3.        (a)  Provide

              (b)  Operate

              suitable means of communication between the ground station and
              the Carrier's aircraft.

SECTION 3.    UNIT LOAD DEVICE CONTROL

R.3.1.    Handling

R.3.1.1.    (a) Provide

or

(b) arrange for

suitable storage space for Unit Load Devices, protected
against local weather conditions.

R.3.1.2.    Apply correct storage and handling techniques in accordance
with the Carrier's requirements.

R.3.1.3.    Take appropriate action to prevent theft or unauthorized use
of, or damage to the Carrier's Unit Load Devices in the
custody of the Handling Company. Notify the Carrier
immediately of any damage to or loss of such items.

R.3.2.    Administration

R.3.2.1.    Maintain a stock record of all Unit Load Devices received and
dispatched in a suitable manner, as mutually agreed.

R.3.2.2.    Issue Control Receipts when Unit Load Devices are transferred
to or from the owning carrier on the instructions of the
delivering carrier.

R.3.2.3.    Compile and dispatch Stock Check Messages (SCM) as mutually
agreed.

R.3.2.4.    Compile and dispatch Unit Load Device Control Messages (UCM),
according to UCM procedure.

R.3.2.5.    Prepare Unit Device Receipt (LUC) for all transfers of Unit
Load Devices and obtain signature(s) of the transferring and
receiving carrier(s) or approved third parties and distribute
copies according to the Carrier's instructions.

R.3.2.6.    Handle lost, found and damaged Unit Load Device matters and
notify the Carrier on such irregularities.


SECTION 4.    PASSENGERS AND BAGGAGE

4.1.    General

4.1.1.    Inform passengers and/or public about time of arrival and/or
departure of Carrier's aircraft and surface transport.

4.1.2       Make arrangements for stopover, transfer and transit
            passengers and their baggage and inform them about services
            available at the airport.

4.1.3.      Assist passengers requiring special attention, for example,
            disabled passengers and unaccompanied children. When
            requested by the Carrier, provide or arrange for wheelchairs,
            special equipment and specially trained personnel, as
            available, for such assistance. Additional costs may be
            recharged to the Carrier.

4.1.4       Take care of passengers when flights are interrupted, delayed
            or cancelled, according to instructions given by the
            Carrier. If instructions do not exist, deal with such cases
            according to the custom of the Handling Company.

4.1.5.      If applicable, arrange storage of baggage in the Customs
            bonded store if required (any fees to be paid by the
            passenger).

4.1.6.      Notify the Carrier of complaints and claims made by the
            Carrier's clients and, by special arrangements, process such
            claims, as mutually agreed.

4.1.7.      Handle lost, found and damaged property matters, as mutually
            agreed.

4.1.8.      Report to the Carrier any irregularities discovered in
            passenger and baggage handling.

R.4.1.9.    Make available the Handling Company's special lounge
            facilities as specified in Annex(es) B.

R.4.1.10.   (a) Provide

            or

            (b) Arrange for

            personnel and/or facilities for security purposes, for
            example, baggage identification.

4.2.        Departure

4.2.1       Check and ensure that the tickets are valid for the flight for
            which they are presented. The check shall not include the
            fare.

4.2.2       By mutual agreement, check travel documents (passports, visas,
            vaccination and other certificates) for the flight concerned,
            but without liability for the Handling Company.

4.2.3.    (a)  Weigh and/or measure (as applicable), and tag checked and unchecked baggage.

(b)  Effect the conveyance of checked baggage from the baggage check-in position to the baggage sorting area.

4.2.4.    Enter baggage figures on passengers' ticket(s) and detach applicable flight coupon(s) and issue boarding pass(es).

4.2.5.    By mutual agreement, make out excess baggage ticket(s), collect excess baggage charge(s) and detach applicable excess baggage coupon(s).

R.4.2.6.    Where applicable, collect Airport Service Charges from departing passengers accounting therefor to the appropriate authorities.

R.4.2.7.    Carry out Carrier's seat allocation or selection system, as mutually agreed, for

(a) the flight concerned

(b) connecting flight(s)

4.2.8.    Direct passengers through controls to the aircraft.

4.2.9.    Carry out head check of passengers upon embarkation.  (Count to be compared with aircraft documents.)

R.4.2.10.    Handle Denied Boarding Compensation cases, as agreed with the Carrier.

R.4.2.11    Provide facility for accepting and processing of unaccompanied baggage.

**4.3.**    **Arrival.**

4.3.1.    Direct passengers from aircraft through controls to the terminal landside area.

4.3.2.    Deliver baggage in accordance with local procedures.

**4.4.**    **Baggage Handling.**

4.4.1.    Handle baggage in the baggage sorting area.

4.4.2.    Prepare for delivery onto flights,

(a)  Bulk baggage.

(b)  Unit Load Devices.

4.4.3.        Establish the weight of built-up Unit Load Devices.

4.4.4.        (a)  Offload bulk baggage from vehicles.

              (b)  Break down and/or empty Unit Load Devices, for example,
                   containers.

              (c)  Check incoming baggage for transfer connections.

4.4.5.        (a)  Sort transfer baggage.

              (b)  Store transfer baggage for a period to be mutually agreed
                   prior to dispatch.

4.4.6.        (a)  Provide

                   or

              (b)  Arrange

              transport of transfer baggage to the sorting area of the
              receiving carrier.

R.4.5         Town Terminal

R.4.5.1.      Inform passengers/public about time of arrival/departure

R.4.5.2.      Receive departing passengers and baggage.

R.4.5.3.      Carry out passenger and baggage handling as described in
              Sub-Sections 4.1. and 4.2., where applicable.

