# EXHIBIT D

CONDON & FORSYTH LLP

NEW YORK
LOS ANGELES

Direct Dial: (212) 894-6750
Direct Fax: (212) 370-4453
mturner@condonlaw.com

September 28, 2007

***VIA FACSIMILE (212) 349-8226 without attachments***
***VIA EMAIL with attachments***

Walt Kopas, Vice President
United States Aviation Underwriters, Inc.
One Seaport Plaza
199 Water Street
New York, NY 10038-3526

**Re:** All Nippon Airways Company, Ltd. v. United Air Lines, Inc.
United States District Court for the Northern District of California
Case No. C 07 3422 EDL
C & F Ref.: MST/05901

Dear Walt:

Further to our telephone discussion of last week, I am writing in an effort to avoid a situation where the parties become increasingly entrenched in their positions to the point where it would become difficult for either side to take advantage of opportunities to amicably resolve this matter.

As I mentioned in our telephone discussion, one such situation appears to be the position of the parties with regard to the Standard Ground Handling Agreement. Based upon the presentations made by Jeff Worthe and Scott Torpey at our meetings in New York, along with Steve Fus's comments at that time and your comments during our telephone call last week, it appears that UAL's position is, at least in part, based upon anticipated benefits under the Standard Ground Handling Agreement (SGHA) to "defeat plaintiff's claims" and to "cap UAL's liability . . . at $1,500,000." See UAL's Affirmative Defense at paragraph 4 and UAL's Counter-Complaint at paragraphs 22-35. If UAL has a reasonable chance to prevail on these claims, perhaps ANA should reevaluate its position and, if UAL has absolutely no chance of prevailing on these allegations, perhaps UAL should reevaluate its position. However, as I will demonstrate below, if the correct SGHA's are used, there is no possibility of UAL prevailing on these allegations.

UAL's Counter-Complaint, COUNT THREE: BREACH OF CONTRACT and COUNT FOUR: DECLARATORY RELIEF, rely upon the SGHA Main Agreement and Annex A signed by United on July 23, 1991 and by ANA on August 14, 1991, in an attempt to identify a service under the SGHA that was provided at the time of the accident. UAL alleges in paragraphs 22 through 35 that "Moving aircraft under its own power" was such a service. However, according

to UAL's Exhibit 1, Annex B dated September 25, 2001, "the terms of the Main Agreement and Annex A of the SGHA of April 1998. . . shall apply as if such terms were repeated here in full." See UAL Counter-Complaint Exhibit 1, Annex B, page 1 PREAMBLE. Clearly, it cannot be disputed that the agreements that control the relationship of the parties at the time of the accident on October 7, 2003 are the SGHA of April 1998 as published by IATA and not the Main Agreement and Annex A contained in Exhibit 1 of UAL's Counter-Complaint which were signed in 1991. The correct Main Agreement and Annex A that would have been applicable to this October 7, 2003 accident make no mention of UAL providing a service to ANA of "Moving aircraft under its own power" as alleged by UAL. Even the version of Annex B attached to UAL's Counter-Complaint in Exhibit 1, does not refer to any service identified as "Moving aircraft under its own power" or to any section of the SGHA identified as "R.6.7.2." as alleged in paragraphs 23 and 31 of UAL's Counter-Complaint. See UAL Exhibit 1, Annex B, page 1, paragraph 1.1.1 as compared to the correct agreements attached hereto as Attachments 1, 2 and 3.

We should also note that even Annex B attached to UAL's Counter-Complaint in Exhibit 1 is not the correct Annex B that would have been applicable at the time of the accident. Annex B in Exhibit 1 "is valid from: 25 September 2001". However, the Annex B.1.2 dated 25 September 2001 was replaced by Annex B.1.3 dated 25 September 2002, which was the agreement in effect on October 7, 2003 at the time of the accident. See Attachment 3 attached to this letter. No mention is made in the SGHAs that were in effect at the time of the accident - neither the Main Agreement nor Annex A nor Annex B - that in any way identify or suggest any service to be provided by UAL to ANA that could be identified as "Moving aircraft under its own power" or as "Annex A, §§ 6.1.1(b), R.6.7.2".

Clearly, there is no possibility that anyone could interpret the correct SGHA to include a service that UAL was providing to ANA at the time of the accident on October 7, 2003.

As you know, it has been ANA's position that the provisions of the SGHA attached to UAL's Counter-Complaint and the allegations in UAL's Counter-Complaint have no relevance to any issue that has been raised in this litigation. We do not know how or why UAL has misrepresented to the Court that woefully outdated agreements control the relationship of the parties. We are not suggesting these were deliberate misrepresentations by anyone on behalf of UAL, but paragraphs 22 through 35 and Exhibit 1 of the Counter-Complaint are clearly misrepresentations that should be corrected by UAL immediately.

We are bringing these mistakes to your attention at this time, rather than springing them upon UAL in the presence of the Court or mediator, because we wish to fully lay our cards on the table and we have no desire to embarrass UAL, its insurers and/or its counsel. It is clear that serious mistakes have been made on behalf of UAL and that such mistakes must be corrected immediately.

Clearly, the services that were provided to ANA under the correct SGHA; at the gate; during pushback; and, during tow to the engine start line, had nothing to do with any claim or defense asserted in this litigation or this accident. The same is true for the Ramp Controller services that were provided to ANA. The Ramp Controller services that caused this accident were provided by UAL to UAL when UA809 was prematurely cleared to push into ANA's path. The services provided by UAL to UAL had nothing to do with ANA's SGHA.

Mr. Torpey is currently attempting to obtain the deposition of an ANA witness to testify regarding the SGHA and he has stated that he intends to move the Court to compel ANA to bring a witness from Japan to testify at deposition with regard to the SGHA. Clearly, such an effort, both the motion and deposition, would merely waste additional time and expense on an issue that would seemingly be closed. Again, we are not accusing UAL, USAIG or your counsel of deliberately misrepresenting these SGHA's in the signed pleadings filed with the Court, but these are simple facts that should be obvious to UAL. We would be constrained to vigorously oppose any such motion and deposition.

Neither ANA, nor Tokio Marine, nor any of the lawyers in my firm wish to embarrass UAL, USAIG or your counsel. If you have some basis to refute what appears to be obvious and indisputable facts, please bring such information to our attention immediately. Otherwise, please withdraw all claims regarding the SGHA and file an Amended Counter-Complaint that deletes COUNT THREE and COUNT FOUR in their entirety as well as paragraph 4 of the Affirmative Defenses contained in UAL's Answer and withdraw Exhibit 1.

In my view, if we were to spring these mistakes upon UAL in the presence of the Court or Mediator, we might gain some short-term strategic advantage, but it would only increase the parties' intransigence and reduce the possibility of an amicable resolution of this matter in the long run. As UAL has expressed a degree of reliance upon the SGHA to reduce ANA's chances of success in this case, we would expect that losing the SGHA as a defense would encourage UAL to reevaluate its position and perhaps improve the chances of a successful outcome through Mediation.

We would hope that bringing these mistakes to your attention and laying our cards on the table in this manner, would be interpreted as an indication of the confidence ANA has in its position and its desire to arrive at an amicable resolution of this matter that is fair to both sides. Based upon our discussion on the phone last week, it appears that you had misinterpreted my suggestion to initiate Mediation before embarking upon costly and time consuming depositions. However, as expressed several times in our telephone calls, emails and letters, ANA is prepared to proceed with the depositions of its flight crew on the dates requested by Mr. Torpey and we are prepared to proceed with depositions of UAL witnesses. However, in view of the above, we again suggest

that the parties reevaluate their positions before engaging in costly discovery and we again suggest that we give Mediation a chance before the parties become even more intransigent. Please do not again misinterpret our desire to give Mediation a chance before embarking upon costly and wasteful discovery as a lack of confidence in this case by ANA. To do so would be another mistake.

We look forward to receiving your comments and response to this letter, hopefully prior to the Court Conference next week.

Sincerely yours,

Marshall S. Turner

MST/hlj
Attachment
Cc: Frank Silane, Esq.
Scott Cunningham, Esq.
Scott R. Torpey, Esq.
Jeffrey A. Worthe, Esq.

# ATTACHMENT 1






**AHM 810**

# IATA STANDARD GROUND HANDLING AGREEMENT

## STANDARD GROUND HANDLING AGREEMENT (SGHA)

between:

and:

The agreement consists of:

**MAIN AGREEMENT**, and, as required,

**ANNEX A** (description of services)

**ANNEX(ES) B** (location(s), agreed services and charges)

**CONTENTS OF MAIN AGREEMENT**


| | |
|---|---|
| | DEFINITIONS AND TERMINOLOGY |
| **ARTICLE 1** | PROVISION OF SERVICES |
| **ARTICLE 2** | FAIR PRACTICES |
| **ARTICLE 3** | SUBCONTRACTING OF SERVICES |
| **ARTICLE 4** | CARRIER'S REPRESENTATION |
| **ARTICLE 5** | STANDARD OF WORK |
| **ARTICLE 6** | REMUNERATION |
| **ARTICLE 7** | ACCOUNTING AND SETTLEMENT |
| **ARTICLE 8** | LIABILITY AND INDEMNITY |
| **ARTICLE 9** | ARBITRATION |
| **ARTICLE 10** | STAMP DUTIES, REGISTRATION FEES |
| **ARTICLE 11** | DURATION, MODIFICATION AND TERMINATION |




ANA001159

**AHM 810** *(continued)*

## DEFINITIONS AND TERMINOLOGY

For the sake of clarity, the following definitions and terminology apply to the SGHA;

**AIRPORT TERMINAL** means all buildings used for arrival and departure handling of aircraft.

**ARRANGE** (or **MAKE ARRANGEMENTS FOR**) implies that the Handling Company may request an outside agency to perform the service in question. The charge of the outside agency shall be paid by the Carrier. The Handling Company assumes no liability toward the Carrier for such arrangements.

**AS MUTUALLY AGREED** or **BY MUTUAL AGREEMENT** or **BY THE CARRIER'S REQUEST**, it is recommended that, whenever this terminology is used, such items be supported by specific documentation or reference.

**CARGO** includes the Carrier's service cargo and company mail.

**THE CARRIER'S AIRCRAFT** means any aircraft owned, leased, chartered, hired or operated or otherwise utilised by or on behalf of the Carrier and in respect of which the Carrier has either expressly or implicitly contracted, instructed or otherwise requested the Handling Company to perform or carry out any ground handling service(s).

**DEPARTURE CONTROL SYSTEM (DCS)** means an automated method of performing check-in, capacity and load control and dispatch of flights.

**ELECTRONIC DATA INTERCHANGE (EDI)** means the computer-to-computer (application-to-application program processing) transmission of business data in a standard format.