R.4.5.4.      Direct departing passengers to connecting transport for the
              airport.

R.4.5.5.      Receive passengers ex transport from the airport.

R.4.5.6.      Deliver baggage to passengers in accordance with local
              procedures.


SECTION 5 - CARGO AND MAIL

5.1.          Cargo Handling - General

              Physical Handling

5.1.1.        (a)  Provide facilities for handling of cargo, protecting
                   cargo from weather

              (b)  Take appropriate action to prevent theft of, or damage to
                   cargo.

R.5.1.2.    Provide as locally available, essential equipment and storage facilities for special cargo, for example, perishables, live animals, valuables, news films, dangerous goods and other special shipments.

5.1.3.    Store cargo for a period to be mutually agreed.

5.1.4    Obtain receipt upon delivery of cargo.

Document Handling

5.1.5.    Check all documents to ensure shipment may be carried in accordance with the Carrier's requirements. The check shall not include the rates charged.

5.1.6.    Place cargo under Customs' control, if required, and clear discrepancies in accordance with local regulations.

5.1.7.    Present to Customs, as required, cargo for physical examination.

5.1.8.    Take immediate action in accordance with the Carrier's and/or local authorities' instructions in respect of irregularities, damage or mishandling of dangerous goods and special cargo shipments.

5.1.9.    Report to the Carrier any irregularities discovered in cargo handling.

5.1.10.    Handle lost, found and damaged cargo matters, as mutually agreed.

5.1.11.    (a) Notify the Carrier of complaints and claims, giving supporting data.

(b) Process such claims, as mutually agreed.

Miscellaneous

5.1.12.    Take appropriate action to prevent theft or unauthorized use of, or damage to the Carrier's pallets, containers, nets, straps, tie-down rings and other material in the custody of the Handling Company.  Notify the Carrier immediately of any damage to or loss of such items.

R.5.1.13    (a) Provide

or

(b) Arrange for

facilities for handling special cargo products, as mutually agreed.

5.1.14.    Handle diplomatic mail, as mutually agreed.

5.1.15.    Handle company mail, as mutually agreed.

R.5.1.16.    (a) Provide

or

(b) Arrange for

security personnel and facilities.

R.5.1.17.    When requested by the Carrier or local authority, implement
security procedures, as mutually agreed (without the Handling
Company having any liability).

5.2.    Export Cargo

5.2.1.    Accept cargo in accordance with the Carrier's instructions,
ensuring adequate control that shipments are "Ready for
Carriage" and that the weight and volume of the shipments are
checked.

5.2.2.    Tally and assemble for dispatch cargo, up to capacity
available on the carrier's flights.

5.2.3.    Prepare

(a) Bulk cargo.

(b) Unit Load Devices

for delivery on to flights.

5.2.4.    Establish the weight of

(a) built-up Unit Load Devices

(b) bulk load

and provide the load control unit with deadload weights

Document Handling

5.2.5.    (a) Prepare cargo manifests.

(b) Provide the load control unit with Special Load
Notification, as required.

(c) Split air waybill sets. Forward applicable copies of
manifests and air waybills as mutually agreed

(d) Where applicable, return copy of air waybill to shipper, endorsed with flight details.

Customs Control

5.2.6.    Obtain Customs' export clearance.

R.5.2.7.    Prepare Customs documentation, for example, for cross-border truck services, as mutually agreed.

5.3.    **Import Cargo**

Physical Handling

5.3.1.    (a) Offload bulk cargo from vehicles, when applicable

(b) Break down and/or empty Unit Load Devices.

(c) Check incoming cargo against air waybills and manifests.

5.3.2.    Release cargo to the consignee or agent upon proper release by Customs and other government agencies, as required.

5.3.3.    Notify consignee or agent of arrival of shipments in accordance with applicable instructions.

R.5.3.4.    (a) Provide

or

(b) Arrange for

facilities for collection of "Charges Collect" as shown on the air waybills and extend credit to consignees or agents, as mutually agreed.

5.3.5    Take action in accordance with applicable instructions when consignee refuses acceptance or payment.

5.4.    **Transfer Cargo**

5.4.1.    **Identify transfer cargo**

5.4.2.    Prepare transfer manifests for cargo to be transported by another carrier.

5.4.3.    (a) Provide

or

(b) Arrange for

transport to the receiving carrier's warehouse on or in the close proximity of the airport of arrival, of transfer cargo under cover of Transfer Manifest.

5.4.4.    Accept/prepare transfer cargo for onward carriage.

**5.5.**    Post Office Mail

Physical Handling

5.5.1.    Check incoming mail against Post Office mail documents.

5.5.2    Deliver mail to postal authorities against Post Office mail documents for receipt.

5.5.3.    Accept and check outgoing mail from the postal authorities against Post Office mail documents receipt.

5.5.4.    Handle transfer mail.

Document Handling

5.5.5.    Distribute incoming/outgoing Post Office mail documents.

5.5.6.    Handle lost, found and damaged mail matters and report all irregularities to the Carrier and postal authorities in accordance with local practices.

5.5.7.    Maintain a file on all mail matters including irregularities for a period to by mutually agreed.

Miscellaneous

R.5.5.8.    (a) Provide

or

(b) Arrange for

security personnel and facilities.

R.5.5.9.    When requested by the Carrier or local authority, implement security procedures, as mutually agreed (without the Handling Company having any liability).


**SECTION 6.**    RAMP

**6.1.**    Marshalling

6.1.1.    (a) Provide

or

(b) Arrange for

marshalling at arrival and/or departure.

6.2.        Parking

6.2.1.      (a) Provide

            (b) Position and/or remove

            wheelchocks.