**LOADS** means baggage, cargo, mail and any aircraft supplies including ballast.

**OWNING CARRIER** means a carrier who is the owner or lessee of a Unit Load Device.

**PASSENGERS** includes the Carrier's service and free passengers.

**PROVIDE** implies that the Handling Company itself assumes responsibility for the provision of the service in question.

**RECEIVING CARRIER** means a carrier who receives a Unit Load Device from a transferring carrier at a transfer point.

**SPECIAL SHIPMENTS** means, for example, perishables, live animals, valuables, vulnerable cargo, news material, dangerous goods etc.

**SPECIALISED CARGO PRODUCTS** means, for example, express cargo, courier shipments, same day delivery.

**TECHNICAL LANDING** is a landing for other than commercial reasons where no physical change of load occurs.

**TICKET** means either the document entitled "Passenger Ticket and Baggage Check" or any electronic ticket data held in the Carrier's data base.

**TRANSFERRING CARRIER** means a carrier who transfers a Unit Load Device to a receiving carrier at a transfer point.

**TRANSIT FLIGHT** is an aircraft making an intermediate landing for commercial reasons where a change of load occurs.

**TRUCK HANDLING** means loading and/or unloading a truck operating as a Truck Service.

**TRUCK SERVICE** means a service operated by truck on behalf of an airline carrying loads documented in accordance with the applicable IATA and/or ICAO rules, regulations and procedures. In the Main Agreement and in Annex A, the word "aircraft" will read "truck" and "flight" will read "truck service" when it concerns the handling of a truck as meant under the above definitions. In Section 5, item 5.3.1(a) of Annex A, the word "vehicle" means a conveyance of any kind to be used within the ramp area for transport of cargo between warehouse and truck or between two trucks or between two warehouses.

**TURNROUND FLIGHT** is an aircraft terminating a flight and subsequently originating another flight following a complete change of load.

**UNIT LOAD DEVICES (ULDs)** means devices which interface directly with an aircraft restraint system and are registered by the IATA ULD Technical Board.



ANA001160





**AHM 810** *(continued)*

## MAIN AGREEMENT

An Agreement made between:

having its principal office at:

hereinafter referred to as 'the Carrier' or 'the Handling Company' as the case may be,

and:

having its principal office at:

hereinafter referred to as 'the Handling Company' or 'the Carrier', as the case may be,

[the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"]

WHEREBY THE PARTIES AGREE AS FOLLOWS:

### ARTICLE 1

PROVISION OF SERVICES

1.1 **General**

The services will be made available within the limits of possibilities of the Handling Company and in accordance with the applicable IATA and/or ICAO and/or other governing rules, regulations and procedures.

It is not considered necessary or possible to specify every detail of the services it being generally understood what such services comprise and the standards to be attained in their performance.

1.2 **Documents for Ground Handling**

Documents used for ground handling will be the Handling Company's own documents, where applicable, provided these documents comply with standardised formats that may apply under IATA and/or ICAO and/or other governing rules, regulations and procedures.

1.3 **Scheduled Flights**

The Handling Company agrees to provide for the Carrier's Aircraft for flights operating on an agreed schedule at the location(s) mentioned in the Annex(es) B, those services of Annex A as are listed in the Annex B for the respective locations. The Carrier, in turn, agrees to inform the Handling Company as soon as possible about any changes of schedule and/or frequencies and/or types of aircraft.

1.4 **Extra Flights**

The Handling Company will also provide the services to the Carrier's Aircraft for flights in addition to the agreed schedule at the same locations, provided that reasonable prior notice is given and the provision of such additional services will not prejudice commitments already undertaken.

1.5 **Priority**

In case of multiple handling, priority shall, as far as possible, be given to aircraft operating on schedule.

1.6 **Emergency Assistance**

In case of emergency, including but not limited to, forced landings, accidents or acts of violence, the Handling Company shall without delay and without waiting for instructions from the Carrier take all reasonable and possible measures to assist passengers and crew and to safeguard and protect from loss or damage baggage, cargo and mail carried in the aircraft.

The Carrier shall reimburse the Handling Company at cost for any extra expenses incurred in rendering such assistance.

**AHM 810** *(continued)*

1.7 **Additional Services**

As far as possible, the Handling Company will, upon request, provide to the Carrier any additional services. Such services may be governed by special conditions to be agreed between the Parties.

1.8 **Other Locations**

In case of occasional flights of the Carrier's Aircraft at locations which are not designated in the present Agreement, where the Handling Company maintains a ground handling organisation, the Handling Company shall, on request, make every effort, subject to the means locally available, to furnish necessary services.

**ARTICLE 2**

FAIR PRACTICES

2.1 The Handling Company will take all practicable measures to ensure that sales information contained in the Carrier's flight documents is made available for the purposes of the Carrier only.

2.2 Neither Party to this Agreement shall disclose any information contained in Annex(es) B to outside parties without the prior consent of the other Party, unless such information is specifically required by applicable law or by governmental or authorities' regulations, in which case the other Party will be notified accordingly.

**ARTICLE 3**

SUBCONTRACTING OF SERVICES

3.1 The Handling Company is entitled to delegate any of the agreed services to subcontractors with the Carrier's consent, which consent shall not be unreasonably withheld. It is understood that, in this case, the Handling Company shall nevertheless be responsible to the Carrier for the proper rendering of such services as if they had been performed by the Handling Company itself. Any subcontracting of services will be recorded in the Annex(es) B concerned.

3.2 The Carrier shall not appoint any other person, company or organisation to provide the services which the Handling Company has agreed to provide by virtue of this Agreement, except in such special cases as shall be mutually agreed between the Parties.

**ARTICLE 4**

CARRIER'S REPRESENTATION

4.1 The Carrier may maintain at its own cost, its own representative(s) at the location(s) designated in the Annex(es) B. Such representative(s) and representative(s) of the Carrier's Head Office may inspect the services furnished to the Carrier by the Handling Company pursuant to this Agreement, advise and assist the Handling Company and render to the Carrier's clients such assistance as shall not interfere with the furnishing of services by the Handling Company.

4.2 The Carrier may, by prior written notice to the Handling Company and at its own cost, engage an organisation (hereinafter referred to as 'the Supervisor') to supervise the services of the Handling Company at the location(s) designated in Annex(es) B. Such notice shall contain a description of the services to be supervised.

The Supervisor shall have the same authority as defined above in Sub-Article 4.1 for the Carrier's own representative.

4.3 Such assistance, when performed by the Carrier's representative(s) and/or Supervisor(s) will be the sole responsibility of the Carrier, unless requested by the Handling Company.





**AHM 810** *(continued)*

**ARTICLE 5**

STANDARD OF WORK

5.1 The Handling Company shall carry out all technical and flight operations services in accordance with the Carrier's instructions, receipt of which must be confirmed in writing to the Carrier by the Handling Company.

In the case of absence of instructions by the Carrier, the Handling Company shall follow its own standard practices and procedures.

Other services also having a safety aspect, for example, load control, loading of aircraft and handling of dangerous goods, shall be carried out in accordance with applicable IATA and/or ICAO and/or other governing rules, regulations and procedures.

5.2 All other services shall be provided in accordance with standard practices and procedures usually followed by the Handling Company and in accordance with world-wide industry standards. The Handling Company will comply with reasonable requests of the Carrier as long as these do not conflict with the applicable orders and regulations of the appropriate authorities.

5.3. The Handling Company agrees to take all possible steps to ensure that, with regard to contracted services, the Carrier's Aircraft, crews, passengers and load receive treatment not less favourable than that given by the Handling Company to other Carriers or its own comparable operation at the same location.

5.4 The Handling Company agrees to ensure that authorisations of specialised personnel performing services for the Carrier are kept up-to-date. If at any time the Handling Company is unable to provide authorised personnel as requested by the Carrier, the Handling Company shall inform the Carrier immediately.

5.5 The Carrier shall supply the Handling Company with sufficient information and instructions to enable the Handling Company to perform its handling properly.

5.6 In the provision of the services as a whole, due regard shall be paid to safety, security, local and international regulations, applicable IATA and/or ICAO and/or other governing rules, regulations and procedures and the aforementioned request(s) of the Carrier in such a manner that delays and damage to the Carrier's Aircraft and load are avoided and the general public is given the best impression of air transport.

5.7 The Handling Company must report to the Carrier's representative immediately all loss of or damage, threatened or actual, to aircraft and loads noticed in the course of the handling or which in any other way comes to the knowledge of the Handling Company.

5.8 The Parties shall reach mutual agreement on the quality standards for any services, not excluding those covered by Sub-Article 5.1 above. Such quality standards for a specific location may form part of the applicable Annex B. The Handling Company agrees to take all possible steps to ensure that, with regard to contracted services, the agreed upon quality standards will be met.

**ARTICLE 6**

REMUNERATION

6.1 In consideration of the Handling Company providing the services, the Carrier agrees to pay to the Handling Company the charges set out in the respective Annex(es) B. The Carrier further agrees to pay the proper charges of the Handling Company and to discharge all additional expenditure incurred for providing the services referred to in Sub-Articles 1.4, 1.6, 1.7 and 1.8.

6.2 The charges set out in Annex(es) B do not include:

— any charges, fees or taxes imposed or levied by the Airport, Customs or other authorities against the Carrier or the Handling Company in connection with the provision of services herein by the Handling Company or in connection with the Carrier's flights.

— expenses incurred in connection with stopover and transfer passengers and with the handling of passengers for interrupted, delayed or cancelled flights.

Such charges, fees, taxes or other expenses as outlined above shall be borne ultimately by the Carrier;

**ARTICLE 7**

ACCOUNTING AND SETTLEMENT

7.1 The Handling Company shall invoice the Carrier monthly with the charges arising from the provision of the handling services of Annex A as listed in Annex(es) B at the rates of charges set out in Annex(es) B.

7.2 Settlement shall be effected through the IATA Clearing House unless otherwise agreed in Annex(es) B.

**ARTICLE 8**

LIABILITY AND INDEMNITY

In this Article, all references to:

(a) "the Carrier" or "the Handling Company" shall include their employees, servants, agents and subcontractors;

(b) "ground support equipment" shall mean all equipment used in the performance of ground handling services included in Annex A, whether fixed or mobile, and

(c) "act or omission" shall include negligence.

8.1 Except as stated in Sub-Article 8.5, the Carrier shall not make any claim against the Handling Company and shall indemnify it (subject as hereinafter provided) against any legal liability for claims or suits, including costs and expenses incidental thereto, in respect of:

(a) delay, injury or death of persons carried or to be carried by the Carrier;

(b) injury or death of any employee of the Carrier;

(c) damage to or delay or loss of baggage, cargo or mail carried or to be carried by the Carrier, and

(d) damage to or loss of property owned or operated by, or on behalf of, the Carrier and any consequential loss or damage;

arising from an act or omission of the Handling Company in the performance of this Agreement unless done with intent to cause damage, death, delay, injury or loss or recklessly and with the knowledge that damage, death, delay, injury or loss would probably result.