6.2.2.      Position and/or remove

            (a) landing gear locks

            (b) engine blanking covers

            (c) pitot covers

            (d) surface control locks

            (e) tailstands and/or aircraft tethering.

R.6.2.3.    (a) Provide

            (b)  Position and remove

            (c) Operate

            suitable ground power unit for supply of necessary
            electrical power. Any time limit to be specified in
            Annex(es) B.

6.3.        Ramp to Flight deck Communication

R.6.3.1.    Provide headsets

6.3.2.      Perform ramp to flight deck communication

            (a) on arrival

            (b) on departure

            (c) for other purposes

6.4.        Loading and Unloading

6.4.1.        For a period to be mutually agreed,

              (a) provide

              (b) position and remove

              suitable passenger steps.

              (c) provide

              (d) position and remove

              suitable loading bridges.

              (e) provide

              (f) position and remove

              flight deck steps.

R.6.4.2.      Provide

              (a) passenger

              (b) crew

              transport between aircraft and airport terminals.

6.4.3.        (a) Provide

              (b) Operate

              suitable equipment for loading and/or unloading.

6.4.4.        (a) Provide           .

              (b) Operate

              suitable equipment for transport of loads between agreed
              points on the airport as required. (Equipment to be released
              and/or made available, as mutually agreed.)

6.4.5.        Assemble/deliver/receive loads.

6.4.6.        (a) Unload loads from aircraft, returning lashing materials
                  to the Carrier.

              (b) Load, stow and secure loads in the aircraft in accordance
                  with the Carrier's instructions and procedures. (Lashing
                  materials may be charged at cost.)

              (c) Operate in-plane loading systems in accordance with the
                  Carrier's instructions.

6.4.7.     Load, stow and secure special cargo, for example, perishables, live animals, valuables, news films, dangerous goods and other special shipments in accordance with the Carrier's instructions.

6.4.8.     Redistribute loads in aircraft according to the Carrier's instructions.

6.4.9.     (a) Open and secure aircraft hold doors.

Secure and lock aircraft hold doors when loading is complete.

R.6.4.10.   Refill the Carrier's ballast bags with ballast approved by the Carrier.

R.6.4.11.   Provide filled ballast bags.

R.6.4.12.   Arrange for safeguarding of all loads with special attention to valuables and vulnerable cargo during loading/unloading and during transport between aircraft and airport terminal(s).

R.6.5.     Starting.

R.6.5.1.    (a) Provide

(b) Position and remove

(c) Operate

appropriate unit(s) for engine starting.

6.6.      Safety Measures

6.6.1.     (a) Provide

(b) Position and remove

(c) Operate

suitable fire fighting equipment and other protective equipment, as required.

R.6.6.2.    (a) Provide

or

(b) Arrange for

aircraft security personnel.

R.6.7.    Moving of Aircraft

R.6.7.1.    (a) Provide

(b) Position and remove

suitable towing and/or push back equipment. (Towbar to be provided by the Carrier unless otherwise agreed).

(c) Tow/and/or push aircraft according to the Carrier's instructions.

(d) Tow aircraft between other agreed points according to the Carrier's instructions.

R.6.7.2.    Move aircraft under its own power in accordance with the Carrier's instructions.


SECTION 7 - AIRCRAFT SERVICING

R.7.1.    Exterior Cleaning

R.7.1.1.    Perform exterior cleaning of flight deck windows.

R.7.1.2.    Perform reasonable cleaning of aircraft integral steps.

R.7.1.3.    Wipe excess oil from engine nacelles and landing gear.

R.7.1.4    Clean wings, controls, engine nacelles and landing gear.

R.7.1.5.    Clean cabin windows.


7.2.    Interior Cleaning

7.2.1.    Clean and tidy flight deck according to the Carrier's instructions and, if specified, under the control of a person authorized by the Carrier by

(a) emptying ash trays
(b) disposing of litter
(c) clearing waste from seat back stowages and racks
(d) wiping crew tables
(e) cleaning and tidying seats
(f) mopping floor
(g) cleaning windscreen on inside, as requested.

7.2.2.    Clean and tidy, as appropriate,

(1) crew compartments (other than flight deck)
(2) lounges
(3) bars, pantries, galleys
(4) passenger cabins
(5) toilets
(6) cloakrooms
(7) vestibules

by

(a) emptying ash trays
(b) disposing of litter
(c) clearing waste from seat back and overhead stowages.
(d) wiping tables
(e) cleaning and tidying seats and passenger service units
(f) cleaning the floors (carpets and surrounds)
(g) wiping surfaces in pantries (sinks and working surfaces) and toilets (wash basins, bowls, seats,mirrors and surrounds)
(h) removing, as necessary any contamination caused by air-sickness, spilled food or drink and offensive stains.

7.2.3.    Clean and tidy pantry/galley fixtures and empty and clean refuse bins.

R.7.2.4.    Clean floor and floor covers extensively

R.7.2.5.    Clean cabin fixtures and fittings.

R.7.2.6.    Clean cabin windows.

R.7.2.7.    Clean

(a) cargo holds.

(b) cargo cabins.

(c) Unit Load Devices

R.7.2.8.    Fold and stow blankets.

R.7.2.9.    Make up berths.

R.7.2.10.    Change

(a) head rest covers.

(b) pillow covers.

Covers to be supplied by the Carrier.

R.7.2.11.      Distribute in

(a) cabin

(b) toilets

items provided by the Carrier.

R.7.2.12       Disinfect and/or deodorize aircraft (materials may be supplied
by the Carrier).

7.3.       Toilet Service

7.3.1.      (a) Provide

(b) Position and remove

toilet servicing unit.