PROVIDED THAT all claims or suits arising hereunder shall be dealt with by the Carrier; and

PROVIDED ALSO THAT the Handling Company shall notify the Carrier of any claims or suits without undue delay and shall furnish such assistance as the Carrier may reasonably require.

PROVIDED ALSO THAT where any of the services performed by the Handling Company hereunder relate to the carriage by the Carrier of passengers, baggage or cargo direct to or from a place in the United States of America then if the limitations of liability imposed by Article 22 of the Warsaw Convention would have applied if any such act or omission had been committed by the Carrier but are held by a Court not to be applicable to such act or omission committed by the Handling Company in performing this Agreement then upon such decision of the Court the indemnity of the Carrier to the Handling Company hereunder shall be limited to an amount not exceeding the amount for which the Carrier would have been liable if it had committed such act or omission.

8.2 The Carrier shall not make any claim against the Handling Company in respect of damage, death, delay, injury or loss to third parties caused by the operation of the Carrier's aircraft arising from an act or omission of the Handling Company in the performance of this Agreement unless done with intent to cause damage, death, delay, injury or loss or recklessly and with knowledge that damage, death, delay, injury or loss would probably result.

8.3 (a) Notwithstanding the provisions of Sub-Article 8.1, in the case of claims arising out of surface transportation which is provided on behalf of the Carrier and is part of the operation of loading/embarking or unloading/disembarking and/or is covered by the Carrier's Contract of Carriage the indemnity shall not exceed the limits specified in the said Contract of Carriage.





**AHM 810** *(continued)*

(b) In the case of claims arising out of surface transportation which is not provided on behalf of the Carrier and/or is not part of the operation of loading/embarking or unloading/disembarking and/or is not covered by the Carrier's Contract of Carriage the waiver and indemnity herein contained shall not apply.

8.4 The Handling Company shall not make any claim against the Carrier and shall indemnify it (subject as hereinafter provided) against any legal liability for claims or suits, including costs and expenses incidental thereto, in respect of:

(a) injury to or death of any employees of the Handling Company, its servants, agents or subcontractors; and

(b) damage to or loss of property owned or operated by, or on behalf of, the Handling Company and any consequential loss or damage;

arising from an act or omission of the Carrier in the performance of this Agreement unless done with intent to cause damage, death, delay, injury or loss or recklessly and with knowledge that damage, death, delay, injury or loss would probably result.

8.5 Notwithstanding Sub-Article 8.1(d), the Handling Company shall indemnify the Carrier against any physical loss of or damage to the Carrier's Aircraft caused by the Handling Company's negligent operation of ground support equipment PROVIDED ALWAYS THAT the Handling Company's liability shall be limited to any such loss of or damage to the Carrier's Aircraft not exceeding the limits stated in Annex(es) B which shall not, in any event, exceed USD 1,500,000 except that loss or damage in respect of any incident below USD 3,000 shall not be indemnified.

For the avoidance of doubt, save as expressly stated, this Sub-Article 8.5 does not affect or prejudice the generality of the provisions of Sub-Article 8.1 including the principle that the Carrier shall not make any claim against the Handling Company and shall indemnify it against any liability in respect of any and all consequential loss or damage howsoever arising.

**ARTICLE 9**

ARBITRATION

9.1 Any dispute or claim concerning the scope, meaning, construction or effect of this Agreement or arising therefrom shall be referred to and finally settled by arbitration in accordance with the procedures set forth below and, if necessary, judgement on the award rendered may be entered in any Court having jurisdiction thereof:

(1) If the Parties agree to the appointment of a single arbitrator the arbitral tribunal shall consist of him alone. The arbitrator may be appointed either directly by the Parties or, at their request, by the IATA Director General.

(2) If they do not so agree to the appointment of a single arbitrator, the arbitral tribunal shall consist of three arbitrators appointed as follows:

(a) if only two Parties are involved in the dispute each Party shall appoint one of the three arbitrators. Should either Party fail to appoint his arbitrator such appointment shall be made by the IATA Director General;

(b) if more than two parties are involved in the dispute they shall jointly agree on the appointment of two of the arbitrators. Failing unanimous agreement thereon, such appointment shall be made by the IATA Director General;

(c) the two arbitrators appointed in the manner provided above shall appoint the third arbitrator, who shall act as chairman. Should they fail to agree on the appointment of the third arbitrator, such appointment shall be made by the IATA Director General.

(3) The IATA Director General may, at the request of any Party concerned, fix any time limit he finds appropriate within which the Parties or the arbitrators appointed by the Parties, shall constitute the arbitral tribunal. Upon expiration of this time limit, the IATA Director General shall take the action prescribed in the preceding paragraph to constitute the tribunal.

(4) When the arbitral tribunal consists of three arbitrators, its decision shall be given by a majority vote.



ANA001165




**AHM 810** *(continued)*

(5) The arbitral tribunal shall settle its own procedure and if necessary shall decide the law to be applied. The award shall include a direction concerning allocation of costs and expenses of and incidental to the arbitration (including arbitrator fees).

(6) The award shall be final and conclusively binding upon the Parties.

**ARTICLE 10**

STAMP DUTIES, REGISTRATION FEES

10.1 All stamp duties and registration fees in connection with this Agreement, which may be prescribed under the national law of either Party to this Agreement, are payable by that Party.

10.2 All stamp duties and registration fees in connection with this Agreement, which may be prescribed under the national law of the location(s), as mentioned in the Annex(es) B and not being a location situated in the country of either Party to this Agreement will be shared equally between the Parties.

**ARTICLE 11**

DURATION, MODIFICATION AND TERMINATION

11.1 This Agreement shall be effective from .................... . It shall supersede any previous arrangements between the Parties governing the provision of services at locations for which there are valid Annex(es) B to this Agreement.

11.2 Modification of, or additions to this Agreement shall be recorded in Annex(es) B.

11.3 Any notice referred to under this Article 11 given by one Party under this Agreement shall be deemed properly given if sent by registered letter to the respective Head Office of the other Party.

11.4 This Main Agreement shall continue in force until terminated by either Party giving sixty days prior notice to the other Party.

11.5 Termination by either Party of all or any part of the services to be furnished at a specific location requires sixty days prior notice to the other Party. In the event of part termination of services, consideration shall be given to an adjustment of charges.

11.6 In the event of the Carrier's or the Handling Company's permit(s) or other authorisation(s) to conduct its air transportation services, or to furnish the services provided for in the Annex(es) B, wholly or in part, being revoked, cancelled, or suspended, that Party shall notify the other Party without delay and either Party may terminate the Agreement or the relevant Annex(es) B at the effective date of such revocation, cancellation or suspension by giving to the other Party notice thereof within twenty-four hours after such event.

11.7 Either Party may terminate this Agreement and its Annexes at any time if the other Party becomes insolvent, makes a general assignment for the benefit of creditors, or commits an act of bankruptcy or if a petition in bankruptcy or for its reorganisation or the readjustment of its indebtedness be filed by or against it, provided the petition is found justified by the appropriate authority, or if a receiver, trustee or liquidator of all or substantially all of its property be appointed or applied for.

11.8 Both Parties shall be exempt from obligation if prompt notification is given by either Party in respect of any failure to perform its obligations under this Agreement arising from any of the following causes;

— labour disputes involving complete or partial stoppage of work or delay in the performance of work;

— force majeure or any other cause beyond the control of either Party.

11.9 In the event of the Agreement or part thereof being terminated by notice or otherwise, such termination shall be without prejudice to the accrued rights and liabilities of either Party prior to termination.





**AHM 810** *(continued)*

11.10 The Handling Company shall have the right at any time to vary the charges set out in the Annex(es) B provided, however, that the Handling Company has given notice in writing to the Carrier not less than thirty days prior to the revised charges becoming effective. The notice shall specify the revised charges which the Handling Company proposes to introduce, together with the date on which they are to be brought into effect.

Notwithstanding the foregoing, when schedule changes as mentioned in Sub-Article 1.3 affect the handling costs, the Handling Company shall have the right to adjust the charges as from the date of the schedule change provided that the Handling Company does so within thirty days of the schedule change.

Signed the ..........................................................

at ..........................................................

for and on behalf of ..........................................................

by ..........................................................

Signed the ..........................................................

at ..........................................................

for and on behalf of ..........................................................

by ..........................................................

# ATTACHMENT 2





AHM 810 — Annex A

## IATA STANDARD GROUND HANDLING AGREEMENT

## STANDARD GROUND HANDLING AGREEMENT

### Annex A — Ground Handling Services

to the Standard Ground Handling Agreement
effective from:
between:
hereinafter referred to as 'the Carrier' or 'the Handling Company', as the case may be,
and:
hereinafter referred to as 'the Handling Company' or 'the Carrier', as the case may be.
This Annex A
is valid from:
and replaces:

### TABLE OF CONTENTS


SECTION 1. REPRESENTATION AND ACCOMMODATION
1.1 General

SECTION 2. LOAD CONTROL, COMMUNICATIONS AND DEPARTURE CONTROL SYSTEM
2.1 Load Control
2.2 Communications
2.3 Departure Control System (DCS)

SECTION 3. UNIT LOAD DEVICE (ULD) CONTROL
3.1 Handling
3.2 Administration

SECTION 4. PASSENGERS AND BAGGAGE
4.1 General
4.2 Departure
4.3 Arrival
4.4 Baggage Handling
4.5 Remote/Off Airport Services
4.6 Intermodal Transportation

SECTION 5. CARGO AND POST OFFICE MAIL
5.1 Cargo Handling — General
5.2 Outbound (Export) Cargo
5.3 Inbound (Import) Cargo
5.4 Transfer/Transit Cargo
5.5 Post Office Mail