(c) Empty, clean, flush toilets and replenish fluids in
accordance with the Carrier's instructions.

7.4.       Water Service

7.4.1.      (a) Provide

(b) Position and remove

water servicing unit.

(c)  Replenish water tanks with drinking water, the standard
of which is to meet the Carrier's requirements.

R.7.5.      Cooling and Heating

R.7.5.1.     (a) Provide

(b) Position and remove

(c) Operate

cooling unit.

R.7.5.2.     (a) Provide

(b) Position and remove

(c) Operate

heating unit.

R.7.6.          Snow and Ice Removal

R.7.6.1.        Remove snow from the aircraft without deicing.

R.7.6.2.        (a) Provide

                (b) Position and remove

                (c) Operate

                deicing unit.

R.7.7.          Cabin Equipment

R.7.7.1.        Rearrange cabin by

                (a) removing

                (b) installing

                seats and other cabin equipment.

R.7.7.2.        Handle In-flight Entertainment matters, as agreed.


SECTION 8   FUEL AND OIL

8.1.            Fuelling and/or Defueling.

8.1.1.          Liaise with fuel suppliers.

8.1.2.          Inspect fuel appliances for contamination of fuel.

8.1.3.          Prepare aircraft for fuelling/defueling.

8.1.4.          Supervise fuelling/defueling. operations.

8.1.5.          Check the delivered fuel quantity.

8.1.6.          Drain water from aircraft fuel tanks.

8.2.            Replenishing of Oils and Fluids

8.2.1.          Liaise with suppliers.

8.2.2.          Supervise replenishing operation.

8.2.3.          (a) Provide

                (b) Operate

                special replenishing equipment.

SECTION 9 – AIRCRAFT MAINTENANCE

9.1.        Routine Services

9.1.1.      Perform line inspection in accordance with the Carrier's
            current instructions.

9.1.2.      Enter in the aircraft log and sign for the performance of the
            line inspection.

9.1.3       Enter remarks in the aircraft log regarding defects observed
            during the inspection.

9.1.4.      Perform pre-flight check immediately before aircraft
            departure.

9.1.5.      Provide skilled personnel to assist the flight crew or ground
            staff in the performance of the inspection.

R.9.2.      Non-Routine Services

R.9.2.1.    Rectify defects entered in the aircraft log as reported by the
            crew or revealed during the inspection to the extent requested
            by the Carrier.

            However, major repairs must be especially agreed upon between
            the Carrier and the Handling Company.

R.9.2.2.    Enter in the aircraft log and sign for the action taken.

R.9.2.3.    Report technical irregularities and actions taken to the
            Carrier's maintenance base in accordance with the Carrier's
            instructions.

R.9.2.4.    Maintain the Carrier's technical manuals, handbooks, catalogs,
            etc.

R.9.2.5.    Provide engineering facilities, tools and special equipment to
            the extent available.

R.9.3.      Material Handling

R.9.3.1.    (a) Obtain Customs' clearance for

            (b) Administer

            the Carrier's spare parts, power plants and/or equipment.

R.9.3.2.    Provide periodic inspection of the Carrier's spare parts
            and/or spare power plant.

R.9.3.3        Provide suitable storage space for accommodation of the
               Carrier's spare parts and/or special equipment.

R.9.3.4.       Provide suitable storage space for accommodation of the
               Carrier's spare power plant.

**R.9.4.**     **Parking and Hangar Space**

R.9.4.1.       (a) Provide

               or

               (b) Arrange for

               suitable parking space.

R.9.4.2.       (a) Provide

               or

               (b) Arrange for

               suitable hangar space.


SECTION 10     FLIGHT OPERATIONS AND CREW ADMINISTRATION

   10.1.       General

   10.1.1.     Inform the Carrier of any known project affecting the
               operational services and facilities made available to its
               aircraft in the areas of responsibility specified in Annex(es)
               B.

   10.1.2.     Keep up-to-date all necessary manuals and instructions that
               the Carrier must provide and ensure that all prescribed forms
               are available.

   10.1.3.     After consideration of the Carrier's instructions, suggest the
               appropriate action to pilot-in-command in case of operational
               irregularities, taking into account the meteorological
               conditions, the ground services and facilities available,
               aircraft servicing possibilities and the overall operational
               requirements.

   10.1.4.     Maintain a trip file by collecting all documents specified by
               the Carrier, all messages received or originated in connection
               with each flight and dispose of this file as instructed by the
               Carrier.

10.2.       Flight Preparation at the Airport of Departure

10.2.1.     Arrange for the provision of the meteorological documentation
            and aeronautical information for each flight.

10.2.2.     Analyze the operational conditions and

            (a) prepare or request

            (b) sign

            (c) make available

            the operational flight plan according to the instructions and
            data provided by the Carrier.

10 2 3      (a) Prepare or request

            (b) Sign

            (c) File

            the Air Traffic Services (ATS) Flight Plan.

10.2.4.     Furnish the crew with an adequate briefing.

10 2.5.     (a) Prepare

            (b) Sign

            The fuel order.

10.2.6.     Hand out flight operation forms as specified by the Carrier
            and obtain signature of the pilot-in-command, where
            applicable.

10.2.7.     Supply the appropriate local ground handling unit with the
            required weight and fuel data.

**R.10.3.**     **Flight Preparation at a Point Different from the Airport of
            Departure.**

R.10.3.1.   Analyze the operational conditions and

            (a) prepare or request

            (b) sign

            (c) make available

            the operational flight plan according to the instructions and
            data provided by the Carrier.