ANA001168





## AHM 810 — Annex A *(continued)*

| | |
|---|---|
| SECTION 6. | RAMP |
| 6.1 | Marshalling |
| 6.2 | Parking |
| 6.3 | Ramp to Flight Deck Communication |
| 6.4 | Loading/Embarking and Unloading/Disembarking |
| 6.5 | Starting |
| 6.6 | Safety Measures |
| 6.7 | Moving of Aircraft |

| | |
|---|---|
| SECTION 7. | AIRCRAFT SERVICING |
| 7.1 | Exterior Cleaning |
| 7.2 | Interior Cleaning |
| 7.3 | Toilet Service |
| 7.4 | Water Service |
| 7.5 | Cooling and Heating |
| 7.6 | De-icing/Anti-icing Services and Snow/Ice Removal According to the Carrier's Instructions |
| 7.7 | Cabin Equipment and Inflight Entertainment Material |
| 7.8 | Storage of Cabin Material |

| | |
|---|---|
| SECTION 8. | FUEL AND OIL |
| 8.1 | Fuelling and/or Defuelling |
| 8.2 | Replenishing of Oils and Fluids |

| | |
|---|---|
| SECTION 9. | AIRCRAFT MAINTENANCE |
| 9.1 | Routine Services |
| 9.2 | Non-routine Services |
| 9.3 | Material Handling |
| 9.4 | Parking and Hangar Space |

| | |
|---|---|
| SECTION 10. | FLIGHT OPERATIONS AND CREW ADMINISTRATION |
| 10.1 | General |
| 10.2 | Flight Preparation at the Airport of Departure |
| 10.3 | Flight Preparation at a Point Different from the Airport of Departure |
| 10.4 | In-flight Assistance |
| 10.5 | Post-flight Activities |
| 10.6 | In-flight Re-despatch |
| 10.7 | Crew Administration |

| | |
|---|---|
| SECTION 11. | SURFACE TRANSPORT |
| 11.1 | General |
| 11.2 | Special Transport |

| | |
|---|---|
| SECTION 12. | CATERING SERVICES |
| 12.1 | Liaison and Administration |
| 12.2 | Catering Ramp Handling |





ANA001169





**AHM 810 — Annex A** *(continued)*

SECTION 13. SUPERVISION AND ADMINISTRATION
13.1 Supervisory Functions of Services Provided by Others
13.2 Administrative Functions

SECTION 14. SECURITY
14.1 Passengers and Baggage Screening and Reconciliation
14.2 Cargo and Post Office Mail
14.3 Catering
14.4 Aircraft Security
14.5 Additional Security Services



ANA001170





**AHM 810 — Annex A** *(continued)*

**SECTION 1. REPRESENTATION AND ACCOMMODATION**

**1.1 General**

1.1.1 If required, arrange guarantee or bond to facilitate the Carrier's activities.

1.1.2 Liaise with local authorities.

1.1.3 Indicate that the Handling Company is acting as handling agent for the Carrier.

1.1.4 Inform all interested Parties concerning movements of the Carrier's aircraft.

1.1.5 As mutually agreed, effect payment, on behalf of the Carrier, including but not limited to:

(a) airport, customs, police and other charges relating to the services performed.

(b) cost for provisions of bond guarantee.

(c) out-of-pocket expenses, accommodation, transport, etc..

1.1.6 Provide office space for the Carrier's representative(s).

**SECTION 2. LOAD CONTROL, COMMUNICATIONS AND DEPARTURE CONTROL SYSTEM**

**2.1 Load Control**

2.1.1 Convey and deliver flight documents between the aircraft and appropriate airport buildings.

2.1.2 (a) Prepare

(b) Sign

(c) Distribute

(d) Clear

(e) File

as appropriate, documents, including but not limited to, loading instructions, loadsheets, balance charts, Captain's load information and manifests, in accordance with local or international regulations or as reasonably required by the Carrier.

2.1.3 (a) Compile

(b) Despatch

statistics, returns and reports, as mutually agreed.

**2.2 Communications**

2.2.1 (a) Compile

(b) Despatch and receive

all messages in connection with the services performed by the Handling Company, using the Carrier's originator code or double signature procedure, as applicable. Inform the Carrier's representative of the contents of such messages. Charges for transmitting messages may be recharged to the Carrier.





**AHM 810 — Annex A** *(continued)*

2.2.2 Maintain a message file containing all above mentioned messages pertaining to each flight for ninety days.

2.2.3 (a) Provide

(b) Operate

suitable means of communication between the ground station and the Carrier's aircraft.

**2.3 Departure Control System (DCS)**

2.3.1 (a) Provide

(b) Operate

equipment and facilities to allow the Handling Company access to the Carrier's DCS, as mutually agreed.

2.3.2 Access the following facilities in the Carrier's DCS:

(a) Training programme.

(b) Check-In.

(c) Boarding Control.

(d) Baggage reconciliation.

(e) Baggage tracing.

(f) Load Control.

(g) Other services, as mutually agreed.

**SECTION 3. UNIT LOAD DEVICE (ULD) CONTROL**

**3.1 Handling**

3.1.1 (a) Provide

or

(b) Arrange for

suitable storage space for ULDs, as mutually agreed.

3.1.2 Apply correct storage and handling techniques in accordance with the Carrier's requirements.

3.1.3 Take appropriate action to prevent theft or unauthorised use of, or damage to the Carrier's ULDs in the custody of the Handling Company. Notify the Carrier immediately of any damage to or loss of such items.

**3.2 Administration**

3.2.1 (a) Take physical inventory of ULD stock and maintain a stock record.

(b) Compile and despatch ULD Control Messages (UCM), according to UCM procedure.

(c) Compile and despatch Stock Check Messages (SCM), as mutually agreed.

3.2.2 Prepare ULD exchange control (LUC) for all transfers of ULDs and obtain signature(s) of the transferring and receiving carrier(s) or approved third parties and distribute copies according to the Carrier's instructions.

3.2.3 Handle lost, found and damaged ULD matters and notify the Carrier of such irregularities.

**SECTION 4. PASSENGERS AND BAGGAGE**

**4.1 General**

4.1.1 Inform passengers and/or public about time of arrival and/or departure of Carrier's aircraft and surface transport.



ANA001172




**AHM 810 — Annex A** *(continued)*

4.1.2 Make arrangements for stopover, transfer and transit passengers and their baggage and inform them about services available at the airport.

4.1.3 When requested by the Carrier,

(a) provide

or

(b) arrange for

special equipment, facilities and specially trained personnel, as available, for assistance to

(1) unaccompanied minors.

(2) disabled passengers.

(3) VIPs.

(4) transit without visa passengers (TWOVs).

(5) deportees.

(6) others, as specified.

Additional costs may be recharged to the Carrier.

4.1.4 Take care of passengers when flights are interrupted, delayed or cancelled, according to instructions given by the Carrier. If instructions do not exist, deal with such cases according to the practice of the Handling Company.

4.1.5 If applicable, arrange storage of baggage in the Customs' bonded store if required (any fees to be paid by the passenger).

4.1.6 Notify the Carrier of complaints and claims made by the Carrier's clients and, process such claims, as mutually agreed.

4.1.7 Handle lost, found and damaged property matters, as mutually agreed.

4.1.8 Report to the Carrier any irregularities discovered in passenger and baggage handling.

4.1.9 (a) Provide

or

(b) Arrange for
(1) check-in position(s),
(2) service counter(s)/desk(s) for other purposes,
(3) lounge facilities,

as specified in Annex(es) B.

4.1.10 (a) Provide

or

(b) Arrange for

personnel and/or facilities for porter service.

**4.2 Departure**

4.2.1 Check and ensure

(a) that tickets are valid for the flight(s) for which they are presented. The check shall not include the fare

(b) when requested, check that tickets presented are not blacklisted in the industry ticket service data base. Blacklisted documents shall not be honoured and immediately reported to the Carrier, as mutually agreed.

**AHM 810 — Annex A** *(continued)*

4.2.2 By mutual agreement, check travel documents (passports, visas, vaccination and other certificates) for the flight(s) concerned, but without the Handling Company having any liability.

4.2.3 (a) Weigh and/or measure (as applicable), and tag checked and unchecked baggage.

(b) Effect the conveyance of checked baggage from the baggage check-in position to the baggage sorting area.

Additional costs for baggage requiring special handling may be recharged to the Carrier.

4.2.4 (a) Enter baggage figures on passengers' ticket(s) and detach applicable flight coupon(s)

(b) Enter baggage figures for ticketless passengers, as mutually agreed

for

(1) initial flight.
(2) subsequent flight(s).

4.2.5 By mutual agreement, make out excess baggage ticket(s), collect excess baggage charge(s) and detach applicable excess baggage coupon(s).

4.2.6 As mutually agreed, collect airport and /or any other service charges from departing passengers accounting therefor to the appropriate authorities.

4.2.7 (a) Carry out the Carrier's seat allocation or selection system
(b) Issue boarding pass(es)

for

(1) initial flight.
(2) subsequent flight(s).

4.2.8 Direct passengers through controls to the aircraft.

4.2.9 Carry out head check of passengers upon embarkation. (Count to be compared with aircraft documents.)

4.2.10 Handle Denied Boarding Compensation cases, as agreed with the Carrier.

4.2.11 Provide facility for accepting and processing of unaccompanied baggage.

4.2.12 (a) Provide
(b) Manage
(c) Maintain
automated check-in device(s), as mutually agreed. Additional costs may be recharged to the Carrier.

**4.3 Arrival**

4.3.1 Direct passengers from aircraft through controls to the terminal landside area.

4.3.2 Deliver baggage in accordance with local procedures.

**4.4 Baggage Handling**

4.4.1 Handle baggage in the baggage sorting area.

4.4.2 Prepare for delivery onto flights

(a) bulk baggage

(b) ULDs

according to the Carrier's instructions.

4.4.3 Establish the weight of built-up ULDs.





**AHM 810 — Annex A *(continued)***

4.4.4 (a) Offload bulk baggage from vehicles.

(b) Break down and/or empty ULDs.

(c) Check incoming baggage for transfer connections.

4.4.5 (a) Sort transfer baggage.

(b) Store transfer baggage for a period to be mutually agreed prior to despatch.

4.4.6 (a) Provide

or

(b) Arrange for

transport of transfer baggage to the sorting area of the receiving carrier.

4.4.7 Handle crew baggage, as mutually agreed.

**4.5 Remote/Off Airport Services**

4.5.1 Inform passengers/public about time of arrival/departure.

4.5.2 Receive departing passengers and baggage.

4.5.3 Carry out passenger and baggage handling as described in Sub-Sections 4.1 and 4.2, where applicable.

4.5.4 Direct departing passengers to connecting transport to the airport.

4.5.5 Receive passengers arriving from the airport.

4.5.6 Deliver baggage to passengers in accordance with local procedures.

**4.6 Intermodal Transportation**

**Departure by rail, road or sea**

4.6.1 Receive departing passengers and baggage from the Carrier.

4.6.2 Carry out passenger and baggage handling as described in Sub-Sections 4.1 and 4.2, where applicable, substituting "rail, road or sea transportation" for "aircraft", and "flight(s)", and "terminal" for "airport", as applicable.