R.10.3.2.     Send to the Carrier or its representative at the airport of departure

              (a) the operational flight plan

              (b) The ATS Flight Plan

              as specified in Annex(es) B, including information for crew briefing.

10.4.         In-flight Assistance

10.4.1.       Follow up the progress of the flight against flight movement messages, flight plan messages and position reports received.

10.4.2.       Provide information on flight progress to the Carrier's ground handling representative.

10.4.3.       Assist the flight as requested and/or deemed necessary to facilitate its safe and efficient conduct, in accordance with the flight plan.

10.4.4.       Monitor the movement of the flight within VHF range and provide assistance, as necessary.

10.4.5.       Take immediate and appropriate action in case of in-flight irregularity, according to the Carrier's instructions (written or verbal.

10.4.6.       Log and notify as specified by the Carrier any incident of an operational nature (delays, diversions, engine trouble, etc.).

R.10.4.7.     Perform in-flight assistance, including re-dispatch until adjacent area is able to accept responsibility if, for reasons of communications failure, weather phenomena, safety of aircraft or emergency, it is undesirable to stop these services at the area boundary specified in Annex(es) B. Similar conditions may make it desirable to transfer these services to the next area before the area boundary is crossed.

R.10.4.8.     Provide assistance to the flight, as required, beyond the VHF ranges.

R.10.5.       Post-flight Activities

R.10.5.1.     Obtain a debriefing from incoming crews, distributing reports or completed forms to offices concerned, whether governmental or Carriers.

R.10.6.       In-flight Re-dispatch

R.10.6.1.     Analyze meteorological information and the operational flight
              conditions for re-dispatch, calculating and planning it
              according to the data provided by the aircraft in flight, and
              informing the pilot-in-command about the results thus
              obtained.

R.10.7.       Crew Administration

R.10.7.1.     Perform crew administration services, as mutually agreed.


SECTION 11    SURFACE TRANSPORT

   11.1.       General

   11.1.1.     Make all necessary arrangements for the transport of

              (1) crews

              (2) passengers

              (3) baggage

              (4) cargo and/or mail

              between

              (a) airport and town terminal

              (b)  airport and other agreed points

              (c) separate terminals at the same airport.

   11.2.       Special Transport

   11.2.1.     Make all necessary arrangements for special transport within
              the limit of local possibilities.


SECTION 12    CATERING SERVICES

   12.1.       Liaison and Administration

   12.1.1.     Liaise with the Carrier's catering supplier.

   12.1.2.     Handle requisitions made by the Carrier's authorized
              representative.

R.12.1.3.    Complete stock returns and other documentation.

R.12.1.4.    Maintain stocks at agreed levels

R.12.1.5.    Pack and dispatch catering items, as agreed.

R.12.1.6.    (a) Provide

or

(b) Arrange for

security personnel and/or facilities.

R.12.2.    Catering Ramp Handling

R.12.2.1.    Unload/load and stow catering loads from/on aircraft.

R.12.2.2.    Transfer catering loads on the aircraft.

R.12.2.3.    Transport catering loads between the aircraft and agreed points.

R.12.3.    Storage

R.12.3.1.    Provide, according to the Carrier's requirements

(a) bonded

(b) unbonded

(c) air conditioned

(d) cold

(e) deep freeze

storage accommodation.

R.12.3.2.    Store the carrier's

(a) spare catering equipment.

(b) consumable material.

(c) food stock.

(d) bar stock.

R.12.4.    Cleaning Services

R.12.4.1.    Empty, wash and clean removable catering equipment.

R.12.4.2.    Arrange for cleaning and/or laundering of cabin blankets and
linen.

R.12.4.3.    Remove and, as required, destroy food and material left over
from incoming flights in accordance with local regulations
and/or the Carrier's instructions.

R.12.5.    Preparation

R.12.5.1.    Refill removable containers with hot and/or cold drinking
water, the standard of which is to meet the Carrier's
requirements.

R.12.5.2.    Prepare and assemble for delivery

(a) materials and unprocessed articles

(b) bar and/or catering supplies and other goods

in accordance with agreed specifications.


SECTION 13    SUPERVISION AND ADMINISTRATION

13.1.    Supervisory Functions (pre-flight, on-flight and post-flight)

13.1.1.    Attend at the airport as necessary to supervise and coordinate
the ground handling services contracted by the Carrier with
third party(ies).

13.1.2.    Cooperate with the Carrier's designated representative, as
required.

13.1.3.    Ensure that the handling company(ies) is(are) timely informed
about operational data, including alterations.

13.1.4.    Check availability and preparedness of staff, equipment,
supplies and services of the handling company(ies) to perform
the ground handling services.

13.1.5.    Check preparation for documentation.

13.1.6.    Ensure that prompt notification of the Carrier's requirements
is given to all interested parties.

13.1.7.    Check that all loads, including necessary documents, will be
ready in time to be loaded on the flight.

13.1.8.    Meet aircraft upon arrival and contact crew.

13.1.9.    Receive briefing from crew and give information about
irregularities, changes in schedule or other matters.

13.1.10.    Supervise and coordinate the ground handling services, deciding non-routine matters, as required.

13.1.11.    Check dispatch of operational messages.

13.1.12.    Check tracings of baggage, cargo, mail and lost and found articles. Follow-up, if necessary.

13.1.13.    Note irregularities in station log and inform the Carrier's designated representative in accordance with the relevant directives.

**13.2.**        **Administrative Functions**

13.2.1.    Establish and maintain local procedures in accordance with the Carrier's requirements.

13.2.2.    As required, take action on all communications addressed to the Carrier.

13.2.3.    Prepare, forward and file reports/statistics/documents and perform any other administrative duty that may be required by the Carrier or local conditions.