4.6.3 Direct departing passengers to connecting transport.

4.6.4 If applicable, load baggage on connecting transport, as directed by the rail, road or sea transporter.

**Arrival by rail, road or sea**

4.6.5 Receive arriving passengers and baggage from the rail, road or sea transporter.

4.6.6 Carry out passenger and baggage handling as described in Sub-Sections 4.1 and 4.3, where applicable, substituting "rail, road or sea transportation" for "aircraft" and "flight(s)", and "terminal" for "airport", as applicable.

4.6.7 Direct arriving passengers through controls to the Carrier's flight departure services.

4.6.8 If applicable, offload baggage from connecting transport, as directed by the rail, road or sea transporter and transfer it to the Carrier's airport services.

**AHM 810 — Annex A** *(continued)*

**SECTION 5. CARGO AND POST OFFICE MAIL**

**5.1 Cargo Handling — General**

**Facilities and Equipment**

5.1.1 (a) Provide

(b) Arrange

suitable warehouse and handling facilities for
(1) general cargo.
(2) special shipments.
(3) specialised cargo products.

(c) Store cargo for a period to be mutually agreed,

(d) Take appropriate action to prevent theft of, or damage to cargo, as mutually agreed.

5.1.2 (a) Provide

(b) Arrange

suitable equipment for the handling of
(1) general cargo,
(2) special shipments,
(3) specialised cargo products,

as mutually agreed.

5.1.3 (a) Provide

(b) Arrange
handling services for
(1) general cargo,
(2) special shipments,
(3) specialised cargo products,

as mutually agreed.

**Document Handling**

5.1.4 (a) Issue

(b) Obtain

receipt upon delivery of cargo.

5.1.5 Receive, process and send all or any messages as required by the Carrier and as mutually agreed.

**Customs Control**

5.1.6 Place cargo under Customs control, if required, and clear discrepancies in accordance with local regulations.

5.1.7 Present to Customs, as required, cargo for physical examination.

**Irregularities Handling**

5.1.8 Take immediate action in accordance with the Carrier's and/or local authorities' instructions in respect of irregularities, damage or mishandling of dangerous goods and other special shipments.

5.1.9 Report to the Carrier any irregularities discovered in cargo handling.

5.1.10 Handle lost, found and damaged cargo matters, as mutually agreed.

**AHM 810 — Annex A** *(continued)*

5.1.11 (a) Notify the Carrier of complaints and claims, giving supporting data.

(b) Process such claims, as mutually agreed.

**Miscellaneous**

5.1.12 Take appropriate action to prevent theft or unauthorised use of, or damage to, the Carrier's pallets, containers, nets, straps, tie-down rings and other material in the custody of the Handling Company. Notify the Carrier immediately of any damage to or loss of such items.

5.1.13 Handle, as mutually agreed,

(a) diplomatic cargo.

(b) diplomatic mail.

(c) company mail.

**5.2 Outbound (Export) Cargo**

**Physical Handling**

5.2.1 Accept cargo in accordance with the Carrier's instructions, ensuring that

(a) machine-readable cargo labels are affixed and processed, where applicable.

(b) shipments are "ready for carriage".

(c) the weight and volume of the shipments are checked.

(d) the regulations for the carriage of special cargo, particularly the IATA Dangerous Goods Regulations (DGR), IATA Live Animals Regulations (LAR), and others have been adhered to.

5.2.2 Tally and assemble for despatch cargo for the Carrier's flights.

5.2.3 Prepare

(a) bulk cargo

(b) ULDs

for delivery onto flights.

5.2.4 Establish the weight of

(a) bulk load

(b) built-up ULDs

and provide the load control unit with deadload weights.

**Document Handling**

5.2.5 (a) Check all documents to ensure shipment may be carried in accordance with the Carrier's requirements. The check shall not include the rates charged.

(b) Obtain capacity/booking information for the Carrier's flights.

(c) Split airwaybill sets. Forward applicable copies of manifests and air waybills, as mutually agreed.

(d) Prepare cargo manifests.

(e) Provide the load control unit with Special Load Notification, as required.

(f) Where applicable, return copy of airwaybill to shipper, endorsed with flight details.



ANA001177





**AHM 810 — Annex A** *(continued)*

**Customs Control**

5.2.6 Obtain Customs export clearance.

5.2.7 Prepare Customs documentation, for example, for cross-border truck services, as mutually agreed.

**5.3 Inbound (Import) Cargo**

**Physical Handling**

5.3.1 (a) Offload bulk cargo from vehicles, when applicable.

(b) Break down and/or empty ULDs.

(c) Check incoming cargo against airwaybills and manifests.

5.3.2 Release cargo to the consignee or agent upon proper release by Customs and other government agencies, as required.

**Document Handling**

5.3.3 (a) Notify consignee or agent of arrival of shipments, in accordance with applicable instructions.

(b) Make available cargo documents to consignee or agent.

5.3.4 (a) Provide

or

(b) Arrange for

facilities for collection of "Charges Collect" as shown on the airwaybills and extend credit to consignees or agents, as mutually agreed.

**Irregularities Handling**

5.3.5 Take action in accordance with applicable instructions when consignee refuses acceptance or payment.

**5.4 Transfer/Transit Cargo**

5.4.1 Identify transfer/transit cargo.

5.4.2 Prepare transfer manifests for cargo to be transported by another carrier.

5.4.3 (a) Provide

or

(b) Arrange for

transport to the receiving carrier's warehouse on or in the close proximity of the airport of arrival, of transfer cargo under cover of Transfer Manifest.

5.4.4 Accept/prepare

(a) transfer cargo

(b) transit cargo

for onward carriage.

**5.5 Post Office Mail**

**Physical Handling**

5.5.1 (a) Provide

or

(b) Arrange for

essential equipment, storage and handling facilities.



ANA001178

**AHM 810 — Annex A** *(continued)*

5.5.2 Check incoming mail against Post Office mail documents. Issue substitute documents, if necessary.

5.5.3 Deliver mail, together with Post Office mail documents, against receipt to postal authorities.

5.5.4 Check outgoing mail from postal authorities against mail documents. Give receipt of acceptance of mail to postal authorities.

5.5.5 Handle and check transfer mail against accompanying mail documents. Issue subsititute documents, if necessary.

**Document Handling**

5.5.6 Distribute incoming/outgoing Post Office mail documents.

**Irregularities Handling**

5.5.7 Handle lost, found and damaged mail matters and report all irregularities to the Carrier and postal authorities in accordance with local practices.

5.5.8 Maintain a file on all mail matters including irregularities for a period to be mutually agreed.

**SECTION 6. RAMP**

**6.1 Marshalling**

6.1.1 (a) Provide

or

(b) Arrange for

marshalling at arrival and/or departure.

**6.2 Parking**

6.2.1 (a) Provide

(b) Position and/or remove

wheelchocks.

6.2.2 Position and/or remove

(a) landing gear locks.

(b) engine blanking covers.

(c) pitot covers.

(d) surface control locks.

(e) tailstands and/or aircraft tethering.

6.2.3 (a) Provide

(b) Position and remove

(c) Operate

suitable ground power unit for supply of necessary electrical power. Any time limit to be specified in Annex(es) B.

**6.3 Ramp to Flight Deck Communication**

6.3.1 Provide headsets.

6.3.2 Perform ramp to flight deck communication

(a) during tow-in and/or push-back.

(b) during engine starting.

(c) for other purposes.





## AHM 810 — Annex A *(continued)*

**6.4 Loading/Embarking and Unloading/Disembarking**

6.4.1 For a period to be mutually agreed,

(a) Provide

(b) Position and remove

(1) suitable passenger steps.

(2) suitable loading bridges.

(3) flight deck steps.

6.4.2 Provide

(a) passenger

(b) crew

transport between aircraft and airport terminals.

6.4.3 (a) Provide

(b) Operate

suitable equipment for loading and/or unloading.

6.4.4 (a) Provide

(b) Operate

suitable equipment for transport of Loads between agreed points on the airport, as required. (Equipment to be released and/or made available, as mutually agreed.)

6.4.5 Assemble/deliver/receive Loads.

6.4.6 (a) Unload Loads from aircraft, returning lashing materials to the Carrier.

(b) Load, stow and secure Loads in the aircraft in accordance with the Carrier's instructions and procedures. (Cost for lashing materials may be recharged to the Carrier.)

(c) Operate in-plane loading system in accordance with the Carrier's instructions.

6.4.7 Load, stow and secure perishables, live animals, valuables, news films, dangerous goods and other special shipments in accordance with the Carrier's instructions.

6.4.8 Redistribute Loads in aircraft according to the Carrier's instructions.

6.4.9 (a) Open and secure aircraft hold doors.

(b) Secure and lock aircraft hold doors when loading is complete.

6.4.10 Refill the Carrier's ballast bags with ballast approved by the Carrier.

6.4.11 Provide filled ballast bags.

6.4.12 Arrange for safeguarding of all Loads with special attention to valuables and vulnerable cargo during loading/unloading and during transport between aircraft and airport terminal(s).

**6.5 Starting**

6.5.1 (a) Provide

(b) Position and remove

(c) Operate

appropriate unit(s) for engine starting.





## AHM 810 — Annex A *(continued)*

**6.6 Safety Measures**

6.6.1 (a) Provide

(b) Position and remove

(c) Operate

suitable fire-fighting and other protective equipment.

**6.7 Moving of Aircraft**

6.7.1 (a) Provide

(b) Position and remove

suitable tow-in and/or push-back equipment. (Towbar to be provided by the Carrier unless otherwise agreed.)

(c) Tow in and/or push back aircraft according to the Carrier's instructions.

(d) Tow aircraft between other agreed points according to the Carrier's instructions.

(e) Provide authorised cockpit brake operator in connection with towing.

## SECTION 7. AIRCRAFT SERVICING

**7.1 Exterior Cleaning**

7.1.1 Perform cleaning of

(a) flight deck windows.

(b) cabin windows.

7.1.2 Perform reasonable cleaning of aircraft integral steps.

7.1.3 Wipe excess oil from engine nacelles and landing gear.

7.1.4 Clean wings, controls, engine nacelles and landing gear.

**7.2 Interior Cleaning**

7.2.1 Clean and tidy flight deck according to the Carrier's instructions and, if specified, under the control of a person authorised by the Carrier, by

(a) emptying ash trays.

(b) disposing of litter.

(c) clearing waste from seat back stowage's and racks.

(d) wiping crew tables.

(e) cleaning and tidying seats.

(f) mopping floor.

(g) cleaning flight deck windows on inside, as requested.