13.2.4.    Maintain the Carrier's manuals, circulars, etc., connected with the performance of the services.

13.2.5.    Check and sign on behalf of the Carrier invoices, supply orders, handling charge notes, work orders, etc., as agreed with the Carrier.


Signed the *7/23/91*                    Signed the   AUGUST 14, 1991

at Chicago, Illinois                    at           HANEDA, TOKYO


| DEPT. | INITIAL |
|-------|---------|
| SALES |         |
| PP    |         |
| USING | SAVD JINGEN GWKMF |
| CREDIT |        |
| MGR. PP |       |
| LAW   |         |

for and on behalf of                    for and on behalf of
**UNITED AIR LINES, INC.**                ALL NIPPON AIRWAYS CO., LTD.

by                                       by

**RICHARD J. FITZGERALD**
**DIRECTOR PURCHASING**                   DIRECTOR

                                         ENGINEERING&MAINTENANCE

                                         ADMINISTRATION



**UNITED SERVICES**

INTERNATIONAL AIRLINES TECHNICAL POOL | **Ground Handling Agreement**

United Contract No. 108536-13

Annex B.1.2

Total of 5 Pages

# UNITED SERVICES' IATA STANDARD GROUND HANDLING AGREEMENT

| SIMPLIFIED PROCEDURE |

### Annex B - Location(s), Agreed Services, Charges and Supplementary Conditions

to the Standard Ground Handling Agreement (SGHA) of April 1998

between: **ALL NIPPON AIRWAYS CO., LTD (NH)**

having its principal office at:

**3-5-4 Haneda Airport**
**Ota-ku, Tokyo 144-0041**
**Japan**

and hereinafter referred to as 'the Carrier'

and: **UNITED AIR LINES, INC. (UA)**

having its principal office at:

**1200 East Algonquin Road**
**Elk Grove Township, Illinois  60007, USA**

and hereinafter referred to as 'the Handling Company'

using FAA Certificate number UALR011A.

| This Annex B for the location(s): | **San Francisco Int'l. Airport, San Francisco,, California USA (SFO)** |
| --- | --- |
| is valid from: | **25 September, 2001** |
| and replaces: | **Annex B.1.1 dated 1 August, 2000.** |

**PREAMBLE:**

This Annex B is prepared in accordance with the simplified procedure whereby the Carrier and the Handling Company agree that, except for the terms set forth in this Annex B, the terms of the Main Agreement and Annex A of the SGHA of April 1998 as published by the International Air Transport Association shall apply as if such terms were repeated herein in full. By signing this Annex B, the parties confirm that they are familiar with the aforementioned Main Agreement, Annex A and International Airline Technical Pool Rules.

**PARAGRAPH 1.    HANDLING CHARGES**

1.1.    For a single ground handling consisting of the arrival and the subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A of the SGHA of April 1998:

1.1.1    Section 6.  RAMP

6.1.1

6.2.1, 6.2.2(on request), 6.2.3(on request; additional charges apply)

6.3.1  6.3.2(a)(b)

6.5.1(a)(b)(c)(on request; additional charges apply)

6.6.1

6.7.1(a)(b)(c)(d)(e)



# UNITED SERVICES

### INTERNATIONAL AIRLINES TECHNICAL POOL        **Ground Handling Agreement**

Section 7.    AIRCRAFT SERVICING
>    7.1.1(on request; additional charges apply)
>    7.5.1(as requested, additional charges apply), 7.5.2(as requested, additional charges apply)

Section 8.  FUEL AND OIL
>    8.1.1, 8.1.2(a)(b), 8.1.3(a)(b), 8.1.4, 8.1.5, 8.1.6, 8.1.9, 8.1.10, 8.1.11
>    8.2.1, 8.2.2, 8.2.3(a)(b)

Section 9.  AIRCRAFT MAINTENANCE
>    9.1.1, 9.1.2, 9.1.3, 9.1.4(a)(b), 9.1.5
>    9.2.1, 9.2.2, 9.2.3, 9.2.4, 9.2.5 (on request, additional charge shall apply)
>    9.3.1(b), 9.3.2, 9.3.3
>    9.4.1(a)(b), 9.4.2(a) (if available, additional charge shall apply)

1.1.2.  The performance of the services listed in Sub-Paragraph 1.1 above shall be accomplished in accordance with Carrier's General Procedures Manual (GPM).

1.1.3.  For the performance of services listed in Sub-Paragraph 1.1, Section 9.3 above, The Handling Company will provide parts storage, parts handling, pick-up and delivery of parts at other airlines, and/or customs broker, and prepare airway bills; and conduct periodic inventories.

1.1.4.  For the performance of import services listed in Sub-Paragraph 1.1, Section 9.3.1 above, Carrier will arrange for an independent custom brokerage agent to clear inbound cargo shipments through Customs.  After Customs clearance is obtained, the Handling Company will arrange pick-up and transport of inbound material from the Customs / Cargo area to the Carrier's parts storage/airport office.

1.1.5.  For the performance of export services listed in Sub-Paragraph 1.1, Section 9.3.1 above, Handling Company will coordinate documentation and transport of outbound material shipments from the  Carrier's parts storage/airport office to Customs / Cargo area for uplift on Carrier's flights or other carrier's flights.

1.2    For the performance of the services listed in Sub-Paragraph 1.1, the Handling Company shall charge the Carrier for a single ground handling:

|  |  |
|---|---|
| B-777 aircraft check, including ETOPS check, with maintenance release | USD 850.00 |
| B-777 aircraft check without maintenance release | USD 775.00 |
| B-747-400 aircraft check with maintenance release | USD 865.00 |
| B-747-400 aircraft check without maintenance release | USD 790.00 |

1.2.1  For the charges in Paragraph 1.2 above Handling Company will provide at least one (1) NH certified staff and one (1) Aircraft Maintenance Technician (AMT), for a maximum total of six (6) man-hours.