7.2.2 As appropriate,

(a) empty ash trays

(b) dispose of litter

(c) clear waste from seat back and overhead stowages

(d) wipe tables

(e) clean and tidy seats and passenger service units

(f) clean floors (carpets and surrounds)





**AHM 810 — Annex A** *(continued)*

(g) wipe surfaces in pantries, galleys (sinks and working surfaces) and toilets (wash basins, bowls, seats, mirror and surrounds)

(h) remove, as necessary, any contamination caused by airsickness, spilled food or drink and offensive stains

(i) clean telephones, fax machines, LCD screens and any other equipment according to the Carrier's instructions in

(1) crew compartments (other than flight deck).
(2) lounges.
(3) bars, pantries, galleys.
(4) passenger cabins.
(5) toilets.
(6) cloakrooms.
(7) vestibules.

7.2.3 As appropriate,

(a) empty

(b) clean

all refuse bins.

(c) clean and tidy pantry/galley fixtures.

7.2.4 Clean floor and floor covers extensively.

7.2.5 Clean cabin fixtures and fittings.

7.2.6 Clean cabin windows.

7.2.7 Clean

(a) cargo holds.

(b) cargo cabins.

(c) ULDs.

7.2.8 Fold and stow blankets.

7.2.9 Make up berths.

7.2.10 Change

(a) head rest covers.

(b) pillow covers.

Covers to be supplied by the Carrier.

7.2.11 Distribute in

(a) cabin

(b) toilets

items provided by the Carrier.

7.2.12 Disinfect and/or deodorize aircraft (materials may be supplied by the Carrier).

7.2.13 (a) Remove

(b) Destroy

food and material left over from incoming flights in accordance with local regulations and/or the Carrier's instructions.

7.2.14 (a) Provide

(b) Arrange

for cleaning and/or laundering of cabin blankets and linen.



ANA001182





**AHM 810 — Annex A** *(continued)*

**7.3 Toilet Service**

7.3.1
(a) Provide
(b) Position and remove toilet servicing unit.
(c) Empty, clean, flush toilets and replenish fluids in accordance with the Carrier's instructions.

**7.4 Water Service**

7.4.1
(a) Provide
(b) Position and remove

water servicing unit.

(c) Replenish water tanks with drinking water, the standard of which is to meet the Carrier's requirements.

7.4.2 Drain water tanks, according to the Carrier's instructions and local regulations.

**7.5 Cooling and Heating**

7.5.1
(a) Provide
(b) Position and remove
(c) Operate

cooling unit. Any time limit to be specified in Annex(es) B.

7.5.2
(a) Provide
(b) Position and remove
(c) Operate

heating unit. Any time limit to be specified in Annex(es) B.

**7.6 De-icing/Anti-icing Services and Snow/Ice Removal According to the Carrier's Instructions**

7.6.1 Remove snow from aircraft without using de-icing fluid.

7.6.2
(a) Provide
(b) Position and remove
(c) Operate
(1) anti-icing units.
(2) de-icing units.

7.6.3 Provide de-icing/anti-icing fluids meeting the Carrier's specifications.

7.6.4 Remove frost, ice and snow from aircraft using de-icing fluid. Fluids to receive purity and contamination inspection prior to use.

7.6.5 Apply anti-icing fluid to aircraft.

7.6.6 Supervise performance of de-icing/anti-icing operations.

7.6.7 Perform final inspection after de-icing/anti-icing operations and inform flight crew of results.

**7.7 Cabin Equipment and Inflight Entertainment Material**

7.7.1 Rearrange cabin by
(a) removing
(b) installing

cabin equipment, for example, seats and cabin divider.

**AHM 810 — Annex A *(continued)***

7.7.2 Collect and/or distribute

(a) airline magazines

(b) newspapers/magazines

(c) menus

(d) headphones

(e) others

according to the Carrier's instructions.

**7.8 Storage of Cabin Material**

7.8.1 Provide suitable storage space for the Carrier's cabin material, as mutually agreed.

7.8.2 Take periodic inventory.

7.8.3 (a) Provide

or

(b) Arrange for

replenishment of stocks.

**SECTION 8. FUEL AND OIL**

**8.1 Fuelling and/or Defuelling**

8.1.1 Liaise with fuel suppliers.

8.1.2 (a) Inspect the Carrier's fuel product deliveries for contamination, prior to storage, in accordance with the Carrier's instructions. Notify the Carrier of results.

(b) Inspect fuel vehicles and/or appliances for contamination. Notify the Carrier of results.

8.1.3 If applicable, supervise the placement of the Carrier's product into storage at

(a) the Handling Company's facility.

(b) a storage facility designated by the Carrier.

8.1.4 Supervise fuelling/defuelling operations.

8.1.5 Prepare aircraft for fuelling/defuelling.

8.1.6 Drain water from aircraft fuel tanks.

8.1.7 Receive the Carrier's product from storage in quantities requested.

8.1.8 (a) Provide

(b) Position, remove and operate

approved fuelling/defuelling equipment.

8.1.9 Fuel/defuel aircraft with quantities of products requested by the Carrier's designated representative.

8.1.10 Check and verify the delivered fuel quantity.

8.1.11 Deliver the completed fuel order(s) to the Carrier's designated representative.

8.1.12 Maintain records of all fuelling/defuelling operations and provide the Carrier with an inventory and usage summary in accordance with the Carrier's instructions.

**8.2 Replenishing of Oils and Fluids**

8.2.1 Liaise with suppliers.





**AHM 810 — Annex A** *(continued)*

8.2.2 Perform or supervise replenishing operations.

8.2.3 (a) Provide
(b) Operate
special replenishing equipment.

SECTION 9. AIRCRAFT MAINTENANCE

**9.1 Routine Services**

9.1.1 Perform line inspection in accordance with the Carrier's current instructions.

9.1.2 Enter in aircraft log and sign for performance of line inspection.

9.1.3 Enter remarks in aircraft log regarding defects observed during the inspection.

9.1.4 (a) Perform pre-departure inspection immediately before aircraft departure according to the Carrier's instructions.
(b) Perform ice-check immediately before aircraft departure according to the Carrier's instructions.

9.1.5 Provide skilled personnel to assist the flight crew or ground staff in the performance of the inspection.

**9.2 Non-routine Services**

9.2.1 Rectify defects entered in the aircraft log as reported by the crew or revealed during the inspection, to the extent requested by the Carrier. However, major repairs must be separately agreed upon between the Parties.

9.2.2 Enter in aircraft log and sign for the action taken.

9.2.3 Report technical irregularities and actions taken to the Carrier's maintenance base in accordance with the Carrier's instructions.

9.2.4 Maintain the Carrier's technical manuals, handbooks, catalogues, etc.

9.2.5 Provide engineering facilities, tools and special equipment to the extent available.

9.2.6 Move aircraft under its own power in accordance with the Carrier's instructions.

**9.3 Material Handling**

9.3.1 (a) Obtain Customs clearance for
(b) Administer
the Carrier's spare parts, power plants and/or equipment.

9.3.2. Provide periodic inspection of the Carrier's spare parts and/or spare power plant.

9.3.3 Provide suitable storage space for the Carrier's spare parts and/or special equipment.

9.3.4 Provide suitable storage space for the Carrier's spare power plant.

**9.4 Parking and Hangar Space**

9.4.1 (a) Provide
or
(b) Arrange for
suitable parking space.

9.4.2 (a) Provide
or
(b) Arrange for
suitable hangar space.





**AHM 810 — Annex A *(continued)***

**SECTION 10. FLIGHT OPERATIONS AND CREW ADMINISTRATION**

**10.1 General**

10.1.1 Inform the Carrier of any known project affecting the operational services and facilities made available to its aircraft in the areas of responsibility specified in Annex(es) B.

10.1.2 Keep up-to-date all necessary manuals and instructions that the Carrier must provide and ensure that all prescribed forms are available.

10.1.3 After consideration of the Carrier's instructions, suggest the appropriate action to pilot-in-command in case of operational irregularities, taking into account the meteorological conditions, the ground services and facilities available, aircraft servicing possibilities and the overall operational requirements.

10.1.4 Maintain a trip file by collecting all documents specified by the Carrier, all messages received or originated in connection with each flight and dispose of this file as instructed by the Carrier.

**10.2 Flight Preparation at the Airport of Departure**

10.2.1 (a) Arrange for

(b) Deliver to the aircraft

meteorological documentation and aeronautical information for each flight.

10.2.2 Analyse the operational conditions and

(a) prepare

(b) request

(c) sign

(d) make available

the operational flight plan according to the instructions and data provided by the Carrier.

10.2.3 (a) Prepare

(b) Request

(c) Sign

(d) File

the Air Traffic Services (ATS) Flight Plan.

10.2.4 Furnish the crew with an adequate briefing.

10.2.5 (a) Prepare

(b) Sign

the fuel order.

10.2.6 Hand out flight operation forms as specified by the Carrier and obtain signature of the pilot-in-command, where applicable.

10.2.7 Supply the appropriate local ground handling unit with the required weight and fuel data.

10.2.8 (a) Obtain

(b) Monitor

(c) Manage

the Carrier's slot time allocation with the appropriate ATS.

**10.3 Flight Preparation at a Point Different from the Airport of Departure**

10.3.1 Arrange for the provision of the meteorological documents and aeronautical information.



ANA001186

## AHM 810 — Annex A *(continued)*

10.3.2 Analyse the operational conditions and

(a) prepare

(b) request

(c) sign

the operational flight plan according to the instructions and data provided by the Carrier.

10.3.3 Send to the Carrier or its representative at the airport of departure,

(a) the operational flight plan,

(b) the ATS Flight Plan,

(c) information for crew briefing,

as instructed by the Carrier and/or as specified in the Annex(es) B.

**10.4 In-flight Assistance**

10.4.1 Follow up the progress of the flight against flight movement messages, flight plan messages and position reports received.

10.4.2 Provide information on flight progress to the Carrier's ground handling representative.

10.4.3 Assist the flight as requested and/or deemed necessary to facilitate its safe and efficient conduct in accordance with the flight plan.

10.4.4 Monitor movement of the flight within VHF range and provide assistance, as necessary.

10.4.5 Take immediate and appropriate action in case of in-flight irregularity, according to the Carrier's instructions (written or verbal).

10.4.6 Log and notify as specified by the Carrier any incident of an operational nature (delays, diversions, engine trouble, etc.).

10.4.7 Perform in-flight assistance, including re-despatch until adjacent area is able to accept responsibility if, for reasons of communications failure, weather phenomena, safety of aircraft or emergency, it is undesirable to stop these services at the area boundary specified in Annex(es) B. Similar conditions may make it desirable to transfer these services to the next area before the area boundary is crossed.

10.4.8 Provide assistance to the flight, as required, beyond VHF range.

**10.5 Post-flight Activities**

10.5.1 Obtain a debriefing from incoming crews, distributing reports or completed forms to offices concerned, whether governmental or the Carrier's.