1.2.2  Included in the charges in Paragraph 1.2 above Handling Company will provide a maximum of 50 square feet of storage of Carrier's spare parts.

1.2.3  Included in the charges in Paragraph 1.2 above Handling Company will provide initial training for Handling Company's AMTs.

1.3    **RATE INCREASES.**  Notwithstanding the provisions of Article 11.10 of the Main Agreement, the Handling Company shall not vary the charges set in Annex(es) B for a one (1) year period and thereafter with thirty (30) day notice. The price may be adjusted based on but not limited to changes to the (RPI)(CPI) or Handling Company's salary cost.

1.3.1  Notwithstanding the foregoing, when schedules change as mentioned in Sub Article 1.3 of the Main Agreement affect the handling cost, the Handling Company shall have the right to adjust the charges as from the date of the schedule change provided that the Handling Company does so within thirty (30) days of the schedule change.

1.4    Handling in case of technical landing for other than commercial purposes will be charged at fifty percent (50 %) of the above rates, provided that a physical change of load is not involved.

1.5    Handling in case of return to ramp will not be charged extra, provided that a physical change of load is not involved.

1.6    Handling in case of return to ramp involving a physical change of load will be charged as for handling in case of technical landing in accordance with Sub-Paragraph 1.2 of this Annex.



# UNITED SERVICES

**INTERNATIONAL AIRLINES TECHNICAL POOL**          **Ground Handling Agreement**

1.7     **OFF SCHEDULE OPERATIONS / CANCELLATIONS.** In the event Carrier's flight arrives late (60 minutes) or early (30 minutes) from a mutually agreed upon time, in addition to the per flight charge, Carrier shall reimburse Handling Company for overtime payments to Handling Company's personnel assigned to perform the services. Charges for overtime furnished, will be for the minimum period as established by Handling Company's local station policy.

1.7.1   Minimum billings shall consist of the Carrier's published flight schedule unless the Handling Company is notified of a flight cancellation in accordance with the following:

Hours Prior To Scheduled Flight
On Which Cancellation

| Notice Is Received | Cancellation Fee * |
|---|---|
| More Than 24 Hours | None |
| Less Than 24 Hours | 50% |

*Percentage of the applicable Handling fee.

1.7.2   Notwithstanding Paragraph 6 of this Annex B, any notice given pursuant to Paragraph 1.7 above, shall be deemed properly given if given to Handling Company's local station management.

## PARAGRAPH 2.   ADDITIONAL CHARGES

2.1     Services listed in Annex A which are not included in Paragraph 1 of this Annex B, and all other services unless set forth below, will be charged for at applicable current MAGSA rates.

2.2     For the performance of the services listed in Sub-Paragraph 1.1 which exceed six (6) man-hours, the Handling Company shall charge the Carrier for a single ground handling at applicable current MAGSA rates.

## PARAGRAPH 3.   DISBURSEMENTS

3.1     Any disbursements made by the Handling Company on behalf of the Carrier will be reimbursed by the Carrier at cost price plus an accounting surcharge of fifteen percent (15 %).

## PARAGRAPH 4.   RELEASE, INDEMNITY AND INSURANCE

4.1     Deletion and Replacement. Article 8, Liability and Indemnity, of the Main Agreement is hereby deleted in its entirety and replaced with the following Paragraph 4, Release, Indemnity and Insurance:

4.2     Release. Carrier hereby releases Handling Company, its directors, officers employees and agents from any and all liabilities, claims, demands, suits, damages and losses, including, without limitation, all attorneys' fees, costs and expenses in connection therewith or incident thereto which may accrue to Carrier against Handling Company for loss of, damage to, destruction of, any property owned or operated by Carrier, including without limitation any aircraft, in any manner arising out of or in any way connected with the services furnished or to be furnished by Handling Company under this Agreement.

4.2.1   Hull Damage Exception. - Notwithstanding the provisions of 4.2 above, Handling Company shall indemnify Carrier against any physical loss of or damage to Carriers aircraft caused by any negligent act or omission of Handling Company or by Handling Company's actual intent to cause such loss or damage, provided that Handling Company's obligation with respect to such loss or damage shall not, in any event (i) exceed USD 1,500,000, or (ii) apply to such loss or damage of an amount less than USD 3,000.

4.3     Indemnity. Carrier agrees to indemnify and hold harmless Handling Company, its directors, officers, employees and agents and affiliates (each an "indemnitee") from and against any and all liabilities, claims, demands, suits, damages and losses, including, without limitation, all reasonable attorneys' fees, costs, and expenses in connection therewith or incident thereto (including but not limited to reasonable attorneys' fees incurred by Handling Company in establishing its rights to indemnification hereunder) (collectively referred to in this Paragraph 4 as "Claims") of third parties for death of or bodily injury to any person or persons whomsoever (including, without limitation, Carrier's employees but excluding Handling Company's employees) and for loss of, damage to, destruction of, any property whatsoever (including, without limitation, any loss of use thereof), in any manner arising out of or in any way connected with goods or services furnished or to be furnished by Handling Company under this Agreement, all whether or not arising in tort or occasioned in whole or part by the negligence of Handling Company of any type or degree, provided that the foregoing indemnity obligation of the Carrier shall not apply to any such Claim resulting from any act of the Handling Company done with actual intent to cause such death, injury, loss, damage or destruction. Carrier shall, at the request of Handling Company, negotiate and



# UNITED SERVICES
# ☰☷

**INTERNATIONAL AIRLINES TECHNICAL POOL**          **Ground Handling Agreement**

defend any Claim brought against any Indemnitee or in which any Indemnitee is joined as a party defendant based upon any other matters for which Carrier has agreed to indemnify each Indemnitee as provided above Carrier's obligation under this Paragraph will survive the expiration or termination of this Agreement.