**10.6 In-flight Re-despatch**

10.6.1 Analyse meteorological information and the operational flight conditions for re-despatch, calculating and planning it according to the data provided by the aircraft in flight and informing the pilot-in-command about the results thus obtained.

**10.7 Crew Administration**

10.7.1 Distribute relevant crew schedule information provided by the Carrier to all parties concerned.

10.7.2 Arrange hotel accommodation for

(a) scheduled

(b) non-scheduled

crew layover, as specified by the Carrier.





## AHM 810 — Annex A *(continued)*

10.7.3 (a) Provide

or

(b) Arrange for

crew transportation, as specified by the Carrier.

10.7.4 Direct crews through airport facilities and brief them, as required.

10.7.5 Liaise with hotel(s) on crew call and pick-up timings.

10.7.6 (a) Prepare crew allowance forms, as specified by the Carrier.

(b) Pay crew allowances, as specified by the Carrier.

10.7.7 Inform the Carrier of any crew indisposition or potential absence.

10.7.8 Take necessary action, as specified by the Carrier.

### SECTION 11. SURFACE TRANSPORT

**11.1 General**

11.1.1 Make all necessary arrangements for the transport of

(a) passengers

(b) baggage

(c) cargo and/or mail

between

(1) airport and town terminal.
(2) airport and other agreed points.
(3) separate terminals at the same airport.

**11.2 Special Transport**

11.2.1 Make all necessary arrangements for special transport within the limit of local possibilities.

### SECTION 12. CATERING SERVICES

**12.1 Liaison and Administration**

12.1.1 Liaise with the Carrier's catering supplier.

12.1.2 Handle requisitions made by the Carrier's authorised representative.

**12.2 Catering Ramp Handling**

12.2.1 Unload/load and stow catering loads from/on aircraft.

12.2.2 Transfer catering loads on aircraft.

12.2.3 Transport catering loads between aircraft and agreed points.

### SECTION 13. SUPERVISION AND ADMINISTRATION

**13.1 Supervisory Functions of Services Provided by Others (pre-flight, on-flight and post-flight)**

13.1.1 Attend at the airport as necessary to supervise and coordinate the ground handling services contracted by the Carrier with third party(ies).

13.1.2 Cooperate with the Carrier's designated representative, as required.

13.1.3 Ensure that the Handling Company(ies) is (are) timely informed about operational data, including alterations.

13.1.4 Check availability and preparedness of staff, equipment, supplies and services of the Handling Company(ies) to perform the ground handling services.

13.1.5 Check preparation for documentation.



ANA001188





**AHM 810 — Annex A** *(continued)*

13.1.6 Ensure that prompt notification of the Carrier's requirements is given to all interested parties.

13.1.7 Check that all loads including necessary documents will be ready in time to be loaded on the flight.

13.1.8 Meet aircraft upon arrival and contact crew.

13.1.9 Receive briefing from crew and give information about irregularities, changes in schedule or other matters.

13.1.10 Supervise and coordinate the ground handling services, deciding non-routine matters, as required.

13.1.11 Check despatch of operational messages.

13.1.12 Check tracings of baggage, cargo, mail and lost and found articles. Follow up, if necessary.

13.1.13 Note irregularities in station log and inform the Carrier's designated representative in accordance with the relevant directives.

**13.2 Administrative Functions**

13.2.1 Establish and maintain local procedures in accordance with the Carrier's requirements.

13.2.2 As required, take action on all communications addressed to the Carrier.

13.2.3 Prepare, forward and file reports/statistics/documents and perform any other administrative duty that may be required by the Carrier or local conditions.

13.2.4 Maintain the Carrier's manuals, circulars, etc., connected with the performance of the services.

13.2.5 Check and sign on behalf of the Carrier invoices, supply orders, handling charge notes, work orders, etc., as agreed with the Carrier.

**SECTION 14. SECURITY**

**14.1. Passenger and Baggage Screening and Reconciliation**

14.1.1. (a) Provide

or

(b) Arrange for
(1) matching of passengers against established profiles.
(2) security questioning, as required.

14.1.2. (a) Provide

or

(b) Arrange for
(1) screening of checked baggage.
(2) screening of transfer baggage.
(3) screening of mishandled baggage.
(4) physical examination of checked, transfer and mishandled baggage, as required.
(5) identification of security cleared baggage.

14.1.3. (a) Provide

or

(b) Arrange for
(1) screening of passengers.
(2) screening of unchecked baggage.
(3) physical examination of passengers and unchecked baggage, as required.

14.1.4. (a) Provide

or

(b) Arrange for
(1) identification of passengers prior to boarding.
(2) reconciliation of boarded passengers with their baggage.
(3) passengers to identify their own baggage, as required.
(4) offloading of baggage of passengers who fail to board the aircraft.





**AHM 810 — Annex A** *(continued)*

**14.2. Cargo and Post Office Mail**

14.2.1. As specified by the Carrier,

(a) provide
or

(b) arrange for
(1) screening of cargo and/or mail.
(2) physical examination of cargo, as required.
(3) holding of cargo and/or mail for variable periods.
(4) secure storage of cargo and/or mail.

**14.3. Catering**

14.3.1. (a) Provide

or

(b) Arrange for
(1) control of access to the catering unit.
(2) proper identification and authorisation of staff.
(3) security supervision during food preparation.
(4) security check of catering uplifts.
(5) sealing of food and/or bar trolleys/containers.
(6) physical examination of catering vehicles prior to loading.

**14.4. Aircraft Security**

14.4.1. (a) Provide

or

(b) Arrange for

control of access to
(1) aircraft.
(2) designated areas.

14.4.2. (a) Provide

or

(b) Arrange for
(1) search of aircraft.
(2) guarding of aircraft.
(3) guarding of designated areas.
(4) security of baggage in the baggage make-up area.
(5) sealing of aircraft.

14.4.3. (a) Provide

or

(b) Arrange for

security personnel
(1) to safeguard all loads during the transport between aircraft and designated locations.
(2) during offloading and loading of aircraft.





ANA001190






## AHM 810 — Annex A *(continued)*

**14.5. Additional Security Services**

14.5.1. (a) Provide

or

(b) Arrange for

additional security services, as requested by the Carrier.

Signed the ..........................................................................

at ..........................................................................

for and on behalf of ..........................................................................

by ..........................................................................

Signed the ..........................................................................

at ..........................................................................

for and on behalf of ..........................................................................

by ..........................................................................

# ATTACHMENT 3

別添 11—4

UNITED

INTERNATIONAL AIRLINES TECHNICAL POOL

Ground Handling Agreement

United Contract No. 108536-17

Annex B.1.3

## UNITED SERVICES' IATA STANDARD GROUND HANDLING AGREEMENT

SIMPLIFIED PROCEDURE

### Annex B - Location(s), Agreed Services and Charges – "L" Pool

to the Standard Ground Handling Agreement (SGHA) of April 1998

between: ALL NIPPON AIRWAYS CO., LTD (NH)

having its principal office at: 3-5-4 Haneda Airport, Ota-ku, Tokyo 144-0041, Japan.

and hereinafter referred to as 'the Carrier'

and: UNITED AIR LINES, INC. (UA)

having its principal office at: 1200 East Algonquin Road, Elk Grove Township, Illinois 60007, USA

and hereinafter referred to as 'the Handling Company'

using FAA Certificate number UALR011A.

This Annex B for the location(s): San Francisco Int'l. Airport, San Francisco,, California USA (SFO)

is valid from: 25 September, 2002

and replaces: Annex B.1.2 dated 25 September, 2001.

**PREAMBLE:**

This Annex B is prepared in accordance with the simplified procedure whereby the Carrier and the Handling Company agree that, except for the terms set forth in this Annex B, the terms of the Main Agreement and Annex A of the SGHA of April 1998 as published by the International Air Transport Association shall apply as if such terms were repeated here in full. By signing this Annex B, the parties confirm that they are familiar with the aforementioned Main Agreement, Annex A and International Airline Technical Pool Rules.

**PARAGRAPH 1. HANDLING CHARGES**

1.1. For a single ground handling consisting of the arrival and the subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A of the SGHA of April 1998:

1.1.1. Section 6. RAMP

6.1.1
6.2.1, 6.2.2(on request), 6.2.3(on request; additional charges apply)
6.3.1, 6.3.2(a)(b)
6.5.1(a)(b)(c)(on request; additional charges apply)
6.6.1
6.7.1(a)(b)(c)(d)(e)

ALL NIPPON AIRWAYS CO., LTD. CONTRACTS ANA

H.Q

Section 7. AIRCRAFT SERVICING
7.1.1(on request; additional charges apply)
7.5.1(as requested, additional charges apply), 7.5.2(as requested, additional charges apply)

Section 8. FUEL AND OIL
8.1.1, 8.1.2(a)(b), 8.1.3(a)(b), 8.1.4, 8.1.5, 8.1.8, 8.1.9, 8.1.10, 8.1.11
8.2.1, 8.2.2, 8.2.3(a)(b)

Section 9. AIRCRAFT MAINTENANCE
9.1.1, 9.1.2, 9.1.3, 9.1.4(a)(b), 9.1.5
9.2.1, 9.2.2, 9.2.3, 9.2.4, 9.2.5 (on request, additional charge shall apply)
9.3.1(b), 9.3.2, 9.3.3
9.4.1(a)(b), 9.4.2(a) (if available, additional charge shall apply)

1.1.2. The performance of the services listed in Sub-Paragraph 1.1 above shall be accomplished in accordance with Carrier's General Procedures Manual (GPM).

1.1.3. For the performance of services listed in Sub-Paragraph 1.1, Section 9.3 above, The Handling Company will provide parts storage, parts handling, pick-up and delivery of parts at other airlines, and/or customs broker, and prepare airway bills; and conduct periodic inventories.

1.1.4. For the performance of import services listed in Sub-Paragraph 1.1, Section 9.3.1 above, Carrier will arrange for an independent custom brokerage agent to clear inbound cargo shipments through Customs. After Customs clearance is obtained, the Handling Company will arrange pick-up and transport of inbound material from the Customs / Cargo area to the Carrier's parts storage/airport office.

1.1.5. For the performance of export services listed in Sub-Paragraph 1.1, Section 9.3.1 above, Handling Company will coordinate documentation and transport of outbound material shipments from the Carrier's parts storage/airport office to Customs / Cargo area for uplift on Carrier's flights or other carrier's flights.

1.2 For the performance of the services listed in Sub-Paragraph 1.1, the Handling Company shall charge the Carrier for a single ground handling:

B-777 aircraft check, including ETOPS check, with maintenance release

B-777 aircraft check without maintenance release

B-747-400 aircraft check with maintenance release

B-747-400 aircraft check without maintenance release

1.2.1 For the charges in Paragraph 1.2 above Handling Company will provide at least one (1) NH certified staff and one (1) Aircraft Maintenance Technician (AMT), for a maximum total of six (6) man-hours.