4.4    Insurance - Coverage.  Carrier will, at its sole cost and expense, procure and maintain in full force and effect during the term of this Agreement, policies of insurance of the type and minimum amounts stated below, and with insurers of recognized financial responsibility covering the liability of Carrier relating to the operation of its aircraft:

Aircraft liability insurance with minimum limit of $750,000,000 per occurrence; and all risk aircraft ground and flight hull insurance covering all aircraft used in connection with services performed hereunder

4.5    Insurance - Endorsement.  The policies of insurance described in Paragraph 4.4 will be endorsed to (i) waive rights of subrogation against Handling Company, its directors, officers, employees and agents thereunder with respect to the matters for which Carrier has released Handling Company pursuant to Paragraph 4.2, and (ii) name Handling Company, its directors, officers, employees and agents as additional assureds thereunder with respect to Claims of third parties for which Carrier is obligated to defend and indemnify Handling Company pursuant to Paragraph 4.3 provided, however, that such policies will specify with respect to Claims in favor of Handling Company, its directors, officers, employees and agents, that they will not be deemed as additional assureds thereunder, and expressly cover the obligations assumed by Carrier under Paragraph 4.3.  The insurance policies referred to in Paragraph 4.4 will contain Breach of Warranty clauses in behalf of Handling Company.

4.6    Evidence of Insurance.  The Carrier will provide Handling Company, prior to services being performed, evidence of such insurance as required in Paragraphs 4.4 and 4.5 satisfactory to Handling Company and providing 30 days notice of cancellation, non-renewal or adverse material change to the coverage required.

## PARAGRAPH 5.    CHOICE OF LAW

5.1    Notwithstanding Article 9.1 of the Main Agreement, this Agreement and any dispute arising under or in connection with this Agreement, including any action in tort, shall be governed by the laws of the state of California, USA.

## PARAGRAPH 6.    NOTICES

6.1    Any notice required or permitted under the terms and provisions of this Agreement shall be in writing and shall be delivered by hand or sent by telex or facsimile, confirmed by a letter dispatched by the close of business on the next succeeding business day, by certified mail, return receipt requested, or by overnight courier addressed to the parties as set forth in Paragraph 6.2.

6.2    Notwithstanding Article 11.3 of the SGHA Main Agreement, any notice of termination given by one party under this Agreement shall be deemed properly given if sent as stated in Paragraph 6.1 above in case of the Handling Company to:

United Air Lines, Inc. - WHQUS
Director – Airport Services
2850 West Golf Road, 6th Floor
Rolling Meadows, Illinois 60008-4099 USA

Telephone: 847 700-3912    Facsimile: 847 364-1849

And in case of the Carrier to:

ALL NIPPON AIRWAYS CO., LTD.
Director - Aircraft Maintenance Planning & Control
3-5-4 Haneda Airport
Ota-ku, Tokyo 144-0041
Japan

Telephone: 81-3-5756-5411                Facsimile: 81-3-5756-5407



# UNITED SERVICES

**INTERNATIONAL AIRLINES TECHNICAL POOL**          **Ground Handling Agreement**

**PARAGRAPH 7.   ACCOUNTING AND SETTLEMENT**

7.1    Notwithstanding Sub-Article 7.2 of the Main Agreement, settlement of account shall be as follows:

      Payment of charges will be made through the IATA Clearing House.

7.2    Invoices.  Handling Company will send all invoices to the Carrier at the following address:

      ALL NIPPON AIRWAYS CO., LTD.
      3-5-4 Haneda Airport
      Ota-ku, Tokyo 144-0041
      Japan
           Attn: Technical Sales & Contracts

**PARAGRAPH 8.   TRAINING**

8.1    Not applicable.

**PARAGRAPH 9.   PARTS PROVISIONING**

9.1    Upon Carrier's request and Handling Company's acceptance thereof, oils, grease and hydraulic fluids may be provided by the Handling Company to the Carrier at Handling Company's cost plus a fifteen percent (15 %) fee. All parts required for the proper servicing of the aircraft will be provided under separate agreement.

**PARAGRAPH 10.   DURATION, MODIFICATION AND TERMINATION**

10.1    Notwithstanding Article 11.4 of the Main Agreement, this Annex B Agreement shall be effective as of the date first set forth above and continue for a period of one (1) year, and year to year thereafter unless earlier terminated in accordance with the terms of this Agreement.

10.2    Modification of, or additions to this Agreement shall be recorded in amendments to this Annex B which will amend or supersede this Annex B.

10.3    After a period of twelve (12) months, either party may terminate this Agreement.  Such termination shall require not less than sixty (60) days previous written notice to the other party as set forth in Paragraph 6 above.

For and on behalf of                                    For and on behalf of

   UNITED AIR LINES, INC.                           ALL NIPPON AIRWAYS CO., LTD.

At   CHICAGO, ILLINOIS U.S.A.                 At   HANEDA, TOKYO    JAPAN

By:   _Michael Gentile_                             By:   _Hiroyuki Ito_

Printed Name:  Michael Gentile                 Printed Name:  Hiroyuki Ito

Title:  Manager, Line Maintenance Sales     Title: Director – Aircraft Maintenance Planning
                                         & Control