1.2.2 Included in the charges in Paragraph 1.2 above Handling Company will provide a maximum of 50 square feet of storage of Carrier's spare parts.

1.2.3 Included in the charges in Paragraph 1.2 above Handling Company will provide initial training for Handling Company's AMTs.

1.3 RATE INCREASES. Notwithstanding the provisions of Article 11.10 of the Main Agreement, the Handling Company shall not vary the charges set in Annex(es) B for a one (1) year period and thereafter with thirty (30) day notice. The price may be adjusted based on but not limited to changes to the (RPI)(CPI) or Handling Company's salary cost.

1.3.1 Notwithstanding the foregoing, when schedules change as mentioned in Sub Article 1.3 of the Main Agreement affect the handling cost, the Handling Company shall have the right to adjust the charges as from the date of the schedule change provided that the Handling Company does so within thirty (30) days of the schedule change.

1.4 Handling in case of technical landing for other than commercial purposes will be charged at fifty percent (50 %) of the above rates, provided that a physical change of load is not involved.

1.5 Handling in case of return to ramp will not be charged extra, provided that a physical change of load is not involved.

1.6 Handling in case of return to ramp involving a physical change of load will be charged as for handling in case of technical landing in accordance with Sub-Paragraph 1.2 of this Annex.







ANA001193

1.7 OFF SCHEDULE OPERATIONS / CANCELLATIONS. In the event Carrier's flight arrives late (60 minutes) or early (30 minutes) from a mutually agreed upon time, in addition to the per flight charge, Carrier shall reimburse Handling Company for overtime payments to Handling Company's personnel assigned to perform the services. Charges for overtime furnished, will be for the minimum period as established by Handling Company's local station policy.

1.7.1 Minimum billings shall consist of the Carrier's published flight schedule unless the Handling Company is notified of a flight cancellation in accordance with the following:

| Hours Prior To Scheduled Flight On Which Cancellation Notice Is Received | Cancellation Fee * |
|---|---|
| More Than 24 Hours | None |
| Less Than 24 Hours | 50% |

*Percentage of the applicable Handling fee.

1.7.2 Notwithstanding Paragraph 6 of this Annex B, any notice given pursuant to Paragraph 1.7 above, shall be deemed properly given if given to Handling Company's local station management.

PARAGRAPH 2. ADDITIONAL CHARGES

2.1 Services listed in Annex A which are not included in Paragraph 1 of this Annex B, and all other services unless set forth below, will be charged for at applicable current MAGSA rates.

2.2 For the performance of the services listed in Sub-Paragraph 1.1 which exceed six (6) man-hours, the Handling Company shall charge the Carrier for a single ground handling at applicable current MAGSA rates.

PARAGRAPH 3. DISBURSEMENTS

3.1 Any disbursements made by the Handling Company on behalf of the Carrier will be reimbursed by the Carrier at cost price plus an accounting surcharge of fifteen percent (15 %).

PARAGRAPH 4. RELEASE, INDEMNITY AND INSURANCE

4.1 Deletion and Replacement. Article 8, Liability and Indemnity, of the Main Agreement is hereby deleted in its entirety and replaced with the following Paragraph 4, Release, Indemnity and Insurance:

4.2 Release. Carrier hereby releases Handling Company, its directors, officers employees and agents from any and all liabilities, claims, demands, suits, damages and losses, including, without limitation, all attorneys' fees, costs and expenses in connection therewith or incident thereto which may accrue to Carrier against Handling Company for loss of, damage to, destruction of, any property owned or operated by Carrier, including without limitation any aircraft, in any manner arising out of or in any way connected with the services furnished or to be furnished by Handling Company under this Agreement.

4.2.1 Hull Damage Exception. - Notwithstanding the provisions of 4.2 above, Handling Company shall indemnify Carrier against any physical loss of or damage to Carriers aircraft caused by any negligent act or omission of Handling Company or by Handling Company's actual intent to cause such loss or damage, provided that Handling Company's obligation with respect to such loss or damage shall not, in any event (i) exceed or (ii) apply to such loss or damage of an amount less than

4.3 Indemnity. Carrier agrees to indemnify and hold harmless Handling Company, its directors, officers, employees and agents and affiliates (each an "Indemnitee") from and against any and all liabilities, claims, demands, suits, damages and losses, including, without limitation, all reasonable attorneys' fees, costs, and expenses in connection therewith or incident thereto (including but not limited to reasonable attorneys' fees incurred by Handling Company in establishing its rights to indemnification hereunder) (collectively referred to in this Paragraph 4 as "Claims") of third parties for death of or bodily injury to any person or persons whomsoever (including, without limitation, Carrier's employees but excluding Handling Company's employees) and for loss of, damage to, destruction of, any property whatsoever (including, without limitation, any loss of use thereof), in any manner arising out of or in any way connected with goods or services furnished or to be furnished by Handling Company under this Agreement, all whether or not arising in tort or occasioned in whole or part by the negligence of Handling Company of any type or degree, provided that the foregoing indemnity obligation of the Carrier shall not apply to any such Claim resulting from any act of the Handling Company done with actual intent to cause such death, injury, loss, damage or destruction. Carrier shall, at the request of Handling Company, negotiate and








defend any Claim brought against any Indemnitee or in which any Indemnitee is joined as a party defendant based upon any other matters for which Carrier has agreed to indemnify each Indemnitee as provided above. Carrier's obligation under this Paragraph will survive the expiration or termination of this Agreement.

4.4 Insurance - Coverage. Carrier will, at its sole cost and expense, procure and maintain in full force and effect during the term of this Agreement, policies of insurance of the type and minimum amounts stated below, and with insurers of recognized financial responsibility covering the liability of Carrier relating to the operation of its aircraft:

Aircraft liability insurance with minimum limit of $750,000,000 per occurrence; and all risk aircraft ground and flight hull insurance covering all aircraft used in connection with services performed hereunder.

4.5 Insurance - Endorsement. The policies of insurance described in Paragraph 4.4 will be endorsed to (i) waive rights of subrogation against Handling Company, its directors, officers, employees and agents thereunder with respect to the matters for which Carrier has released Handling Company pursuant to Paragraph 4.2, and (ii) name Handling Company, its directors, officers, employees and agents as additional assureds thereunder with respect to Claims of third parties for which Carrier is obligated to defend and indemnify Handling Company pursuant to Paragraph 4.3 provided, however, that such policies will specify with respect to Claims in favor of Handling Company, its directors, officers, employees and agents, that they will not be deemed as additional assureds thereunder, and expressly cover the obligations assumed by Carrier under Paragraph 4.3. The insurance policies referred to in Paragraph 4.4 will contain Breach of Warranty clauses in behalf of Handling Company.

4.6 Evidence of Insurance. The Carrier will provide Handling Company, prior to services being performed, evidence of such insurance as required in Paragraphs 4.4 and 4.5 satisfactory to Handling Company and providing 30 days notice of cancellation, non-renewal or adverse material change to the coverage required.

PARAGRAPH 5. CHOICE OF LAW

5.1 Notwithstanding Article 9.1 of the Main Agreement, this Agreement and any dispute arising under or in connection with this Agreement, including any action in tort, shall be governed by the laws of the state of California, USA.

PARAGRAPH 6. NOTICES

6.1 Any notice required or permitted under the terms and provisions of this Agreement shall be in writing and shall be delivered by hand or sent by telex or facsimile, confirmed by a letter dispatched by the close of business on the next succeeding business day, by certified mail, return receipt requested, or by overnight courier addressed to the parties as set forth in Paragraph 6.2.

6.2 Notwithstanding Article 11.3 of the SGHA Main Agreement, any notice of termination given by one party under this Agreement shall be deemed properly given if sent as stated in Paragraph 6.1 above in case of the Handling Company to:

If by mail:
United Air Lines, Inc. - WHQUS
Director -- Airport Services
P.O. Box 66100
Chicago, Illinois 60666
Phone: 847 700-3912 Facsimile: 847 364-1849

If by courier:
United Air Lines, Inc. - WHQUS
Director -- Airport Services
1200 E. Algonquin Road
Elk Grove, Illinois 60007

And in case of the Carrier to:

ALL NIPPON AIRWAYS CO., LTD.
Director - Aircraft Maintenance Planning & Control
3-5-4 Haneda Airport
Ota-ku, Tokyo 144-0041
Japan
Telephone: 81-3-5756-5411 Facsimile: 81-3-5756-5407





UNITED

INTERNATIONAL AIRLINES TECHNICAL POOL

Ground Handling Agreement

PARAGRAPH 7. ACCOUNTING AND SETTLEMENT

7.1 Notwithstanding Sub-Article 7.2 of the Main Agreement, settlement of account shall be as follows:

Payment of charges will be made through the IATA Clearing House.

7.2 Invoices. Handling Company will send all invoices to the Carrier at the following address:

ALL NIPPON AIRWAYS CO., LTD.
3-5-4 Haneda Airport
Ota-ku, Tokyo 144-0041
Japan
Attn: Technical Sales & Contracts

PARAGRAPH 8. TRAINING

8.1 Not applicable.

PARAGRAPH 9. PARTS PROVISIONING

9.1 Upon Carrier's request and Handling Company's acceptance thereof, oils, grease and hydraulic fluids may be provided by the Handling Company to the Carrier at Handling Company's cost plus a fifteen percent (15 %) fee. All parts required for the proper servicing of the aircraft will be provided under separate agreement.

PARAGRAPH 10. DURATION, MODIFICATION AND TERMINATION

10.1 Notwithstanding Article 11.4 of the Main Agreement, this Annex B Agreement shall be effective as of the date first set forth above and continue for a period of one (1) year, and year to year thereafter unless earlier terminated in accordance with the terms of this Agreement.

10.2 Modification of, or additions to this Agreement shall be recorded in amendments to this Annex B which will amend or supersede this Annex B.

10.3 After a period of twelve (12) months, either party may terminate this Agreement. Such termination shall require not less than sixty (60) days previous written notice to the other party as set forth in Paragraph 6 above.

| For and on behalf of | For and on behalf of |
|---|---|
| UNITED AIR LINES, INC. | ALL NIPPON AIRWAYS CO., LTD. |
| At: CHICAGO, ILLINOIS U.S.A. | At: HANEDA, TOKYO JAPAN |
| By: [signature] | By: [signature] |
| Printed Name: Michael Gentile | Printed Name: Hiroyuki Ito |
| Title: Manager, Airport Services | Title: Director, Aircraft Maintenance & Control |



