# EXHIBIT 7

# All Nippon Airways
## vs.
# United Air Lines

Deposition of

# **Eishin Yamaguchi**

Volume 1

November 27, 2007

Reported By:  Brandon Combs,  CSR 12978
Job Number: 1-6056

Eishin Yamaguchi

1           UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                   --o0o--

4  ALL NIPPON AIRWAYS COMPANY,        )
   LTD.,                              )
5                                     )
               Plaintiff,             )
6                                     )
           vs.                        )  No. C07-03422 EDL
7                                     )
   UNITED AIR LINES, INC.,            )
8                                     )
               Defendant.             )
9  _____)

10

11

12

13          VIDEOTAPED DEPOSITION OF

14            EISHIN YAMAGUCHI

15          _____

16            November 27, 2007

17

18

19

20

21  REPORTER: BRANDON D. COMBS, RPR, CSR 12978    Job 6056

22

23

24

25

Combs Reporting, Inc. 888-406-4060
www.combsreporting.net

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

```
 1                 INDEX
 2                          PAGE
 3
 4   EXAMINATION BY MR. TORPEY .. .. .. .. .. .. .. .11
 5
 6
 7                EXHIBITS
 8   EXHIBIT    DESCRIPTION              PAGE
 9      1    Fourth Amended Notice of Taking Video    33
            Depositions.
10
       2    Operations Manual (English).      54
11
       3    SFO Airport Operations Bulletin, July   104
12          31, 2000.
13     4    SFO Airport Operations Bulletin,     104
            August 7, 2001.
14
15     5    Recon 1, Photo of gate area.     105

16     6    Transcripts - Ramp Tower and Ground   110
            Control.
17     7    October 8, 2003, Van Mckenny, NTSB.   127
18
19           REQUESTED BE MARKED
20   PAGE              LINE
21    90                6
22
23
24
25
                                      Page 2
```

```
 1         UNITED STATES DISTRICT COURT
 2         NORTHERN DISTRICT OF CALIFORNIA
 3              ---oOo---
 4   ALL NIPPON AIRWAYS COMPANY,    )
        LTD,                 )
 5                           )
        Plaintiff,           )
 6                           )
        vs              ) No. C07-03422 EDL
 7                           )
     UNITED AIR LINES, INC.,     )
 8                           )
        Defendant.           )
 9   _____)
10
11              --oOo--
12      BE IT REMEMBERED THAT, pursuant to Notice and
13   on Tuesday, November 27, 2007, commencing at
14   9:58 a.m. thereof at 595 Market Street, Suite 620,
15   San Francisco, California, before me, BRANDON D. COMBS,
16   a Certified Shorthand Reporter, personally appeared
17        EISHIN YAMAGUCHI,
18   called as a witness by the Defendant being first duly
19   sworn, testified as follows:
20              --oOo--
21      JAFFE, RAITT, HEUER & WEISS, 27777 Franklin
22   Road, Suite 2500, Southfield, MI 48034-8214, represented
23   by SCOTT R. TORPEY, Attorney at Law, appeared as counsel
24   on behalf of the Defendant.
25      CONDON & FORSYTH, LLP, Times Square Tower,
                                      Page 3
```

```
 1   Seven Times Square, New York, NY 10036, represented by
 2   MARSHALL S. TURNER and TIMOTHY ESKRIDGE, Attorneys at
 3   Law, appeared as counsel on behalf of the Plaintiff
 4      WORTHE, HANSON & WORTHE, The Xerox Centre,
 5   1851 East First Street, Ninth Floor, Santa Ana,
 6   CA 92705, represented by JEFFREY A. WORTHE, Attorney at
 7   Law, appeared as counsel on behalf of the Defendant
 8      ALSO PRESENT: Steven S. Fus; Yoshihiro
 9   Mizuno; Shinsuke Moriya; Sadaaki Matsutani, Interpreter;
10   Satoe Ohari, Interpreter; Stephen Statler, Videographer.
11              --oOo--
12      THE VIDEOGRAPHER: Good morning. Here begins
13   Videotape 1 of the deposition of Eishin Yamaguchi in the
14   matter of All Nippon Airways, Limited versus
15   United Airlines, Incorporated in the U.S. District Court
16   for the Northern District of California. The case
17   number is C07-03422 EDL. Today's date is November 27,
18   2007, and the time on the video monitor is 9:58 a.m.
19      The video operator today is Stephen Statler
20   representing Combs Reporting, 595 Market Street,
21   Suite 620, San Francisco. And this videotaped
22   deposition is taking place at 595 Market Street and was
23   noticed by Jaffe Raitt.
24      Counsel, please voice identify yourselves and
25   state whom you represent.
                                      Page 4
```

```
 1      MR. TORPEY: Scott Torpey on behalf of United.
 2      MR. WORTHE: Jeff Worthe for United Airlines.
 3      MR. FUS: Steve Fus for United Airlines.
 4      MR. TURNER: Marshall Turner from
 5   Condon & Forsyth for All Nippon Airways.
 6      MS. ESKRIDGE: Timothy Eskridge, Condon &
 7   Forsyth for All Nippon Airways.
 8      MR. MORIYA: Shinsuke Moriya.
 9      MR. MIZUNO: Yoshihiro Mizuno.
10      MR. TURNER: Also present here is
11   Mr. Matsutani, who is an interpreter
12      MR. TORPEY: And Satoe Ohari who is also an
13   interpreter.
14      THE VIDEOGRAPHER: The court reporter today is
15   Brandon Combs of Combs Reporting. And would the
16   reporter please administer the oath.
17      (After being duly sworn, the interpreters,
18      Satoe Ohari & Sadaaki Matsutani, translated
19      questions put to the witness into the Japanese
20      language and the answers thereto given by the
21      witness were translated into the English
22      language.)
23              --oOo--
24   MR. TORPEY: I'd like --
25   MR. TURNER: Just a couple of housekeeping
                                      Page 5
```

2 (Pages 2 to 5)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

**Page 6**

1  matters. To begin with, since this is the first
2  deposition being taken in this case, I want to make it
3  clear that this deposition is being taken pursuant to
4  the Federal Rules of Civil Procedure; is that correct?
5      MR. TORPEY: That's correct.
6      MR. TURNER: All objections except as to form
7  being reserved to the time of trial.
8      MR. TORPEY: The rules provide that all
9  objections other than form and foundation are preserved
10  and there is no need to raise them. It also provides
11  that there are no speaking objections
12      MR. TURNER: In view of the fact that we have
13  received five deposition notices with differing requests
14  for documents, I just want to quickly go over them and
15  make it clear what has been and is being produced
16      MR. TORPEY: Well, let me do this, Marshall.
17  I don't want this to, you know, detract or take away
18  from the amount of time we have here today with the
19  witness. We can discuss that at another time. If you
20  have additional documents you're producing here today,
21  produce them. Otherwise we can discuss this at another
22  time.
23      MR. TURNER: This will just take a few
24  minutes. In view of the fact that we received five
25  notices, I think it has to be clear, a couple of them

**Page 7**

1  having been received just last week
2      The first one, which is the original notice,
3  has an Exhibit A requesting only the All Nippon Airways
4  investigation file. That was fully produced as part of
5  our initial disclosure
6      The second one -- notice is an amended notice
7  to take video deposition. That was received in mid
8  September. And there are a couple of additional
9  requests in addition to the accident investigation file
10  in Exhibit A.
11      Number 2 requests All Nippon Airways pilot
12  files which requests all accidents/incidents that the
13  pilots, in this case Mr. Yamaguchi, may have been
14  involved in or received disciplinary action. There are
15  no such accidents/incidents or disciplinary action. It
16  also requests certificates and training from 1995 to
17  date.
18      We do have his certificates, and we do have
19  his record of training, but these are documents that
20  contain personal information that we would only produce
21  if we have a confidentiality order. And to my knowledge
22  I have not received such an order from United's counsel,
23  although the court did direct that United's counsel
24  provide us with an order pursuant to her order. And we
25  had a hearing on November 13.

**Page 8**

1      Those documents are here. If we can have an
2  agreement on them, you can examine the witness on them.
3  Without an order, you cannot have copies, but I may let
4  you see them so you can examine the witness.
5      The third item in that second deposition
6  notice contains documents regarding ground handling
7  agreement. This witness has no knowledge of documents
8  recording ground handling agreements.
9      The second amended notice, which was the third
10  notice we received in late September, that is exactly
11  the same as the second one. Nothing further to be
12  produced there.
13      Two, a third amended notice and a fourth
14  amended notice were both received last week. They
15  request some additional documents including ANA
16  operation manual in existence on the day of the
17  accident, October 7, 2003.
18      This witness has not had any opportunity to
19  attempt to locate such a document nor does he know if
20  there is a document that is in existence. You, of
21  course, can examine him on this.
22      He did however obtain from ANA's legal
23  department a section that he believes is the only
24  conceivably relevant section which is current. Some of
25  it was applicable in October of '03. Some of it may not

**Page 9**

1  have been, but you're welcome to look at that version
2      Also, you asked for all the publications on
3  board the aircraft, required to be onboard the aircraft
4  on October 7, 2003. This witness does not have control
5  over those documents, and he has not had the opportunity
6  to look for them since he didn't see this notice
7  actually until yesterday.
8      And you also asked for routing in item 7 of
9  the third and fourth amended notices, his routing on the
10  day of October 7, 2003. This witness has not had the
11  opportunity to look for them. He doesn't know if it
12  still exists for the day of October 7, 2003, but he does
13  know from whom he would have obtained such routing. And
14  it was neither ANA nor United Airlines. He knows the
15  company he received it from
16      That's all I have on these notices because I
17  have a few documents that he also obtained that are
18  included in the ANA accident investigation file, but he
19  doesn't have and never had access to and never saw the
20  complete ANA investigation file that has been produced
21  in this case.
22      MR. TORPEY: Well, let me quickly respond.
23  First of all, as I said in both conversation and by
24  letter, I was and continue to be willing to make any
25  documents that you believe are confidential and should

3 (Pages 6 to 9)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

| Page 10 | Page 12 |
|---|---|

Page 10

1  be subject to the protective order retroactively covered
2  under that order, and to date you refused.
3      Secondly, this notice, which is the notice
4  dated November 19, 2007, was sent on that day by fax and
5  email to your office. You filed no objections as
6  required if you have an objection.
7      And you can laugh, Marshall. I think that's
8  disrespectful. Do whatever you like. Say whatever you
9  like. But here we are at the deposition. You're
10  prepared to produce some but not all of the documents.
11      And to add to that, this was a notice by a
12  party to this case to another party. This is not a
13  notice to Mr. Yamaguchi personally.
14      Now you chose not to produce documents, and,
15  as you know, we have a motion that's going to be filed
16  with the court, and we're asking the court to take
17  appropriate action with regard to what you've done.
18      I don't think there's anything more that I
19  need to say. If you want to hand me documents you're
20  producing in response to my notice, I'll look at them to
21  the extent I can. But it won't be possible for me to
22  spend much time on them nor will I have the ability to
23  consult with my experts which I would certainly have
24  done had you produced this as required.
25      There was a document request sent to you, as

Page 11

1  you know, that you responded to a week and a half or two
2  weeks ago that was sent back in October. There are
3  items in there that you haven't produced either, so
4  we'll address that at another time.
5      MR. TURNER: I think in response to your
6  comments I want the record to reflect that all of our
7  responses have been timely and complete. And I
8  certainly want to point out for the record the court's
9  order of November 19 requiring United to provide a
10  stipulated protective order as referenced at her hearing
11  on June 13, and on -- I'm sorry -- November 13, 2007,
12  and also at that hearing Mr. Torpey informed me that he
13  would be providing me with the corrected protective
14  order.
15      And the court has ordered that United Airlines
16  revise the stipulated protective order and that the
17  parties shall then submit the jointly proposed order to
18  the court. I still have not seen that order.
19      MR. TORPEY: Let's begin the deposition. I'd
20  like to start.
21      EXAMINATION BY MR. TORPEY
22      MR. TORPEY: Q. Mr. Yamaguchi, please, you do
23  have some understanding of English. You can understand
24  me as we speak now; correct?
25      A. No. I do not have an accurate understanding.

Page 12

1      Q. You're the pilot in command of a Boeing 777
2  commercial airliner, correct, sir?
3      A. Yes.
4      MR. TURNER: I hate to interrupt. Is it okay
5  with the translators and you if Mr. Matsutani kindly
6  chimes in once in a while?
7      MR. TORPEY: Well, here's what I think. I
8  think, with all due respect to Mr. Yamaguchi, I don't
9  think it's necessary that every question and every
10  answer be translated. This is a commercial airline
11  pilot. He speaks every day fluently, I'm sure, with air
12  traffic control. The regulations require that. That's
13  part of his job.
14      And for us to sit here for hours with
15  translation that's unnecessary, I think is unnecessary.
16  I think if and when there comes a point in time that the
17  witness feels that there is a language problem, then
18  certainly one or both interpreters can weigh in. But
19  otherwise I think, Marshall, all we're doing is wasting
20  a bunch of time. It's not really up to you. I would
21  ask Mr. Yamaguchi.
22      Q. And let me ask you --
23      MR. TURNER: Hold it. Before you ask a
24  question, you've made a comment on the record. I'm
25  entitled to respond.

Page 13

1      MR. TORPEY: Go ahead, please.
2      MR. TURNER: Mr. Yamaguchi does not give
3  depositions every day, and it is not his native tongue.
4  He is entitled to a translator, and he will use one. My
5  question had nothing to do with it. My question was a
6  matter of procedure here.
7      We have brought Mr. Matsutani as a translator
8  here, and he did just -- I don't know if it was a
9  constructive comment or not for the other translator.
10      And I just wanted to know if that's offensive
11  to you or to the other translator in which case he won't
12  interfere. But it seemed to be very simply and perhaps
13  constructive. But I just want to make sure there wasn't
14  any objection to it.
15      MR. WORTHE: We also have to take into
16  consideration the reporter with two people speaking over
17  each other. My suggestion is one interpreter.
18      MR. TORPEY: Well, here is the way I think it
19  should be done. First of all, it's now almost 10:15.
20  And I haven't gotten one question or answer from
21  Mr. Yamaguchi.
22      We have got a dozen people in the room, and we
23  have to get this deposition done. We started at 10:00
24  at your request, and we haven't gotten one question
25  done. I've asked Satoe Ohari to be the interpreter.

4 (Pages 10 to 13)

Eishin Yamaguchi

---

1  It's my deposition of this witness  Ms  Ohari is going
2  to interpret this.
3      If your interpreter believes that something is
4  interpreted incorrectly, then I welcome him to speak up
5  and correct it.  You know, we've both done this before
6  many times, so this is not something new.
7      But I also -- and I'll stand on this,
8  Marshall -- we can have him -- we can have Satoe and
9  your interpreter interpret every single question if
10  that's what you are going to direct happen here today.
11  But I can tell you that we will not finish this
12  deposition here today under any circumstances, let alone
13  in the seven hours allowed by the federal rules
14      So I'm asking -- so that we don't have to come
15  here for an additional period of time in the future, I'm
16  asking that the witness, when possible, be able to be
17  asked and answer questions in English.
18      To the extent he feels uncomfortable, I would
19  welcome Mr  Yamaguchi to turn to Mr  Ohari or your
20  interpreter and ask for assistance.  I think that's very
21  reasonable, and that's what I'd ask you to do Marshall
22      MR  TURNER:  The main reason that we haven't
23  gotten any questions out in almost 15 minutes is mostly
24  your talking on the subject  It was a very simple
25  comment.  I thought it was constructive, and I think

Page 14

---

1      Mr  Yamaguchi, what positions have you held when you
2  started at ANA up to today?
3      A.   At first I was copilot for Boeing 767.  Then I
4  was copilot for 747-400, and now I am captain of 777
5      Q    And how long have you been a captain for the
6  777?
7      A.   Seven years
8      Q.   Okay  So roughly since 2000 sometime?
9      A   Yes.
10      Q.   If you remember, when approximately in 2000?
11      A.   It was from February of 2000.
12      Q.   And did you -- or have you flown the last
13  seven years anything else other than a 777 for ANA?
14      A.   No
15      Q.   We had talked a little bit at the outset about
16  your proficiency with English  Do you read English?
17      A   I can read in English about aeronautical
18  matters, but I do not believe that I can read other
19  things in English with accuracy.
20      Q.   Do you think reading an English newspaper is
21  something you could do?
22      A   No.  I do not think so
23      Q.   Can you write in English?
24      A.   To a certain degree.
25      Q    And with regard to your responsibilities as a

Page 16

---

1  you're agreeing to it.  Let's get on with the
2  deposition   The witness is entitled to, and we'll use,
3  the interpreter.
4      MR  TORPEY:  So you're directing that the
5  interpreter has to translate every question and answer?
6      MR  TURNER:  That's the way the deposition is
7  going to go, yes
8      MR  TORPEY:  All right.  Then we'll deal with
9  that at another time.
10      Q.   Mr  Yamaguchi, I apologize, sir, for the
11  delay  I won't take any more of your time than is
12  necessary today.  Would you start by giving us your full
13  name, please.
14      A.   My name is Eishin Yamaguchi.
15      Q.   And, Mr  Yamaguchi, where are you employed,
16  sir?
17      A   By ANA, All Nippon Airways.
18      Q.   And how long have you been with ANA?
19      A   17 years.
20      Q   And how old are you, sir?
21      A.   I am 44
22      Q.   Was ANA your first aviation-related
23  employment?
24      A   Yes, that's right.
25      Q.   And just give me a little background,

Page 15

---

1  captain and/or a pilot in command of a 777 for ANA, are
2  you required to be able to speak and understand in the
3  English language?
4      A   I would like the question in Japanese once
5  more.  No.
6      Q.   Okay  When you fly and communicate with air
7  traffic control, what language do you speak to them in?
8      A.   Ordinarily in English.
9      Q.   So let's say you're flying into Narita, you're
10  talking to air traffic control, you'd speak to them in
11  English; correct?
12      A.   I do speak in English, but if it was a
13  complicated matter, I would communicate in Japanese.
14      Q.   If you're flying to the United States and
15  you're talking to air traffic control, you would talk to
16  them in English; right?
17      A   That's right.
18      Q.   You would not speak to air traffic control in
19  the U S in any other language; correct?
20      A.   No.
21      Q   No, you would not speak in any other tongue
22  than English?
23      A   That's right.
24      Q.   With regard to publications by Boeing, for
25  example, relating to your aircraft, are those published

Page 17

---

5 (Pages 14 to 17)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

| | |
|---|---|
| 1  in English? | 1   recollection of the events at SFO on October 7, '03? |
| 2     A.  Translations were distributed to us. | 2     A.  I don't have personal knowledge, but I have a |
| 3     Q.  When did you arrive in the United States prior | 3   recollection to a certain degree. |
| 4  to today, sir? | 4     Q.  Okay.  Your ANA's lawyer may have told you |
| 5     A.  I arrived yesterday. | 5   this, but if not, I'll do so |
| 6     Q.  About what time? | 6          If you don't recall something Mr. Yamaguchi, |
| 7     A.  I arrived at 9:00 a.m. | 7   then just tell us you don't know or you don't recall. |
| 8     Q.  9:00 a.m.  And did you arrive having been a | 8   We don't want you to guess here today.  So that if you |
| 9  working crew member on an ANA flight? | 9   do answer, we're going to assume that you correctly |
| 10    A.  No.  I came as a passenger. | 10  understood the question and that you've given us an |
| 11    Q.  And when are you scheduled to go back? | 11  answer based on your -- what we'll call personal |
| 12    A.  Tomorrow. | 12  knowledge, that you're not guessing. |
| 13    Q.  And at what time, sir? | 13         Will you do that for us? |
| 14    A.  The flight is scheduled to leave at 11:00 a.m. | 14    A.  Yes. |
| 15    Q.  And goes to where? | 15    Q.  And again, I say this respectfully, being |
| 16    A.  Narita | 16  sworn to tell the truth, of course, you will do so in |
| 17    Q.  And will you be working that flight or just be | 17  response to my questions; correct, sir? |
| 18  a passenger again? | 18    A.  Yes. |
| 19    A.  As a passenger. | 19    Q.  What professional licenses do you hold or |
| 20    Q.  Do you have a period of time before you return | 20  certificates, sir? |
| 21  on a working flight? | 21    A.  I have an ATR certification to work as a |
| 22         THE INTERPRETER:  I'd like the question read | 22  captain and the certification for the aircraft model |
| 23  again. | 23  based on that.  I also have a license for aeronautical |
| 24         MR. TORPEY:  I'll just rephrase it. | 24  radio communication.  Furthermore, I have a physical |
| 25    Q.  Mr. Yamaguchi, when are you next scheduled to | 25  examination certificate.  So in total I have three |
| Page 18 | Page 20 |

| | |
|---|---|
| 1  fly as a crew member for ANA? | 1     Q.  The radio certificate, what does that permit |
| 2     A.  The third of next month. | 2   you to do? |
| 3     Q.  Third of December? | 3     A.  I am allowed to operate the radio |
| 4     A.  Yes. | 4   communication equipment on an aircraft |
| 5     Q.  Other than the attorney for ANA, did you have | 5     Q.  Which allows you to talk to air traffic |
| 6  a chance to speak to anyone else about your giving a | 6   control and other authorities, if you will? |
| 7  deposition here today? | 7     A.  Yes. |
| 8     A.  Are you asking aside from Mr. Turner? | 8     Q.  Are your licenses or certificates issued by a |
| 9     Q.  Yes, sir. | 9   Japanese government authority or the U.S counterpart or |
| 10    A.  No.  Not anyone else besides Mr. Turner | 10  some other authority? |
| 11    Q.  After the day of the incident involved in this | 11    A.  It has -- they were issued by the Japanese |
| 12  case, which is October 7 of 2003, have you ever had an | 12  authorities. |
| 13  opportunity to talk to anyone other than Mr. Turner or a | 13    Q.  Is your understanding of the English language |
| 14  member of his law firm about what took place that day? | 14  about the same today as it was back on October 7, '03? |
| 15    A.  No. | 15    A.  Yes. |
| 16    Q.  Okay.  You haven't talked to Mr. Usui, that's | 16    Q.  On the day of this accident, Mr. Yamaguchi, |
| 17  U-s-u-i, or Mr. Nishiguchi about this matter since the | 17  the flying pilot or copilot, Mr. Nishiguchi, and the |
| 18  accident? | 18  observer pilot, Mr Usui, had you ever before flown with |
| 19    A.  I talked with them on the day of the accident | 19  them? |
| 20    Q.  But not since then about the accident? | 20    A.  Yes. |
| 21    A   No. | 21    Q.  And can you tell me about how many times you |
| 22    Q.  I assume this is the first time you've ever | 22  would have flown with Mr. Nishiguchi, the flying pilot |
| 23  given a deposition or been involved in litigation? | 23  or copilot? |
| 24    A.  It's my first time. | 24    A.  I do not recall the number of times, but it |
| 25    Q.  Do you still have a personal knowledge or | 25  was a two-day flight, so I have flown several times with |
| Page 19 | Page 21 |

6 (Pages 18 to 21)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

**Page 22**

1  him

2  Q. So as of the time this accident occurred on
3  October 7, '03, would you say you'd flown with
4  Mr. Nishiguchi maybe more than a dozen times?

5  A. No. I have not flown with him as many as 12
6  times.

7  Q. What's your best recollection of times you
8  flew with Mr Nishiguchi before October 7, '03, with
9  Mr. Nishiguchi being a flying crew member?

10  A. How shall I count this. For example, one
11  flight from Tokyo to Osaka would count as once?

12  Q. Yeah. Fair enough. That would be fine.

13  A. If that is the case, it would be maximum six
14  times.

15  Q. Would those all have been in a 777?

16  A. Yes.

17  Q. And on those six occasions, were you the pilot
18  not flying and Mr. Nishiguchi was the pilot flying?

19  A. No. Sometimes I was the pilot, and sometimes
20  Mr. Nishiguchi was.

21  CHECK INTERPRETER: Sometimes I was the pilot
22  flying; sometimes Mr. Nishiguchi was the pilot flying

23  MR. TORPEY: Q. The six times, how many
24  separate trips did that comprise?

25  A. Three flights a day, and there were two such

**Page 23**

1  days. But it could have been less than that.

2  Q. Are there other pilots that you fly with more
3  frequently than -- that you did fly with prior to this
4  accident more frequently than Mr. Nishiguchi?

5  A. I do not recall.

6  Q. Have you flown with him since the date of the
7  accident?

8  A. Yes

9  Q. And do you remember on how many different
10  trips?

11  A. I do not have a clear or accurate
12  recollection.

13  Q. Okay. Would you say it was more than six
14  trips?

15  A. No. I think it is less than six.

16  Q. How about with Mr. Usui?

17  A. It was a one return trip, so shall we say that
18  it was two times?

19  CHECK INTERPRETER: One round-trip

20  THE INTERPRETER: I said return trip, so it's
21  the same thing

22  MR. TORPEY: Q. So I'm clear then since the
23  date of the accident, you had one round-trip --

24  A. Yes

25  Q. -- with Mr. Usui. And prior to the date of

**Page 24**

1  the accident, can you give me, Mr Yamaguchi, an idea of
2  how many times you would have flown with Mr Usui?

3  A. I was talking about that one round-trip before
4  the day of the accident.

5  Q. Okay. Understood. Then let me ask you, since
6  the date of the accident, have you flown with Mr Usui?

7  A. I have not flown with him

8  Q. Is Mr. Usui a check airman?

9  A. He is so today.

10  Q. Was he back on October 7 of '03?

11  A. I recall that he was in training to be a
12  checker.

13  Q. Prior to the day of this accident,
14  Mr Yamaguchi, had you ever flown a 777 aircraft with
15  Mr Nishiguchi to or out of San Francisco airport?

16  A. No

17  Q. Do you know if Mr. Nishiguchi at any time
18  prior to October 7, '03, ever flew a 777 aircraft in or
19  out of San Francisco airport?

20  A. Although I do not know the number of times, I
21  believe that he was flying in and out of San Francisco
22  frequently.

23  Q. As a crew member of a 777 aircraft; is that
24  correct?

25  A. Yes.

**Page 25**

1  Q. Okay. And with regard to yourself, as a crew
2  member of a 777 aircraft, prior to October 7 of '03, is
3  that a trip you frequently made?

4  A. Although I do not recall the exact number of
5  times, I was doing that as a crew member almost every
6  month.

7  Q. Okay When you say every month, how many
8  times on average per month would you be a crew member
9  for a 777 going into or out of San Francisco?

10  A. Are you talking about the time before the
11  accident?

12  Q. Yes, sir So that would be from when you
13  started as a 777 captain in February of 2000 to
14  October 7, '03, how many times per month would you be
15  the pilot flying or pilot not flying, crew member of an
16  ANA aircraft to or from San Francisco?

17  A. I believe that it would be 12, 13, 14 times,
18  approximately

19  Q. Per month?

20  A. No. Before the accident.

21  Q. But 12 or 13 times per month before the
22  accident?

23  A. I'm talking about the number of times in total
24  before the accident. So although I don't know exactly
25  how many times, it would be over ten times

7 (Pages 22 to 25)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1    Q.   Okay  Understood
2        In February of 2000, was ANA flying to
3   San Francisco airport, flying 777s to San Francisco?
4    A.   Yes.
5    Q.   And I take it it's done so regularly up to
6   today? They continue to fly that route to and from
7   San Francisco?
8    A.   Yes.
9    Q.   Other than the accident of October 7 of '03,
10  have you ever been involved in any accidents or
11  incidents with regard to any aviation matter?
12   A.   No.
13   Q.   To your knowledge, has Mr. Nishiguchi or Usui
14  been involved in any accidents or incidents other than
15  the one of October 7, '03?
16   A.   Not as far as I know
17   Q.   From February of 2000 to October 7 of '03, can
18  you tell me how many hours you have as the pilot in
19  command of a 777 aircraft?
20   A.   I don't have the record here, so I do not know
21  the accurate number of hours, but I believe it would be
22  about 4,000 several hundred hours.
23   Q.   Okay  And of those hours that you accrued
24  between February 2000 and October 7, 2003 in a 777, how
25  many would have been as the flying pilot? Any idea?

Page 26

1        MR. TURNER: I just want to add that I want to
2   caution and remind the witness that he is not to guess.
3        THE WITNESS: I cannot recall accurately,
4   therefore, I cannot answer
5        MR. TORPEY: Q.  Okay.  So you have no idea
6   how many hours from 1 to 4,000 you spent as the flying
7   pilot of a 777 aircraft between February 2000 and
8   October 7, 2003; true statement?
9        MR. TURNER: Objection as to form and
10  foundation.
11       THE WITNESS: When I talked about the
12  approximate 4,000 hours, I was talking about the hours
13  that are relevant after I became captain.  If it is only
14  up to the date of 2003, October 7, there will not be as
15  many as 4,000 hours
16       MR. TORPEY: Q  Let me do this so we're very
17  clear, Mr. Yamaguchi.
18       In February 2000 when you became a captain for
19  an ANA 777 aircraft, going forward to October 7, 2003,
20  the date of the accident involved here, please tell me
21  two things. Number 1, what are your total hours as
22  pilot in command of a 777 aircraft?
23       MR. TURNER: One question at a time.
24       MR. TORPEY: I haven't finished my question.
25   Q.   Number 2, of those hours, how many were as the

Page 28

1    A.   Are you talking about the total of my flight
2   time?
3    Q.   Yes.  If I understand you, Mr. Yamaguchi, you
4   said that prior to the date of this accident you had
5   4,000-plus hours as pilot in command of a 777.  And what
6   I'm asking, of those 4,000 approximate hours, how many
7   of those were with you as the flying pilot,
8   approximately?
9    A.   I don't have the document at hand, so I cannot
10  say.
11   Q.   Would your best recollection be that perhaps
12  half of those hours or something more or less than half
13  as pilot flying?
14   A.   I'm trying to ascertain the meaning of the
15  term flying pilot. If I'm onboard as the responsible
16  person, I may be flying the aircraft, so I would be the
17  pilot  But sometimes the copilot would be flying the
18  aircraft, in which case I would not be the flying pilot.
19       The only record that remains would be the PIC,
20  in other words, of me as the person responsible.  So
21  there would be no record about the flying time.
22   Q.   Regardless of there being a record,
23  Mr. Yamaguchi, do you have a recollection of about how
24  many of those approximate 4,000 hours that you were
25  pilot in command that you were also the flying pilot?

Page 27

1   flying pilot.
2        MR. TURNER: I object as to form.  Please ask
3   the witness one question at a time, Mr. Torpey.  I want
4   the record clear that I'm objecting to Mr Torpey and
5   his discourtesy in asking these two questions knowing it
6   is improper form.  But I'm going to let the witness
7   answer it.
8        MR. TORPEY: And I would ask that you raise
9   objections, not speaking objections  I don't want to
10  get into a dialogue here, so let's stop that right now
11       MR. TURNER: You know you're very wrong in
12  asking two questions, and it was very discourteous for
13  you to insist upon doing it
14       MR. TORPEY: You can make an objection to
15  form, but you can't do what you just did, and if it
16  continues, we're going to have to ask the court to
17  instruct you to follow the rules.
18       MR. TURNER: You know you're 100 percent
19  wrong.  Please stop that right now.
20       MR. TORPEY: Yeah.  Let's stop and read back
21  the question, and let's continue with the deposition.
22       THE INTERPRETER: The interpreter will repeat
23  the question.
24       THE WITNESS: I do not have a record at hand,
25  so that I cannot say what the hours are accurately.  I

Page 29

8 (Pages 26 to 29)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  know the approximate total time, but I am unable to say
2  how much of that time was as a flying pilot.
3       MR TORPEY: Q  And even if you had the
4  records, which I assume you're talking about your pilot
5  logbooks?
6       A.  I do not keep the time personally.  The
7  company does that.
8       Q.  Okay.  What you're telling me though is that
9  even the company records would not reflect how many of
10  the total hours you have accrued as pilot in command
11  between February 2000 and October 7, 2003, involved you
12  as the flying pilot; correct?
13       A.  Yes.
14       Q.  And finally, Mr. Yamaguchi, what is your best
15  recollection of the total number of hours you have as
16  the pilot in command of a 777 between February 2000 and
17  October 7, 2003?
18       A  I do not know the accurate number of hours,
19  but I would think that it would be around 2,000 hours
20       Q.  Have you at any time been subject to any kind
21  of disciplinary action by any government authority
22  and/or ANA relative to your performance as a pilot?
23       A.  After the accident, my work was suspended for
24  a certain time period.
25       Q.  How long was -- let me  You say your work was

Page 30

1  did you resume the identical duties?  Did anything
2  change?
3       A.  No  It was the same.
4       Q.  Who determined -- strike that.
5            On October 7, 2003, with regard to the flight
6  where the accident occurred, was it your decision to
7  designate your first officer to be the flying pilot that
8  day?
9       A.  Yes
10       Q  What was the reason that you chose not to be
11  the flying pilot that day?
12       A.  There was no reason or limitation for the
13  copilot not to operate the aircraft
14       Q.  And when you came in from Japan on the flight
15  immediately before the departure flight where this
16  accident occurred, did you fly inbound with the same
17  crew members that you were flying back to Japan with?
18       A.  Yes  I was in the deadhead, in other words,
19  the passenger compartment
20       Q  And was Mr  Nishiguchi part of the flight crew
21  for that inbound flight?
22       A  Yes.
23       Q  How about Mr. Usui?
24       A.  He too.
25       Q.  And do you know what role they played, in

Page 32

1  suspended.  ANA suspended you from further piloting for
2  a period of time after this accident?
3       A.  Yes.
4       Q.  And the suspension was because of the accident
5  at San Francisco?
6       A.  Yes
7       Q  And how long was your suspension?
8       A  About two weeks.
9       Q.  Were you paid during those two weeks?
10       A.  Yes.  I was being paid.
11       Q.  Were the other two pilots that were with you
12  on October 7, 2003, also suspended?  Do you know?
13       A  I don't know.
14       Q.  What was the reason you were told you were
15  being suspended?
16       A  I do not recall accurately
17       Q.  Was there ever any type of reprimand either
18  written or verbal ever given to you by ANA relevant to
19  the October 7, 2003, accident?
20       A.  No, I was not.
21       Q.  Are you aware of whether there was any
22  reprimand issued to the other two pilots that were with
23  you?
24       A.  I do not know if they were reprimanded or not.
25       Q.  When you went back to work after two weeks,

Page 31

1  other words, who was the pilot in command and who was
2  the flying pilot on that inbound flight?
3       A.  Mr Usui was the pilot in command, but I don't
4  know which of the two people was the flying pilot
5       Q.  And it was the same aircraft you flew in and
6  out of or were going to fly out of that day that?
7       A.  I do not know
8       Q.  Let me show you what we marked as Exhibit 1 if
9  you could -- our court reporter has that.
10            (Whereupon, Exhibit 1 was marked for
11            identification )
12       MR TORPEY: Q  That's the deposition notice
13  that was dated November 19  Did you read that notice at
14  any time prior to today?
15       A.  I was told that there was this document, but I
16  have not read it with accuracy.
17       Q.  Prior to today, has anyone asked you whether
18  you objected to producing any documentation that ANA has
19  with regard to your employment or piloting, training,
20  things of that nature?  Has anybody asked you whether
21  you would object to that?
22       A.  No.
23       Q.  Do you have a problem with us getting from ANA
24  your records with regard to your -- nonfinancial
25  records, but records regarding your training,

Page 33

9 (Pages 30 to 33)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  employment, certifications, hours flown, any problem
2  with us getting your aviation-related records from ANA?
3     A.  That is not up to me.  It is something for the
4  company to decide.
5     Q.  If the company chose to give them to us,
6  you're fine with their decision?
7     A.  Are personal information included?
8     Q.  No financial information is included
9  Strictly regarding your aviation experience, training,
10  hours, work history, not your personal -- for example,
11  personal medical, personal financial information.  No,
12  none of that.
13     A.  Yes.
14     Q.  Do you know what an operations manual is?  Are
15  you familiar with that term?
16     A.  Yes.
17     Q.  What is an operations manual?
18     A.  It is a manual that explains how to do our
19  work.
20     Q.  Okay.  It's an ANA document; correct?
21     A.  Yes
22     Q.  It sort of is the outline, if you will, of how
23  the company and its employees are expected to perform
24  their duties including with regard to the operation of
25  ANA aircraft; correct?

Page 34

1     A.  Yes.
2     Q.  And it's required that that manual be kept
3  with the aircraft?
4     A.  Yes.
5     Q.  Do you know how many 777s ANA currently has in
6  its fleet?
7     A.  I do not have an accurate recollection.  Maybe
8  about 30.
9     Q.  Are they the same model or configuration?  And
10  I'm not talking about configuration, but in terms of the
11  cockpit or equipment?
12     A.  Yes.
13     Q.  Was that about the size of the fleet back on
14  October 7 of '03?
15     A.  If we are going to compare with that time
16  period, I would say that there is twice as many today.
17     Q.  Okay  But as far as the equipment onboard,
18  and again, in the cockpit they're basically the same
19  today as back in '03?
20     A.  Yes.
21     Q.  How many radios are there onboard an ANA 777?
22  And for clarity, when I say radios, I mean radios that
23  you would use to talk to people outside of the aircraft,
24  for example, air traffic control.
25     A.  There are two types of radios.  One is VHF,

Page 35

1  the other is HF, and there are three VHFs and two HFs
2  onboard.
3     Q.  I'm sorry  There were two -- what did you
4  say?
5     A.  HF
6     Q.  With regard to the 777 you were in on the day
7  of this accident, was there anything different or unique
8  about that?  Or basically was it just like all the other
9  777s you've been in for ANA?
10     A  It was the same.
11     Q.  Now, with regard to the VHF radios, for what
12  purpose would you use those?
13     A.  It is used for communication with ATC or the
14  company radio.  Also to send -- also for data
15  communication.
16     Q.  Okay.  How about the HF?
17     A.  HF is used to communicate with the controllers
18  in areas that the VHF would not reach.
19     CHECK INTERPRETER:  For example, over the
20  ocean.
21     THE INTERPRETER:  For example, over the ocean.
22     MR. TORPEY:  Q.  With regard to the -- you say
23  there are three separate VHF radios onboard the 777?
24     A.  Yes.  Three.
25     Q.  And could they be turned to different

Page 36

1  frequencies simultaneously?
2     A.  Yes.
3     Q.  Would that typically be the protocol that was
4  followed by ANA that there would be three radios on
5  three different frequencies, or would they be tuned to
6  the same frequency.  What would routinely be the
7  protocol?  And we're just talking about the VHF radios
8     A.  Ordinarily or typically, one VHF is used to
9  communicate with ATC.  The second one is used to
10  communicate with the company or is set for guard
11  frequency, and the third one is used for data
12  communication.
13     Q.  All right  Let me make sure I understand
14  The first radio is used for air traffic control
15  communication; is that correct?
16     MR. TURNER:  Can I have that question read
17  back please in English.
18     (Record read by the reporter.)
19     MR. TURNER:  You mean the first VHF?
20     MR. TORPEY:  Yeah  I'll restate the question
21     Q.  I'm only talking now, Mr. Yamaguchi, about VHF
22  radios.  I'm not talking about HF.  We'll do that
23  separately.
24     If I understand you, there are three VHF
25  radios, and one of the three is dedicated for flight

Page 37

10 (Pages 34 to 37)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  deck communications with air traffic control; is that
2  correct?
3      A   Yes.
4      Q.  The second VHF radio you said is used for
5  communicating with the company or for the guard
6  frequency. When you say the company, are you talking
7  about communications between the flight deck and ANA?
8      A   Yes.
9      Q.  What do you mean by the guard frequency?
10     A   If there should be any failure in the VHF that
11  communicates with ATC, then the instruction would be
12  given by that special frequency.
13     Q.  So you leave this second radio, as we're
14  calling it, on a frequency that allows you to
15  communicate during operation of the flight with
16  individuals at ANA; is that correct?
17     A   It depends on where the aircraft is. If it is
18  close to land, then it would be at a frequency setting
19  that allows communication with the company. If the
20  aircraft is far away or over the ocean, then it would be
21  at guard frequency or a frequency that allows
22  communication between aircraft to aircraft.
23     Q.  Okay. And if the aircraft was on the ground,
24  it would be tuned to the frequency that allows you to
25  communicate with ANA; correct?

Page 38

1      A   Yes.
2      Q.  And then the third VHF radio you said is for
3  data. Explain what you mean by that.
4      A   On land, it is set for data communication, but
5  ordinarily in the air, it is at guard frequency.
6      Q.  What kinds of data would you get with that
7  third radio when it was on the ground receiving data?
8      A   The representative data would be weather
9  related to the flight, weight and balance, company
10  messages.
11     Q.  So of the three radios, only one would be used
12  for purposes of communicating with, as you said, ATC.
13  Would that be the same radio that would be used for
14  purposes of contacting, for example, United ramp control
15  at San Francisco?
16     A   Yes.
17     Q.  Now, when I used -- let me ask you, when you
18  use the term air traffic control, are you referring to,
19  for example, at San Francisco the FAA ground or FAA air
20  traffic controllers?
21     A.  Yes.
22     MR. TURNER: Mr Torpey, would this be a good
23  time to take a break. We've been going for about an
24  hour and a half without a break.
25     MR. TORPEY: I'm almost done with this couple

Page 39

1  of questions.
2      Q   So back on October 7 of '03, if you wanted to
3  communicate with air traffic control, you would have to
4  switch to a different frequency on the VHF radio than
5  you would if you wanted to talk to United ramp control;
6  correct?
7      A.  Since the other party that we communicate is
8  different, naturally the frequency would have to be
9  changed.
10     Q.  So you use the -- can we call the one VHF
11  radio as the dedicated radio to talk to ATC or United
12  ground on the respected frequencies? In other words,
13  you use the same radio to do both functions from;
14  correct?
15     MR. TURNER: Objection as to form and
16  foundation
17     THE WITNESS: I'd like the question again.
18     MR TORPEY: Q  I'll rephrase it,
19  Mr. Yamaguchi
20     Back on October 7 of '03, as you've indicated,
21  there were three VHF radios in the aircraft as you were
22  taxiing from the gate towards your intended departure;
23  correct?
24     A   Yes.
25     Q   And was one of the three VHF radios tuned to a

Page 40

1  frequency so that it was dedicated to getting data as
2  you've described?
3      A.  Yes.
4      Q.  And up to the point where the collision
5  occurred on October 7, 2003, was that radio still tuned
6  and receiving data?
7      A   It is already four years since then, so I do
8  not have an accurate recollection about that
9      Q.  Do you have any -- would it be standard
10  protocol, Mr. Yamaguchi, that back on October 7, 2003,
11  you would have changed the frequency on that radio that
12  you were receiving data while you were still on the
13  ground?
14     THE INTERPRETER: I would like the question
15  again, please.
16     (Record read by the reporter.)
17     MR TORPEY: Let me rephrase it.
18     CHECK INTERPRETER: When you say protocol --
19     MR TORPEY: Q  I'll withdraw the question.
20  I'll ask you a new question.
21     With regard to -- we'll call it radio 3 --
22  that you indicated would have been tuned to receiving
23  data including weather briefings and other important
24  information, would it be fair to say, Mr. Yamaguchi,
25  that prior to the impact and leading right up to the

Page 41

11 (Pages 38 to 41)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  impact, to the best of your knowledge, that radio
2  remained tuned to the frequency that allowed it to
3  receive data?
4        Is that a fair statement?
5     A.  Are you inquiring if we were using that radio
6  to obtain data?
7     Q.  Mr. Yamaguchi, you indicated in earlier
8  testimony there were three VHF radios onboard your
9  aircraft on October 7, 2003.  You further testified that
10  one of those three radios was used for receiving data,
11  which included weather briefing, weight and balance, and
12  other important information.
13        Is that a true characterization of your
14  testimony, sir?
15     A.  Yes.
16     Q.  To the best of your knowledge, Mr. Yamaguchi,
17  at any time up to the impact on October 7, 2003, did any
18  member of your crew change the frequency on that radio
19  so that it was doing something other than receiving
20  data?
21     A.  I didn't notice that.  I don't understand why
22  you are asking me such a question.
23     Q.  Well, I appreciate you don't understand why
24  I'm asking, Mr. Yamaguchi, but I want to make sure that
25  I know your testimony in terms of what happened that

Page 42

1  day.
2        So can we leave it by saying to the best of
3  your knowledge, as of the time of the impact on
4  October 7, 2003, one of the three radios, the VHF
5  radios, at the time of impact was tuned to a frequency
6  that allowed ANA's aircraft to receive data?
7        Is that a fair statement, sir?
8     A.  That is my recollection.  I do not recall that
9  I adjusted that radio.
10     Q.  And to your knowledge no one else did either;
11  correct?
12     A.  I didn't notice it.
13     Q.  Okay.  Let me ask you real quick, and then
14  we'll break --
15     A.  I'd like to take a break.
16     MR. TORPEY:  Okay.  Certainly, we'll take a
17  break.
18     THE VIDEOGRAPHER:  This concludes Videotape 2
19  in the deposition of Eishin Yamaguchi.  Going off the
20  record.  The time on the monitor is 11:40 a.m.
21        (Recess taken.)
22     THE VIDEOGRAPHER:  Here begins Videotape 1 of
23  the deposition of Eishin Yamaguchi.  Coming back on the
24  record.  The time on the monitor is 11:54
25     MR. TORPEY:  Q.  Mr. Yamaguchi, we talked

Page 43

1  earlier in the deposition about your suspension
2  following this accident.  Who was it who told you you
3  were suspended?
4     A.  I do not recall who.  On the computer I found
5  that my schedule had changed, so I came to the
6  conclusion that it was a suspension.
7     Q.  Well, when your schedule changed, were you --
8  let me back up.  Were you scheduled to fly the next day
9  on October 8 of 2003?
10     A.  No.  After returning to Japan, there's always
11  a three-day rest.
12     Q.  But after the three-day rest, you were
13  scheduled to resume your flying duties; correct?
14     A.  After the three-day rest, there could be a
15  further vacation or another type of work that is
16  scheduled.
17     Q.  Mr. Yamaguchi, the question specifically, sir,
18  is on October 7, 2003, when were you next scheduled to
19  fly for ANA right before this accident happened?
20     A.  I do not recall
21     Q.  Well, you do recall that you were scheduled to
22  fly and your schedule was changed and you considered
23  that to be a suspension.  You remember that; correct?
24     A.  Yes.
25     Q.  And who sent you that memo, the scheduling

Page 44

1  change memo that you considered a suspension?
2     MR. TURNER:  Objection as to form and
3  foundation.
4     THE WITNESS:  The schedule on the computer was
5  different, but I do not know who instructed that.
6     MR. TORPEY:  Q.  Did it say anything other
7  than a -- showing a revised schedule?  In other words,
8  did it give information as to why it was being changed?
9     A.  That wasn't stated.
10     Q.  Did you ask anyone about that scheduling
11  change?
12     A.  No.  I did not because I thought it was
13  natural for there to be a rest since it was right after
14  an accident.
15     Q.  Did you have to get any training that you
16  would not otherwise have had to get as a result of this
17  accident?
18     A.  There was no special training, but together
19  with Mr. Nishiguchi we made one round-trip domestically
20  and also one round-trip between Narita and
21  San Francisco.
22     Q.  And what was the purpose of that trip?
23     A.  I do not know.
24     Q.  Did you have to get instruction or take any
25  kind of a test during that trip?

Page 45

12 (Pages 42 to 45)

Eishin Yamaguchi

1    A    No.
2        Q.    Are you aware of any corrective action
3    undertaken by ANA as a result of the October 7, 2003
4    accident to preclude such an accident from happening in
5    the future?
6        A    Yes
7        Q    And what corrective action was taken?
8        A    The accident facts were reported to crew
9    members and also there is a chart that we use and a
10    warning information was noted on the chart.
11        Q    And where is this chart and warning kept?
12        A    There is a route manual, and it is written on
13    the route manual
14        Q.    Is that the operations manual?
15        A.    No.  It's a separate thing.
16        Q.    And it's called the route manual?
17        A.    Yes.
18        Q.    And is that kept in the aircraft?
19        A    Each individual has one.
20        Q    So every pilot has their own route manual?
21        A    By own, your term own, do you mean
22    individually?
23        Q    Well, if you wanted to look at the route
24    manual, where would you go to get it?
25        A    And who is doing the looking, me or you?

Page 46

1        Q.    Mr Yamaguchi, let me ask you again.  If you
2    wanted to go and look at the route manual -- I'll
3    rephrase it.
4            Would ANA have a copy of the route manual that
5    you've referred to?
6        A.    The company has a copy, and also the same copy
7    is distributed to each individual.
8        Q.    Okay.  Now, what does the warning that you've
9    described as the corrective action following this
10    October 7, 2003 accident, what does that warning state?
11        A.    It is a warning that says that the aircraft
12    should not taxi if there is an aircraft pushing back
13    from gate 1 or 2.
14        Q.    Is that a -- this route manual, is that a
15    route manual that had existed before October 7, '03?
16        A.    The route manual itself existed
17        Q.    Okay  And it obviously was revised with these
18    corrective actions that you've described; correct?
19        A.    Yes.
20        Q.    And is that a publication that's required to
21    be kept on the aircraft itself, the route manual?
22        A    It is a publication that is not required to be
23    onboard, but each individual should bring one in.
24        Q.    So at the time of this accident, there was at
25    least one copy of the route manual as it existed on

Page 47

1    October 7, 2003, on the aircraft that day; correct?
2        A    Well, each individual had one
3        Q.    Does that answer to my question, yes, there
4    was one on the aircraft that day?
5        A    Yes
6        Q.    And are you familiar with the term pilot
7    logbooks?  Have you ever heard that term used before?
8        A.    Yes
9        Q.    What does that mean to you?
10        A.    It is a personal flight log
11        Q.    And what kind of information do you understand
12    is logged in pilot logbooks?
13        A    Information such as the flight times,
14    departure, IMC, time, and nighttime, and the number of
15    arrivals.
16        Q.    It would have the number of hours flown too;
17    correct?
18        A.    Yes.
19        Q    And do you as a pilot for ANA have something
20    that would be, whatever you call it, similar to a pilot
21    logbook?
22        A.    I do not have one.
23        Q    Would ANA have one?
24        A    Yes, that's right.
25        Q.    And would that be a document that you would

Page 48

1    have had on the aircraft on October 7 of 2003?
2        A    My understanding that the pilot logbook is a
3    personal record  It is different from the journey log,
4    which is the logbook for the aircraft.
5        Q.    Okay  The journey log, is that required to be
6    on the aircraft on October 7 of '03?
7        A    Yes.
8        Q.    Now, you indicated earlier that there was no
9    reason for the first officer not to be the flying pilot.
10    Is there any reason that you could not or should not
11    have been the flying pilot on October 7, 2003?
12        A    There was no reason.
13        Q    Okay  Were you on any medication that
14    precluded you from being the flying pilot that day?
15        A.    No.  I was not on medication
16        Q    Did you take any type of alcohol or drugs of
17    any kind within, say, 12 hours of departure on October 7
18    of '03?
19        A    No.
20        MR. TORPEY:  You know, Marshall, we'd like to
21    look at the document  If you're producing documents,
22    we'd like to have a chance to look at those?
23        MR. TURNER:  Do you have a protective order
24    pursuant to the judge's order?
25        MR. TORPEY:  Well, the judge's order does not

Page 49

13 (Pages 46 to 49)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1 give a deadline by which I have to do that, and I've
2 already told you, and I'm telling you again, that we
3 will make this retroactive. So if you are not going to
4 hand them over at this point, I'm going to assume you're
5 not going to produce them and we won't have a chance to
6 even look at them in this deposition.
7    So now is the chance I want to take a look
8 at them
9    MR. TURNER: First, I would like to find out
10 when you intend, pursuant to the judge's order of
11 November 19 and your own statement to me of November 13,
12 that you are going to make the changes the judge ordered
13 should be made and give us a copy of the confidentiality
14 order. I don't understand what's taking so long.
15    MR. TORPEY: You recall that there was a long
16 holiday weekend, perhaps you forgot that, and here we
17 are and I'm telling you again that I will make it
18 retroactive. So rather than waste any more time talking
19 about it, either produce the documents -- we agree on
20 the record that it will be retroactive -- or don't
21 produce them. But I'm not going to ask you, again
22 Marshall. I'm going to assume whatever -- that whatever
23 you do now is what you're going to do for the rest of
24 these three depositions
25    MR. TURNER: I do have them here, and it's my
                                                    Page 50

1 intent to give them to you. However, we did have some
2 disagreement as to what the content should be. The
3 judge generally agreed to me, generally agreed you were
4 going to get it to me right away.
5    The judge ordered you should get it to me, and
6 I want to note what the content is going to be before I
7 turn it over to you, the documents over to you, pursuant
8 to what you say you will agree to. Are the conditions
9 that you're going to accept, the conditions that the
10 judge expressed during the hearing on November 13.
11    MR. TORPEY: Well, Marshall, of course I'm
12 going to follow the judge's orders. That's why we had
13 the hearing. This has already been decided, so I'm not
14 going to waste any more time discussing it today.
15    I want to see the documents. They were
16 supposed to be produced at 10:00 a.m. It's now
17 afternoon. I want to see the documents now. Either
18 decide to give it to me or don't, but at this point I'm
19 going to continue asking questions --
20    MR. TURNER: I want it clear on the record --
21 and don't give me this supposed to be produced at
22 10:00 o'clock. I've had the documents here. I've told
23 you I've had the documents here, and I've been asking
24 you where the order is that the judge had ordered you to
25 give to us well over a week ago.
                                                    Page 51

1    Now, it's here, and I want to make it a
2 hundred percent clear on the record that you are
3 agreeing that the documents that I give you will be
4 subject to the order as expressed by the judge in the
5 transcript of the hearing on November 13, 2007
6    MR. TORPEY: Marshall, I have said yes to that
7 question several times today and in a letter a week ago
8 Now, please hand over documents and let's stop wasting
9 my time and yours and the witness's. We wanted to see
10 the documents. Can we see those now, please
11    MR. TURNER: As far as wasting of time, you're
12 the one that has wasted virtually two weeks by now on
13 this confidentiality order, not to mention the fact that
14 almost every correction that I had asked you to make
15 almost two months ago were the corrections that the
16 judge ordered at the hearing on November 13. And we
17 could have had this done months ago not just at
18 10:00 o'clock this morning
19    MR. TORPEY: Are you giving me the documents,
20 Marshall, or not because I want to move on with this
21 deposition? I'm not going to discuss it further with
22 you
23    MR. TURNER: Mr. Yamaguchi has his
24 certificates that you had requested be produced.
25 There's a copy for you, and I'm giving Mr. Yamaguchi a
                                                    Page 52

1 copy
2    MR. TORPEY: Are you producing any other
3 documents, Marshall? I want to see every document
4 you're producing in response to my notice at this point
5    MR. TURNER: We are producing the training
6 records that Mr. Yamaguchi had discussed with the legal
7 department of ANA and requested that the last column and
8 the third from the last column be blacked out, redacted
9 There's a copy of Mr. Yamaguchi's training record for
10 him and for you.
11    MR. TORPEY: Is that it?
12    MR. TURNER: Mr. Yamaguchi with regard to the
13 accident investigation file had his statements to the
14 NTSB and United Airlines, statements to the NTSB all of
15 which have been produced and in everyone's possession
16 for years.
17    And as well the Jeppesen chart for the
18 San Francisco International that was in effect on the
19 day of the accident. And this is not Mr. Yamaguchi's
20 document, but he hasn't had time to look for this since
21 he didn't see your most recent document request until
22 yesterday.
23    And this is a section that he got from the
24 legal department at ANA of the operations manual of ANA
25 that covers the portion of the flight on the day of the
                                                    Page 53

14 (Pages 50 to 53)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1    accident, which is in effect now, many of which pages
2    were in effect on October 7, 2003, but some of them have
3    been altered and revised.
4        What I'm handing you now is a current copy.
5        MR. TORPEY: Well, I don't have it. Why don't
6    you hand it to me.
7        MR. TURNER: One second. Just looking to see
8    if I have an extra copy for you. Maybe we can have the
9    court reporter make a copy. I think I just have one
10   copy. So let me identify it as operations manual
11   section 2.3 through 2.3 -- 2-3-3, and supplement
12   pages 7S1 through 7S6-7. I don't seem to have an extra
13   copy, but we'll get a copy from the court reporter.
14       MR. TORPEY: Okay. Is that everything you're
15   producing?
16       MR. TURNER: Yes.
17       MR. TORPEY: Why don't we mark this as one
18   exhibit. This could be Exhibit 2.
19       (Whereupon, Exhibit 2 was marked for
20       identification.)
21       MR. TORPEY: Just, for the record, I have
22   marked as Exhibit 2 all of the documents that Mr. Turner
23   has just turned over in response to our deposition
24   notice.
25       So I will at some point, Mr. Yamaguchi, ask

Page 54

1    whatever necessary information that the company wants to
2    send us.
3        Q.    Would it also be things like maintenance and
4    mechanical issues?
5        A.    It would be rare for that type of information
6    to be communicated to us when we are on land, but
7    sometimes the aircraft mechanical issue may be
8    communicated by us to the company.
9        Q.    So you agree there is a need for having a
10   dedicated VHF radio with its frequency tuned to ANA
11   while your aircraft is on the ground; correct?
12       A.    Not dedicated. For example, we call it left,
13   right, and center radios. As a custom, we use the left
14   one for communication with ATC, the right one for
15   communication with the company, and the center one for
16   data communication, but we can use them for different
17   communications.
18       Q.    Okay. To the best of your knowledge,
19   Mr. Yamaguchi, as the pilot in command of the aircraft
20   on October 7, 2003, at the time of the impact with the
21   United aircraft, were your radios, the VHF radios, the
22   left tuned to a frequency so you could talk to air
23   traffic control, the right tuned to a frequency so you
24   were talking or could talk to ANA, and the center tuned
25   to a frequency to allow you to receive data?

Page 56

1    you some questions about those, but I want the record to
2    be clear that that's the totality of what I was given.
3    And I understand that's the totality of all that I'll be
4    given.
5        MR. TURNER: And one second. I want it
6    absolutely clear that you are agreeing that every page
7    that I've just handed to you will be marked confidential
8    and subject to the confidentiality agreement when we
9    agree to it, when you provide it to me as ordered by the
10   judge and as the judge orders.
11       MR. TORPEY: Didn't I just say that, Marshall.
12   Once again, I'll say, yes, absolutely. I agree, as I
13   did previously, to make these retroactively subject to
14   the protective order.
15       Q.    Now, apologize, Mr. Yamaguchi, for the delay.
16   I'd like to get back to the VHF radio that we were
17   talking about, and I want to try to go through this
18   quickly because we still have a lot to cover.
19       The second of the three VHF radios you
20   indicated would be used for communications with ANA,
21   what kinds of things would you be communicating with ANA
22   about when the aircraft is on the ground, for example,
23   at San Francisco International?
24       A.    For example, if there is a weight and balance
25   adjustment or if there are specific new alerts or

Page 55

1        A.    I did not see those three radios just before
2    and after the impact. It is certain that the left was
3    tuned to communicate with ATC, but I do not have an
4    accurate recollection about the other two.
5        Q.    Well, Mr. Yamaguchi, as of the time of the
6    impact, if the normal routine was being followed by
7    yourself and your crew members, you agree with me that
8    the right-hand radio would be tuned to a frequency
9    allowing you to talk to ANA and the center would be
10   tuned to a frequency to allow you to receive data.
11       Is that a correct statement, sir?
12       A.    Ordinarily that is so, but I do not have a
13   recollection as to whether they were actually so at that
14   time.
15       Q.    Well, you have no reason to believe that they
16   were not -- let me rephrase it.
17       Although you don't have a specific
18   recollection today, would it be fair to say that you
19   have no information whatsoever to lead you to believe
20   that at the time of the impact the VHF radios were not
21   set as you would routinely set them on the ground?
22       THE INTERPRETER: The interpreter will repeat
23   the question in Japanese.
24       THE WITNESS: There was no necessity to change
25   them, but I cannot confirm that the right was set for

Page 57

15 (Pages 54 to 57)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  the company and the center was set to data.
2      MR. TORPEY: Q. Okay. And if you and your
3  crew followed ANA's normal custom and practice, at the
4  time of the impact, the center would be set to receive
5  data, the right would be set to talk to ANA, and the
6  left was set to talk to air traffic control; correct?
7      A. I am repeating myself, but it is certain that
8  the left was used for communication with ATC. But I did
9  not see the right and the center, so I do not know
10  clearly.
11      Q. With all due respect, Mr. Yamaguchi, that was
12  not the question. So I want to have the question read
13  back. Please answer my question, sir.
14      MR. TURNER: With all due respect, your
15  question has been asked half a dozen times already --
16      MR. TORPEY: That's not an objection under the
17  federal rules.
18      MR. TURNER: And you start asking the same
19  question ten times, I'm going to speak up.
20      MR. TORPEY: If you want to move for a
21  protective order and terminate the deposition. If you
22  want to get the judge on the line, you can do that.
23  What you can't do and I won't stand for is for you to
24  give coaching objections. That's what I won't do. You
25  can laugh at me, Marshall.
                                              Page 58

1      MR. TURNER: It is a joke, the way you're
2  behaving. That is a joke.
3      (Record read by the reporter.)
4      THE WITNESS: As a generality that is the
5  case, but whether they were actually so or not, I can't
6  say because I did not check before and after the impact.
7      MR. TORPEY: Q. Mr. Yamaguchi, I'm not asking
8  you, sir, whether you can actually confirm. I'm
9  strictly asking you, as the question indicates, about
10  custom and routine. Do you understand that, sir?
11      A. The general way we use them were -- that were
12  as you say.
13      Q. Okay. And do you have -- strike that.
14      Is there any reason on October 7, 2003, that
15  you're aware of that that general custom or routine with
16  regard to the settings of the VHF radios was not
17  followed?
18      A. I do not recall clearly although I don't think
19  there was any.
20      Q. If the flying -- strike that.
21      The observer pilot would not for any reason
22  change the frequency on one of these radios any time up
23  to the time of impact; correct?
24      A. Not ordinarily.
25      Q. Who was doing the communicating on the day of
                                              Page 59

1  this accident? Was it you or the flying pilot?
2      A. It was me.
3      Q. And as the pilot that was communicating, if
4  there was going to be a frequency change, would you be
5  the one that would make that change?
6      A. Yes.
7      Q. And as the pilot in command of that flight on
8  October 7, if the first officer or flying pilot wanted
9  to make a change in the frequency of any of the three
10  VHF radios, would they let you know that?
11      A. Yes, I think so.
12      Q. And as you sit here today, do you recall your
13  first officer ever asking you if he could change the
14  frequency on the center or the right radio so that they
15  would be tuned to frequencies other than what they would
16  routinely be tuned to?
17      A. No, he did not.
18      Q. All right. Let me ask you in terms of routing
19  the day of -- let me back up.
20      With regard to routing from SFO to Japan
21  airspace, are there different altitudes, for example,
22  that can be assigned?
23      A. Do you mean at the time of departure?
24      Q. Let me rephrase it for you, Mr. Yamaguchi.
25      When you, as the PIC, and the communicating
                                              Page 60

1  pilot talk to air traffic control, did you request any
2  assignment in terms of, you know, what routing you would
3  be assigned for your trip between SFO and Narita, the
4  day of this accident?
5      A. Yes.
6      Q. And do you have a preferred route that, if
7  it's available, you like to get?
8      A. I do not recall clearly if we received
9  clearance with regards to the routing that we requested,
10  but usually there is no change in the routing.
11      Q. When I say routing, I guess, can you ask to be
12  assigned to particular altitudes, for example?
13      A. Altitude is requested by the company to the
14  ATC authority in advance.
15      Q. Do you remember the local time of day that
16  this collision occurred?
17      A. Not accurately.
18      Q. Was it sometime around noon local Pacific
19  time?
20      A. I think it was in the morning.
21      Q. Okay. I know you're not sure, but what's your
22  best estimate of the time locally, Pacific time, that
23  the collision occurred?
24      A. The departure time was around 11:00 a.m., so
25  it was around 20 minutes later.
                                              Page 61

16 (Pages 58 to 61)

Eishin Yamaguchi

1    Q.  Do you recall if you left the gate on time?
2    A.  I do not recall
3    Q.  Okay.  There are other airlines besides ANA
4  that fly out of that terminal, that international
5  terminal that your aircraft departed from; correct?
6    A.  Yes.
7    Q.  And were you aware on October 7, 2003, that
8  there were other airlines flying scheduled flights that
9  morning at around the same time of your flight to Japan?
10   A.  No, I was not aware
11   Q.  So you felt that your flight was the only
12 flight of any airline going to Japan at around
13 11:00 o'clock in the morning that day?
14   A.  That is not what I felt
15   Q.  What was your understanding with regard to
16 other aircrafts, say, between 11:00 and 11:15 when you
17 were scheduled to depart from your gate?  What was your
18 understanding on October 7, 2003, about other aircrafts
19 going to Japan departing at about the same time?
20   A.  I don't know the specifics, but that is around
21 the time frame during which flights to Japan depart
22   Q.  In the area where you departed from, the gates
23 and then the ramp area that this collision ultimately
24 occurred, at the time of the accident, was it a very
25 busy time of the day at that airport in that area, in

Page 62

1    A.  We receive clearance before departure, before
2  we start the engine
3    Q.  Now, let's say, there are two or more
4  aircrafts that are scheduled to fly from San Francisco
5  to Japan airspace and they're both being pushed back
6  from their respective gates at around the same time.
7        How is it determined who is going to get
8  the -- what I'll call the more optimal altitude
9  assignments, if there's more than one aircraft competing
10 for the designated altitude?
11   A.  I would not know that.
12   Q.  Well, only one aircraft would be assigned to
13 one particular altitude at a time; correct?
14   A.  There could be many cases, so I would not know
15 about that.
16   Q.  Well, I guess, Mr. Yamaguchi, if you knew
17 that, for example, United's aircraft or some other
18 aircraft was departing at about the same time as your
19 aircraft and was going to fly to Japan and only one of
20 you could get what would be considered the most fuel
21 efficient or optimal route, would you feel that the
22 person who made the first request to ATC would be the
23 aircraft more likely to get that assignment?  In other
24 words, first come/first serve?  Is that your
25 understanding of how the process works?

Page 64

1  other words, a lot of arrivals and departures at that
2  time?
3        MR. TURNER:  Objection as to form and
4  foundation.
5        THE WITNESS:  Are you asking about the time or
6  the location?
7        MR. TORPEY:  Q.  At the location in the ramp
8  area including the gates and the adjacent ramp area, are
9  there a lot of flights that depart around the time your
10 flight was departing so that it's very congested, if you
11 will, with arrivals and departures in that area at that
12 time?
13       MR. TURNER:  Objection as to form and
14 foundation
15       THE WITNESS:  I do not recall clearly.
16       MR. TORPEY:  Q.  All right.  Are some altitude
17 assignments for airspace between San Francisco and Japan
18 airspace better than others for purposes of fuel
19 efficiency, for example?
20   A.  Yes.
21   Q.  And when you're asking for clearance to taxi
22 and take off, do you request to be assigned to a
23 particular altitude that you believe would be the most
24 fuel efficient or for whatever reason you believe to be
25 the most optimal altitude?

Page 63

1    A.  No, I don't think that is -- would be the only
2  reason
3    Q.  Well, that could be one of the reasons, the
4  first to ask for the optimal airspace may be the one
5  that gets it; correct?
6    A.  That may be one of the reasons, but the routes
7  from the West Coast to Asia are not limited to just
8  San Francisco.
9        THE INTERPRETER:  The interpreter will
10 restate
11       THE WITNESS:  That may be one of the reasons,
12 but the routes from the West Coast to Asia is limited.
13 San Francisco is not the only airport.  There is
14 Los Angeles airport as well as many other airports along
15 the West Coast from which the aircrafts depart.
16       So even if a certain aircraft made the request
17 first in San Francisco, it does not necessarily mean
18 that that aircraft would be assigned that optimal route.
19       MR. TORPEY:  Q.  ANA flies between Los Angeles
20 and Japan; correct?
21   A.  Yes
22   Q.  And I take it you also fly that route with the
23 777?
24   A.  Yes.
25       MR. TURNER:  Counsel, it's past 1:00 o'clock

Page 65

17 (Pages 62 to 65)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

**Page 66**

1    It's way past time for lunch already. Let's break now.
2         MR. TORPEY: We just took a break 45 minutes
3    ago, and I'm happy to stop for lunch, but I'd like to --
4         MR. TURNER: If you're in the middle of a
5    question, then finish the question. Go right ahead.
6         MR. TORPEY: Q. With regard to flights
7    between Japan and LAX, does ANA fly those on a daily
8    basis?
9         A.  Yes.
10        MR. TURNER: You finished that question?
11        MR. TORPEY: Yeah. I guess we can take a
12   break. You know, we've been going for about a little
13   less than two and a half hours of testimony, so how long
14   do you want to break for?
15        MR. TURNER: An hour. We've been going for
16   almost three hours of testimony.
17        MR. TORPEY: No. We haven't.
18        MR. TURNER: We had one break of about
19   10 minutes, and it's well past break time, certainly for
20   the witness, I expect for the translator and for the
21   court reporter.
22        MR. TORPEY: Testimony does not include a
23   lawyer discussion, Marshall, so as far as I'm concerned,
24   we've been here for a little less than two and a half
25   hours of testimony. If you believe otherwise, we'll

**Page 67**

1    just have to see how far this goes, but we'll break.
2    You request an hour break. We'll break for an hour.
3         THE VIDEOGRAPHER: Should we go off the
4    record?
5         MR. TORPEY: Yeah.
6         THE VIDEOGRAPHER: Going off the record. The
7    time on the monitor is 1:01 p.m.
8         (Noon recess taken.)
9         THE VIDEOGRAPHER: Coming back on the record.
10   The time on the monitor is 1:59. Please begin.
11        MR. TORPEY: Q. Mr. Yamaguchi, are you
12   familiar with the term conflict resolution?
13        A.  No. I am not.
14        Q.  As a pilot for ANA, at any time were you
15   trained by ANA or anyone else with regard to what to do
16   when you or a member of your flight crew perceives that
17   it might potentially collide with another aircraft?
18        A.  No.
19        Q.  So even to this day you have never received
20   any training from any source or anyone with regard to
21   what actions you should take in order to determine
22   whether or not you're going to collide with another
23   aircraft and, if so, what to do to resolve that
24   potential collision hazard? Fair statement?
25        MR. TURNER: I'm sorry. Can I have the

**Page 68**

1    question read back please, in English.
2         (Record read by the reporter.)
3         MR. TURNER: Objection as to form and
4    foundation.
5         THE WITNESS: I do not understand what the
6    specific situation is, but I have not been trained for
7    the collision that took place or anything simulating it.
8         MR. TORPEY: Q. Mr. Yamaguchi, so there's no
9    misunderstanding here, even though you were pilot in
10   command of the ANA 777 aircraft, at no time up to
11   October 7, 2003, did you receive any training or
12   instruction of any kind from any source with regard to
13   what actions to take if you believe you are going to
14   collide with other aircraft on the ground?
15        A.  Although I have not received the training,
16   there are warnings given in a document with regards to
17   similar incidents.
18        Q.  What is the document you're referring to?
19   What is it called?
20        A.  There is no special name. I do not recall the
21   name.
22        Q.  Is that a document that ANA has?
23        A.  I think it was included in the -- in one of
24   the documents related to a work log that I saw.
25        Q.  Let me ask you this way, Mr. Yamaguchi. In

**Page 69**

1    all your years of flying you have never heard anyone use
2    the term conflict or conflict resolution; correct?
3         A.  That's right.
4         Q.  I want you to assume for purposes of my
5    questions, Mr. Yamaguchi, that if your aircraft were
6    taxiing and there's another aircraft a distance away and
7    there's a potential that those two aircrafts could
8    collide, I want you to assume that that potential
9    collision hazard is what I'm calling a conflict or
10   potential conflict.
11        Do you understand me?
12        A.  Yes.
13        Q.  For example, on the day of this accident,
14   October 7, 2003, was there any written material that
15   you're aware of that would have assisted you in
16   determining, as you were taxiing towards the United
17   aircraft prior to impact, to determine what you should
18   do to decide whether or not there was a conflict and, if
19   there was a conflict, what you should do to resolve it?
20        THE VIDEOGRAPHER: Excuse me one moment.
21   Madam Translator, the microphone is right underneath the
22   pendant and it's hitting it, so if you could move it to
23   the side.
24        THE INTERPRETER: Should I lower it? My voice
25   is large enough.

18 (Pages 66 to 69)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

**Page 70**

1 THE WITNESS: There's one question; right?
2 MR. TORPEY: Q. Yes.
3 MR. TURNER: I'm sorry. Can I have that
4 question read back then
5 (Record read by the reporter.)
6 MR. TURNER: Objection as to form.
7 THE WITNESS: I don't understand the question
8 very well.
9 MR. TORPEY: Q. Do you think that ANA should
10 have trained you and the other pilots in the cockpit of
11 that aircraft that day on what to do if there is a
12 potential collision hazard, such as the one you
13 encountered the day of this accident?
14 MR. TURNER: Objection as to form.
15 THE WITNESS: In order to obtain my license, I
16 have received Boeing's training, and there's no training
17 limited to taxiing even at Boeing, so I have not
18 received such a training.
19 MR. TORPEY: Q. So you've never received any
20 conflict resolution training by Boeing or ANA or anyone
21 else even to this date; correct?
22 A. I have not received training.
23 Q. Do you think that it would have been a good
24 idea for you and your other crew members to have
25 received conflict resolution training?

**Page 71**

1 A. No, I do not.
2 Q. Why do you think it was not necessary for you
3 or the other crew members on or before October 7, 2003,
4 to receive conflict resolution training?
5 A. That accident entailed a special situation,
6 and it is not possible to receive trainings for the
7 various different special situations.
8 Q. Well, I'm not asking you, Mr. Yamaguchi, if
9 you should get training for every conceivable accident
10 that could ever possibly happen.
11 I'm only asking you whether you believe it
12 would have been useful or advisable for ANA to have
13 trained its pilots in conflict resolutions on or before
14 the day of this accident? Conflict resolution
15 generally.
16 A. I do not believe that such a special training
17 is necessary.
18 Q. Do you know if other airlines provide conflict
19 resolution training to its pilots?
20 A. I do not.
21 Q. Okay. Now, you mentioned earlier in the
22 testimony there was some kind of a warning relating to
23 collision hazards or potential collision hazards, and I
24 asked you what document that was called. And I believe
25 you said it didn't have a particular name.

**Page 72**

1 My question to you is, sir, if you wanted to
2 get a copy of that, where would you go? Who would have
3 it? And in what location would it be held?
4 A. The name is route manual.
5 Q. Is the operations manual that was marked
6 Exhibit 2 -- you're welcome to look at this -- and it's
7 dated July 1 of 2007, at least this generation is -- is
8 the operations manual part of the training or training
9 materials provided to ANA pilots?
10 MR. TURNER: Just for the record to be clear,
11 Exhibit 2 contains more than just the operations manual
12 section. I think it's only the first 10 or 12 pages or
13 so.
14 MR. TORPEY: Q. I'm only referencing the
15 portion of the exhibit that's the operations manual.
16 A. We have a Japanese version, so we do not look
17 at this. This is the English version for foreigners.
18 Q. But the operations manual, even in Japanese,
19 is that part of the required materials to be reviewed as
20 part of training for ANA pilots?
21 A. Yes.
22 Q. Now, if you look at Exhibit 2, the operations
23 manual, this is only a part of the manual. It's not the
24 complete manual; correct?
25 A. Yes, that's right.

**Page 73**

1 Q. On the second page of Exhibit 2, it's talking
2 about taxiing at item 2. Do you see that?
3 A. Yes.
4 Q. And it says, and I'll read it, I quote, the
5 captain shall perform taxi in accordance with the
6 following.
7 Do you see that?
8 A. I can see it, but since I have not compared
9 this to what we use, I cannot really tell whether they
10 are identical.
11 Q. Well, assume for purposes of my questions that
12 they are identical. On the day of the accident,
13 October 7, 2003, you were the captain; correct?
14 A. Yes.
15 Q. And the word shall, you understand that this
16 is mandatory, not discretionary?
17 A. Yes.
18 Q. And on the day of this accident, the flying
19 pilot that was taxiing was not yourself but actually the
20 copilot; correct?
21 A. Yes.
22 Q. Do you know if on the day of this accident,
23 October 7 of 2003, Mr. Yamaguchi, whether that was the
24 rule that was in effect at that time as well as July 1
25 of 2007?

19 (Pages 70 to 73)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1    A.  The manual is revised frequently, so I do not
2  know if the content was the same.
3    Q.  If we assume, Mr. Yamaguchi, that it was the
4  same, then would you agree with me that you and not the
5  first officer should have been taxiing on the day of
6  this accident?
7    A.  No, I do not agree.
8    Q.  And why not?
9    A.  I had the authority to allow the copilot to
10  operate the aircraft.  There was no reason that I had to
11  do it myself.
12    Q.  Well, if, in fact, on October 7, 2003, the
13  operations manual read as it does in Exhibit 2 that the
14  captain shall perform taxi, then you did not have the
15  authority to allow the first officer to perform the
16  taxi; correct?
17    A.  No, that is not so.
18    Q.  Why is it not so despite what it says there?
19    A.  I believe that the interpretation is
20  different.
21    Q.  In what respect?
22    A.  The word captain on this document is not
23  limited to the captain, per se.  It includes the concept
24  that the responsibility of the captain allows his giving
25  permission to the copilot to operate the aircraft.

Page 74

1    Q.  So even if on the day of this accident the
2  operations manual -- and let me back up a step
3        The operations manual is the instructions
4  pursuant to which you have to operate the aircraft;
5  correct?
6    A.  Yes.
7    Q.  And even if on October 7, 2003, the operations
8  manual said that the captain shall perform taxi, you
9  believe and you interpret that statement to mean that
10  you had the right to delegate that to the first officer;
11  correct?
12    A.  That's right.
13    Q.  Have you ever talked to anyone about
14  that -- strike that.
15        Have you ever talked to anyone at ANA about
16  whether your understanding of that is correct or not?
17    A.  Even without talking to anyone, it is obvious
18  that at ANA the -- it is possible for the copilot to be
19  PF from departure to arrival.
20    Q.  But you never asked anyone whether you had the
21  authority to delegate the taxi to the first officer.
22  You never asked anyone that; correct?
23    A.  The manual says that it is possible to have
24  the copilot operate the aircraft.
25    Q.  Can you show me where in the manual it says

Page 75

1  that?
2    A.  I cannot because I do not have a manual at
3  hand.
4    Q.  So it would be in a portion of the operations
5  manual that is not included in the portion marked
6  Exhibit 2; correct?
7    A.  Yes.
8    Q.  Now, getting back to Exhibit 2, that portion
9  of the operations manual, after it says the captain
10  shall perform taxi in accordance with the following,
11  under item 2 it says, be observant of all obstacles
12  around him and taxiing speed is such that he may bring
13  his airplane to an immediate and complete stop
14        Do you see that?
15    A.  Yes.
16    Q.  Now, is the reason as you understand it why
17  that is in the operations manual -- strike that.  Let me
18  rephrase it.
19        Is it your understanding that the reason the
20  captain has to be observant during taxi, observant of
21  all obstacles around him, is to avoid, among other
22  things, colliding with another aircraft?
23    A.  Yes
24    Q.  And if you look further at number 5, it also
25  requires that -- and I'll read it -- ask for a

Page 76

1  signalman's assistance in the event that there's any
2  obstacle in the vicinity of the ramp area.
3        Do you see that?
4    A.  Yes.
5    Q.  And what do you understand that that requires
6  the captain to do?
7    A.  I think it is as is written.
8    Q.  So as written, as you understand it, if during
9  the taxi you, as captain, perceive a potential conflict
10  or collision hazard with another aircraft, then you're
11  supposed to ask a signal person or signalman for
12  assistance.  Is that a correct statement?
13    A.  This is talking about a really severe
14  situation wherein there really might be a collision.
15    Q.  Mr. Yamaguchi, that was not the question.  The
16  question is as you understand what is written, if you
17  perceive -- let me back up.
18        Looking at your operations manual under
19  item 2, taxiing at subsection 2, which requires the
20  captain to be observant of obstacles around him, if
21  during taxi there's another aircraft in your vicinity,
22  according to this manual, you're required -- you shall
23  ask for a signalman's assistance?
24        MR. TURNER:  Objection as to form and
25  foundation.

Page 77

20 (Pages 74 to 77)

Combs Reporting, Inc. 888-406-4060
www.combsreporting.net

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1    THE WITNESS: It depends on the situation
2  Naturally, if I judge that a signalman is necessary, I
3  would request a signalman.
4    MR. TORPEY: Q. What do you understand in
5  this ops manual the word signalman as used in subsection
6  5 means?
7    A. In Japanese the term is chijo, c-h-i-j-o,
8  h-a-i-c-h-i, i-n, but this is a person who will help
9  with the wing tip or the rear of the aircraft that we
10  cannot see.
11    Q. At San Francisco airport on October 7, 2003,
12  would the United ramp controller be someone that you
13  would consider to fall within the definition of a
14  signalman?
15    A. No.
16    Q. So if on October 7, 2003, you perceived that
17  there may be a collision hazard with the United air,
18  according to the policy in ANA's operations manual, what
19  did you understand you had to do at that point, if
20  anything?
21    A. At that point we were continuing with the
22  taxiing based on the judgment that there was no
23  potential for a collision
24    Q. My question to you, sir, is assume that at
25  some point prior to the impact, if you had perceived

Page 78

1    to accurately answer it
2    THE WITNESS: Since this is a hypothetical
3  issue, I cannot give an accurate answer.
4    MR. TORPEY: Q. Mr. Yamaguchi, as the pilot
5  in command of an aircraft that had over 150 people whose
6  lives were in your hands on October 7, 2003, are you
7  telling me and this jury that you have no idea what you
8  should do when faced with the possibility of colliding
9  with the United aircraft on that day?
10    Is that what you're telling us?
11    MR. TURNER: Objection as to form and
12  foundation.
13    MR. TORPEY: Now, before he answers, why don't
14  you change the tape
15    THE VIDEOGRAPHER: This concludes Videotape 2
16  in the deposition of Eishin Yamaguchi. The time on the
17  monitor is 2:48 p.m.
18    (Discussion off the record.)
19    THE VIDEOGRAPHER: Here begins Videotape 3 in
20  the deposition of Eishin Yamaguchi. Coming back on the
21  record. The time on the monitor is 2:51 p.m.
22    MR. TORPEY: I'd ask that the court reporter
23  please read the question back in English and the
24  interpreter please read the question in Japanese.
25    (Record read by the reporter.)

Page 80

1    that there was a collision hazard with the United
2  aircraft, under the terms of the ANA operations manual,
3  what is it that you as pilot in command or others under
4  your command were required to do at that point?
5    A. Subsection 5 talks about a situation when the
6  captain is not able to make a personal judgment.
7    Q. Well, the question to you is in a situation
8  where the captain or the crew perceived -- did perceive
9  a potential conflict or collision hazard, what is it
10  that the ANA operations manual required you to do?
11    A. Therefore it would be a situation that is
12  different from what is written here. We judged that
13  taxiing was possible, so it was not necessary to call a
14  signalman
15    Q. If you had determined that taxiing was not
16  possible and that you needed to call a signalman on
17  October 7, 2003, who would you have called?
18    A. Am I obligated to answer a hypothetical
19  question like that?
20    Q. Yeah.
21    MR. TURNER: It happens to be a very good
22  question. I would object to it as a hypothetical
23  without sufficient foundation or facts and incomplete
24  hypothetical. If the witness understands it, I'd permit
25  him to answer it assuming that he has sufficient facts

Page 79

1    MR. TURNER: Objection as to form and
2  foundation and incomplete hypothetical.
3    THE WITNESS: The answer is no.
4    MR. TORPEY: Would you read back the question
5  and answer
6    (Record read by the reporter.)
7    MR. TORPEY: Q. Now, tell us, Mr. Yamaguchi,
8  what you as the pilot in command believed you needed to
9  do on October 7, 2003 when faced with the potential
10  conflict or potential collision with the United
11  aircraft. What was it that you believe you were
12  supposed to do at that point?
13    MR. TURNER: Objection as to form and
14  foundation and incomplete hypothetical.
15    THE WITNESS: I do not recall how I thought at
16  that time exactly, but I judged that taxiing was
17  possible, therefore, I continued taxiing
18    MR. TORPEY: Q. Was it your decision or the
19  first officer's decision to decide to continue taxiing
20  as opposed to stop?
21    A. The two of us discussed, and the ultimate
22  decision was mine.
23    Q. Did either the observer pilot or your first
24  officer ever express to you concern about whether you
25  should continue to taxi?

Page 81

21 (Pages 78 to 81)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

Page 82

1    A.  I do not recall accurately.
2    Q.  Well, do you recall anything at all about the
3  conversation in that regard?
4    A.  I recall that we had the conversation, but I
5  do not recall the words that were spoken.
6    Q.  Now, there's an area mike or microphones in
7  the cockpit, and those conversations would have been
8  recorded by the cockpit voice recorder; correct?
9    A.  I have never heard it.
10    Q.  That's not the question, Mr. Yamaguchi.  The
11  question is would those discussions -- you were under
12  power, and therefore the cockpit voice recorder was
13  working at the time you had those discussions in the
14  cockpit; correct?
15    A.  Yes.
16    Q.  And so whatever was said by yourself or your
17  two fellow pilots, as far as you know would be recorded
18  on the cockpit voice recorder; correct?
19    A.  I don't know.  I've never heard it.
20    Q.  Was the discussion in English or Japanese?
21    A.  Japanese.
22    Q.  Now, let's say, did you at any point ever turn
23  off the cockpit voice recorder while you were taxiing
24  prior to the impact?
25    A.  No.

Page 83

1    Q.  Now, you indicated you don't know what you
2  thought should be done back on October 7, 2003.  So I
3  want to ask you, let's assume that today, okay, that
4  today you're taxiing at San Francisco Airport and
5  exactly the same situation presents itself to you as it
6  did on October 7 of 2003.
7       When you have a potential conflict or
8  collision hazard with the United aircraft, what do you
9  believe you should do at that point?
10    MR. TURNER:  Objection as to form and
11  foundation, incomplete hypothetical and a misstatement
12  of this witness's prior testimony.
13    MR. TORPEY:  Q.  Go ahead.
14    A.  In the first half of your question you stated,
15  quote, you indicated that you do not know what should be
16  done or what should have been done on October 7, 2003,
17  close quote.
18       I have never made such a statement.
19    MR. TORPEY:  Q.  Well, you indicated you don't
20  recall what you thought you should do.
21    MR. TURNER:  Objection as to form and
22  foundation, misstatement of this witness's prior
23  testimony, and you're just arguing with the witness.
24    MR. TORPEY:  Q.  Mr. Yamaguchi, I want you to
25  assume that you, right this moment, are pilot in command

Page 84

1  and the captain of a 777 in San Francisco with 155 or
2  more people.  I want you to assume that you, during that
3  taxi, see a United aircraft and you perceive that
4  could -- you don't know for sure -- but you perceive
5  that could be a collision hazard.
6       Do you understand my question to this point so
7  far, sir?
8    MR. TURNER:  So far there's no question.
9  Objection as to form and foundation.
10    THE WITNESS:  Are you asking me to assume?
11    MR. TORPEY:  Q.  Mr. Yamaguchi, I think, with
12  all due respect, my question was clear.  I've only asked
13  you whether you understood my question to this point.
14       Do you understand my question to this point,
15  sir?  That's the only thing I've asked you.
16    A.  I don't know what question you are referring
17  to.
18    Q.  Mr. Yamaguchi, we'll try another question
19  since apparently you won't answer that one.
20    MR. TURNER:  There's no reason for those kind
21  of snide comments.
22    MR. TORPEY:  I think the question was direct,
23  and I don't think it was answered, with all due respect
24  to Mr. Yamaguchi.  And I will try another question
25  because apparently that's the thing to do at this point.

Page 85

1    Q.  I'm asking you, sir, whether today when faced
2  with a potential collision hazard at San Francisco
3  airport what it is you, as the pilot in command, are
4  required to do?  That's the question.
5    A.  And naturally if I believe there will be a
6  collision, I will stop.  But if I judge that there's no
7  potential for a collision, then I will continue to taxi.
8    Q.  Now, if you're not sure whether or not you're
9  going to make it or clear, do you agree in that
10  situation that you should stop until you know, in fact,
11  you're not going to collide?
12    A.  If there's a potential for a collision, then
13  naturally we will stop.
14    Q.  And was that the understanding you had of what
15  you should do back on October 7 of 2003 as well?
16    A.  When you ask me is that the understanding,
17  what understanding are you talking about?
18    Q.  In response to two questions, you just told me
19  what you believed you should do today if faced with a
20  collision hazard.  My question is would that be the same
21  answer that would apply back in October 7 of 2003, if
22  faced with the same situation I presented in my
23  hypothetical today?
24    MR. TURNER:  Objection as to form and
25  foundation.

22 (Pages 82 to 85)

Eishin Yamaguchi

1    THE WITNESS:  Do you wish to inquire if we
2  should have stopped?  Is that what you are trying to
3  ask?
4        MR. TORPEY:  Q  Mr. Yamaguchi, do you agree
5  with me, sir, that on October 7, 2003, you or any
6  member of your flight crew felt that you were going to
7  collide with the United aircraft, that it was incumbent
8  upon you to stop your aircraft?  Do you agree with that?
9    A.  If we had felt that there would be a
10 collision, then naturally we would have stopped, but we
11 did not think so  That is why we continued taxiing.
12   Q.  Now, Mr. Yamaguchi, if on October 7, 2003, you
13 didn't know for sure whether or not you might collide
14 with the United aircraft, would you agree with me that
15 you should stop until you know for sure whether or not
16 you were going to collide with the United aircraft?
17       MR. TURNER:  Objection to form and foundation.
18       THE WITNESS:  I do not agree
19       MR. TORPEY:  Q  So even if you don't know
20 whether or not you're going to collide with the United
21 aircraft, you feel it's okay to continue taxiing until
22 you know for sure you're going to hit it?
23       MR. TURNER:  Objection as to form and
24 foundation and a misstatement of this witness's prior
25 testimony.

Page 86

1        THE WITNESS:  I would like the question again.
2  That is not so.
3        MR. TORPEY:  Q  All right.  So what you're
4  saying, Mr. Yamaguchi, is that if you're taxiing and you
5  don't know for sure whether or not you're going to clear
6  the conflict or the other aircraft, then until you do
7  know for sure that you can clear, you should stop.
8        Is that what you're saying?
9        MR. TURNER:  Objection as to form and
10 foundation and a misrepresentation of this witness's
11 prior testimony.
12       THE WITNESS:  Talking in generalities, that
13 would be the case
14       MR. TORPEY:  Q  Okay.  And if on October 7,
15 2003, you or a member of your flight crew was uncertain
16 whether or not your aircraft, if it continued to taxi,
17 would be able to do so without hitting the United
18 aircraft, then the correct thing to do would have been
19 to stop the taxi until you could determine that you
20 would be able to avoid hitting it; correct?
21   A  That is not so.
22   Q.  Well, then explain why that's not so.
23   A.  There's another interpretation that is
24 possible and that is that the United aircraft intruded
25 into the path of our taxiing pathway.

Page 87

1    Q.  So you believe that if United intruded into
2  the taxiing pathway, even if you have come to the
3  determination that you're not sure whether or not you
4  can clear the United aircraft, you are not obligated to
5  stop?
6        MR. TURNER:  Objection as to form and
7  foundation and a misrepresentation of this witness's
8  prior testimony.
9        THE WITNESS:  I have been repeatedly saying
10 that if we had judged that there was a possibility or
11 potential for a collision, we would have stopped.  But
12 at that time our judgment that -- was that there was no
13 such possibility, therefore, we continued taxiing.
14       MR. TORPEY:  Q  You've said that repeatedly,
15 Mr. Yamaguchi, and I'm not asking you about that, so you
16 don't have to tell me that yet another time.
17       I'm asking you now to switch to another
18 situation, that is if on October 7, 2003, you did not
19 know for sure -- and I'll repeat it -- you did not know
20 for sure that you would clear the United aircraft, in
21 that situation, Mr. Yamaguchi, you were required to
22 bring your aircraft to a stop until you knew for sure
23 that you would clear that conflict  True or false, sir?
24       MR. TURNER:  Objection as to form and
25 foundation and incomplete hypothetical.

Page 88

1        THE WITNESS:  There seems to be a difference
2  in our mutual understanding of the situation.  I judged
3  that the situation was clear, therefore, I continued
4  taxiing, but you are working on the premise that that
5  was not possible.
6        MR. TORPEY:  Q  Mr. Yamaguchi, I'm going to
7  move to strike your answer as nonresponsive, and I'm
8  going to ask you one final time, and I'm not going to
9  ask it again.  I'll take the matter up at another
10 time if need be
11       MR. TURNER:  I object to your comments to this
12 witness
13       MR. TORPEY:  Q  You've told us repeatedly
14 that you believe that you could clear.  I am not asking
15 you about that  I'll let you translate that
16       One last time, Mr. Yamaguchi, I want you to
17 assume -- I want you to assume that on October 7, 2003,
18 while your aircraft with 155 passengers was taxiing
19 under your command and you saw the United aircraft and
20 perceived a potential collision hazard, do you agree,
21 Mr. Yamaguchi, that you were obligated to stop if you
22 did not know whether or not you were going to clear, if
23 you did not know -- and I'll repeat -- if you did not
24 know you would clear, you were obligated to stop;
25 correct?

Page 89

23 (Pages 86 to 89)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1      MR. TURNER: Objection as to form, foundation,
2   incomplete hypothetical.
3      THE WITNESS: I am afraid my answer is the
4   same. I did not believe that there would be a
5   collision. I judged that it was possible to taxi.
6      MR. TORPEY: All right. I'd ask the reporter
7   to mark that last two sequences of question and answer
8   We need to have that portion of the transcript if we
9   need to go back to that.
10      I will move to strike, but again, I will take
11   that up at another time. I'm not going to argue with
12   the witness, and I'm not going to ask any further
13   questions. I have a number of follow-ups. That's a
14   critical issue, and I'm not going to go further in light
15   of the fact that the witness is being unresponsive.
16      MR. TURNER: I disagree with your comments and
17   believe the witness is answering your questions as best
18   he can. It's the questions that leave a lot to be
19   desired. It's up to you whether you want to continue on
20   this line or not.
21      MR TORPEY: Well, I've said what I have to
22   say.
23      Q.  Mr. Yamaguchi, I'm going to ask you something
24   different. You indicated that you thought that your
25   aircraft would clear and therefore you continued to taxi

Page 90

1   thought you were going to be able to clear, and based on
2   that discussion, is it your understanding that the other
3   two agreed with you that there was a 100 percent
4   certainty that you would clear the United aircraft and
5   therefore did not have to stop?
6      MR. TURNER: Objection as to form and
7   foundation. Just being repetitious and arguing with
8   this witness, but if you want to waste your time like
9   that, it's fine with me
10      THE WITNESS: I am repeating myself, but I do
11   not have an accurate understanding of what other people
12   were thinking.
13      MR. TORPEY: Q.  If hypothetically the flying
14   pilot, your copilot or the observer pilot had indicated
15   to you as the pilot in command that they're not certain
16   whether or not your aircraft was going to clear the
17   United aircraft, would you have continued to taxi, or
18   would you have ordered the aircraft to stop?
19      MR. TURNER: Objection as to form and
20   foundation and incomplete hypothetical.
21      THE WITNESS: If I can go back to four years
22   ago, perhaps I can give you an answer, but I cannot say
23   what was the thought, stopping or continuing.
24      MR. TORPEY: Again, I'll move to strike as
25   nonresponsive

Page 92

1   as opposed to stopping. Is that your position in this
2   case, sir?
3      A.  Yes.
4      Q.  Now, up until the actual moment when your
5   aircraft impacted the United aircraft, are you
6   testifying here under oath that you believed that your
7   aircraft was not going to hit the United aircraft, you
8   were a hundred percent certain up until the moment of
9   impact that you were not going to hit that United
10   aircraft? Is that your testimony?
11      MR. TURNER: Objection as to form and
12   foundation
13      THE WITNESS: Yes.
14      MR. TORPEY: Q.  And is it your understanding
15   your first officer and the observer pilot were also 100
16   percent certain up to the moment of impact that there
17   was not going to be a collision between the United
18   aircraft and your aircraft?
19      MR. TURNER: Objection as to form and
20   foundation
21      THE WITNESS: They are other people, so I do
22   not know. But I was the PIC, so I rendered the ultimate
23   decision.
24      MR TORPEY: Q.  Well, but you also discussed
25   in Japanese with the other two whether or not you

Page 91

1      Q.  Mr. Yamaguchi, that wasn't my question  I
2   didn't ask you what you were thinking back then. I
3   asked you if your first officer or your observer pilot
4   had expressed to you any concern to the effect that they
5   were not sure whether or not -- whether or not -- your
6   aircraft was going to clear.
7      If, hypothetically, they had said that to you,
8   as the pilot in command, you were obligated to bring
9   your aircraft to a stop until you knew whether or not
10   you were going to collide with the United aircraft?
11      MR. TURNER: Objection as to form and
12   foundation and incomplete hypothetical.
13      THE WITNESS: If there had been such a
14   statement, then I would have considered that statement.
15   But I do not know if we would have stopped or not  I'd
16   like to take a break at an appropriate time
17      MR. TURNER: Good idea. This is an
18   appropriate time. We've been going for an hour and a
19   half since lunch.
20      THE VIDEOGRAPHER: Going off the record. The
21   time on the monitor is 3:33 p.m.
22      (Recess taken )
23      THE VIDEOGRAPHER: Coming back on the record.
24   The time on the monitor is 3:47 p.m  Please begin
25      MR. TORPEY: Q.  Mr Yamaguchi, we were

Page 93

24 (Pages 90 to 93)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  talking before the break about the fact that you were
2  certain that you were not going to collide with United
3  aircraft, and that's why you did not order the aircraft
4  stopped prior to impact
5        What did you or others in your flight crew do
6  to determine and come to the conclusion that you were
7  definitely not going to hit the United aircraft?
8      A  First of all --
9        THE INTERPRETER: The interpreter will
10  restate
11        THE WITNESS: First of all, from the cockpit
12  we saw that there was sufficient clearance or distance
13  and we had received the clearance to taxi and was
14  taxiing according to instructions. But from a certain
15  point in time it is no longer possible to see the rear
16  of the aircraft, therefore, from that point on, it is
17  not possible to judge what the opposing aircraft did.
18        MR. TORPEY: Q. All right. Let me ask you.
19  Mr. Yamaguchi, what you're saying is at some point in
20  time you can't see the tip of your right wing tip as you
21  continue to taxi towards the United aircraft; correct?
22      A  The wing tip cannot be seen from the cockpit.
23      Q  And it was the wing tip --
24      A  In a way.
25      Q  I'm sorry  The right wing tip of your

Page 94

1      Q  If you open the window on the right-hand side,
2  you'd be able to see the tip of the right wing, correct,
3  if you stick your head out and look?
4      A  The potential for a collision wasn't that
5  imminent, therefore, that was not done. But even if
6  that window was opened and someone had looked out, it
7  would be difficult to gauge the distance between the
8  wing tip of our aircraft and the wing tip of the
9  opposing aircraft
10        MR. TORPEY: And I'll move to strike
11      Q. The question, Mr Yamaguchi, is if you looked
12  out the window, opened the window, put your head out and
13  looked out the window, you can see the wing tip on the
14  right-hand side of your aircraft  True statement, sir?
15      A. The answer is the same  Since that was not
16  necessary, it was not done.
17      Q  I didn't ask you that, Mr. Yamaguchi. Once
18  again, I'll move to strike, and for the last time I'll
19  ask you this question.
20        If you want to see the right wing tip of your
21  aircraft while you're sitting at the gate and you open
22  that right-hand window and stick your head out, you can
23  see the right wing tip of your aircraft, that 777
24  aircraft; correct?
25      A  That may be possible, but that is not a usual

Page 96

1  aircraft is what collided with the United aircraft;
2  correct?
3      A  Yes.
4      Q.  And, in fact, even if you had looked out from
5  the first officer's position or your position or the
6  observer's position, even at the gate, you would still
7  not be able to see the wing tip of your aircraft;
8  correct?
9      A  Yes.
10      Q  So during the entire time you're taxiing from
11  the gate to the impact, the portion of your aircraft
12  that struck the United aircraft, was never visible to
13  you, the flying pilot or the observer pilot
14        True statement?
15      A.  You mean our wing tip?
16        MR. TORPEY: Read back the question, please
17        (Record read by the reporter.)
18        THE WITNESS: Yes.
19        MR. TORPEY: Q.  Now, there's a window on the
20  right-hand side of the cockpit that opens; correct?
21      A  Yes.
22      Q  Did anyone that day prior to the impact open
23  the window and try to look out to see the wing tip
24  before the impact?
25      A  No

Page 95

1  procedure.
2      Q.  So you agree with me that if you wanted to
3  stick your head out the window as you were taxiing on
4  October 7, 2003, to see your right wing tip, you could
5  have done that, and you would have seen the right wing
6  tip; correct?
7      A  In such a situation at that time it was not
8  necessary to open the window and see the right wing tip,
9  and, actually, it should not be done because naturally
10  our aircraft would come to a stop, and it would not be
11  necessary.
12      Q.  Are you testifying you have to stop the
13  aircraft to open that right window?
14      A.  Ordinarily the aircraft would be stopped
15      Q.  Not asking you ordinarily, Mr  Yamaguchi. I'm
16  asking you whether you are testifying that in order to
17  physically open the right wing -- excuse me -- the right
18  window of your aircraft, that the aircraft must be at a
19  stop or you are unable to physically open that window?
20  Is that your testimony, sir?
21      A  That is not so
22      Q  If you wanted to open the window -- I'm not
23  asking you whether you think you should  I'm asking you
24  if you wanted to open the window or have your flying
25  pilot open the window on October 7 of 2003, look out the

Page 97

25 (Pages 94 to 97)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  window and see the wing tip to determine if there would
2  be clearance between your aircraft and the United
3  aircraft, you could have done that; correct? That's the
4  only question. You could have done that; correct?
5      MR. TURNER: Objection to form and foundation.
6  And I would like the question read back
7      (Record read by the reporter.)
8      THE WITNESS: I do not know if we could have,
9  but it was not necessary to do so. In fact, the United
10 aircraft people did not open that aircraft's window
11 either.
12     MR. TORPEY: Q. I'll move on to another
13 question, Mr. Yamaguchi. I'm not going to continue to
14 ask you the same thing and get the same answer, so let
15 me ask you this.
16     If, in fact, as you've testified you can't see
17 the right wing tip of your aircraft, then there is
18 absolutely no way you or your flying pilot or your
19 observer pilot can know for certain whether or not the
20 right wing tip is going to collide with the United
21 aircraft because you can't see it within the cockpit.
22 True statement?
23     A. The judgment of the --
24     THE INTERPRETER: The interpreter will
25 restate. The interpreter has to confirm one word.

Page 98

1      MR. TORPEY: Q. And what if you couldn't make
2  a determination either way? Would you stop or would you
3  just drive up your driveway and see if you run over the
4  glass?
5      MR. TURNER: Objection as to form and
6  foundation and incomplete hypothetical.
7      THE WITNESS: Naturally, if I am in a
8  quandary, I would stop.
9      MR. TORPEY: Q. And let me ask you this,
10 Mr. Yamaguchi. If you or others in the cockpit cannot
11 see the wing tip of your aircraft as you're taxiing
12 towards the United Airlines on October 7, 2003, then
13 there's a portion of your aircraft that potentially is a
14 conflict hazard that you cannot rule out simply by
15 looking out the cockpit windows; correct?
16     A. That is a structural issue. As long as one
17 operates a vehicle of that structure, it cannot be
18 helped.
19     Q. I'm not asking you, Mr. Yamaguchi, if it can
20 be helped. I'm asking you once again, that since you
21 cannot see the right wing tip of your aircraft, it is
22 not possible -- it is impossible for you to see whether
23 or not your wing tip is going to clear the United
24 aircraft simply by looking out the windows in the
25 cockpit.

Page 100

1      THE WITNESS: The space or distance was judged
2  before the collision took place. It is just like
3  someone who is driving a car from his left seat he
4  cannot see the front right wheel of his car when he's
5  driving.
6      MR. TORPEY: Q. Well, if there was an object
7  in front of the front right wheel of your car, and you
8  didn't know -- let's put it this way. .
9      Let's say you're driving a car. Let's say
10 you're just driving into a driveway in your house and
11 let's say there's a bunch of nails in your driveway or
12 maybe some glass.
13     And let's say that you pull in but you can't
14 really see your right front tire so you don't know if
15 you are going to run it over and get a flat.
16     Would you keep going until you see if you can
17 make it, or would you stop, get out of the car and try
18 to the determine whether your tire was going to run over
19 it?
20     What would you do, sir?
21     MR. TURNER: Object as to form and foundation.
22     THE WITNESS: That would depend on the
23 situation. If I judge that it is dangerous, then I
24 would stop and remove them. But if I judge that I can
25 pass by, I would do so.

Page 99

1      Is that a true statement or false statement?
2  That's the question. Just say true or say false.
3  That's the question.
4      MR. TURNER: Objection as to form and
5  foundation and the witness is instructed to give the
6  appropriate answer that he believes is responsive.
7      MR. TORPEY: No. The witness is to answer
8  true or false. That's the question. You aren't to
9  instruct your witness to answer other than a way I've
10 asked the question.
11     MR. TURNER: You are not to instruct the
12 witness how to answer the question.
13     MR. TORPEY: Well, I'm not going to argue with
14 you, Marshall. If you want to instruct him not to
15 answer that question, you do so and you have a reason
16 for doing so if you do. But I've asked a question.
17 I've asked this witness whether he thinks it's a true
18 statement or a false statement. That's the only
19 question.
20     Now if you want to follow up and ask questions
21 additionally when you have a chance to do it, you can do
22 it.
23     Q. But right now, sir, all I want to know is what
24 I said to you is that a true statement or a false
25 statement? That's the question.

Page 101

26 (Pages 98 to 101)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1      MR. TURNER: The witness can give what he
2   believes is an appropriate responsive answer.
3      THE INTERPRETER: The interpreter will repeat
4   the question in Japanese.
5      THE WITNESS: We can see the right wing tip of
6   the UA aircraft from its location. We can judge if
7   there is sufficient clearance.
8      MR. TORPEY: I'll move to strike the answer.
9   That wasn't the question, and the witness did not give a
10  true or false statement, and I'm going to move to strike.
11     Q   I'm going to move on to something else because
12  apparently I cannot ask you with regard to that question
13  any further questions until we have a ruling on that
14     Now, Mr. Yamaguchi, after the impact, what did
15  you and your other crew members do?
16     A   We confirmed that there was no fuel leakage
17     Q   How did you do that?
18     A   The observer pilot looked in the window at the
19  right
20     Q   Did he open the window?
21     A   No.
22     Q   Did you or the observer pilot or the flying
23  pilot of this aircraft get out and look around the
24  ground area where the collision occurred?
25     A   No.

                                            Page 102

1      Q   So other than looking out the window by the
2   observer pilot to see whether there was any fuel
3   leaking, did you or the other members of your crew take
4   any other action other than simply leaving the airplane
5   and going directly into the terminal?
6      A   We received a report from the cabin.
7      Q   Who, and what was that report?
8      A   I don't recall who.
9      Q   From a flight attendant.
10     THE WITNESS (WITHOUT INTERPRETER): Yes.
11     MR. TORPEY: Q. And what did the flight
12  attendant say, if you recall?
13     A   The flight attendant reported that there was
14  nothing unusual in the cabin and the attendant reported
15  that there was no injury. He or she then inquired what
16  happened
17     Q   And how were you all taken off the aircraft?
18  Did you go out a back stairway on to a bus, or was your
19  aircraft pulled back to the gate. How was it that you
20  ultimately got off the aircraft, you and the other crew
21  members?
22     A   The aircraft was tugged and pulled back to the
23  gate.
24     Q   So you never left -- you or your other crew
25  members never got off the airplane, after the impact?

                                            Page 103

1   Stayed on it, and ultimately it was tugged back to the
2   gate and that's where you got off  You walked directly
3   into the jetway again?
4      A   Yes.
5      Q   Now, when you impacted the United aircraft,
6   did your aircraft come virtually immediately to a stop?
7      A   Our aircraft did stop, but we don't know if it
8   is due to the impact or due to the braking by the flying
9   pilot
10     Q   Okay  Did he apply brakes immediately upon
11  impact?
12     A   That I do not know
13     Q   Did you do anything in terms of braking or
14  physically manipulating any of the controls at any time
15  on or after the impact?
16     A   No  I did not apply the brakes nor did I
17  manipulate any control.
18     MR. TORPEY: Now, let me show you -- let's
19  mark this as the next exhibit. In fact, the next two
20  exhibits.
21     (Whereupon, Exhibits 3 and 4 were marked for
22  identification.)
23     MR. TORPEY: Q. Have you had a chance,
24  Mr Yamaguchi, to look at Exhibits 3 and 4, those being
25  airport operations bulletins of July 31, 2000, and

                                            Page 104

1   August 7, 2001?
2      A   No
3      Q   Have you ever seen those before?
4      A   No.
5      Q   Were you aware -- let me have you look at
6   Exhibit 3, for example  It says, to all airlines and
7   aeronautical support tenants.
8      On July 31, 2000, All Nippon Airways was
9   flying aircrafts into San Francisco Airport; correct?
10     THE INTERPRETER: May I have the question,
11  please.
12     MR. TORPEY: Let me ask you to mark this --
13  why don't you mark this as exhibit whatever is next, 5,
14  I guess.
15     MR. WORTHE: 5.
16     (Whereupon, Exhibit 5 was marked for
17  identification.)
18     MR. TORPEY: Q  Mr. Yamaguchi, you can see
19  that is -- let me represent to you that is a satellite
20  photograph of the terminal and ramp area at
21  San Francisco Airport that includes the area where the
22  taxi and impact occurred.
23     You'll see that there are designated areas for
24  nonmovement area and others that are called movement
25  areas. Are you familiar with what a movement area is

                                            Page 105

27 (Pages 102 to 105)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  versus a nonmovement area?
2      A.  Yes
3      Q.  What is the difference or the distinction
4  between what would be considered the movement area and
5  the nonmovement area in Exhibit 5?
6      A.  Nonmovement area is under the jurisdiction of
7  the ramp control, whereas the movement area is under the
8  jurisdiction of ground control.
9      Q.  And ramp control is United ramp control in
10  this area; correct?
11     A.  I don't know if it is United or not, but it is
12  called a ramp control
13     Q.  And the movement area is not under the control
14  of ramp control; correct?
15     A.  Ordinarily that is so, but this particular
16  area is one where there is an overlap, so I don't know
17  what the true situation of the operation is.
18     Q.  As a pilot for ANA are you saying that you do
19  not know the distinction at San Francisco International
20  Airport with regard to who has jurisdiction over the
21  movement versus the nonmovement area?
22     A.  There's a guideline on the chart, but there is
23  no way that I would be able to know how the ramp control
24  and ground control actually operate
25     Q.  In order to taxi your aircraft onto any
                                                    Page 106

1      Q.  And if you look at definitions, it describes
2  what a movement area is and a nonmovement area.  Do you
3  see that?
4      A.  Yes
5      Q.  And then under that there's something called
6  reporting point
7      A.  Yes.
8      Q.  And it says numeric pavement marking located
9  on a taxiway that indicates a transition area from a
10  nonmovement to a movement area, and it includes
11  number 1, 2, 10, and 11  You see that?
12     A.  Yes.
13     Q.  Now, are you familiar with the reporting area
14  known as spot 10 at San Francisco Airport?
15     A.  Yes.
16     Q.  And is it your understanding that spot 10 --
17  in fact, if you look at Exhibit 5, this recon photo 1,
18  do you see that designation for spot 10 where the arrow
19  is pointing?
20     A.  Yes.
21     Q.  And do you understand that that's the
22  reporting point or the transition point between the
23  nonmovement to the movement area?
24     A.  Yes
25     Q.  Do you know why spot 10 is called a reporting
                                                    Page 108

1  portion of a movement area at San Francisco, you have to
2  contact the Federal Aviation Administration, ATC ground
3  control; isn't that true?
4      A.  I would like the question again, please.
5      Q.  In order to taxi into any portion of a
6  movement area, you must get clearance from air traffic
7  control ground control; correct?
8      A.  That's right.
9      Q.  And you cannot get permission from ramp
10  control to go into a movement area; correct?
11     A.  Yes
12     Q.  Now, the ground control, that is the Federal
13  Aviation Administration that are the ground controllers;
14  is that correct?
15     A.  I do not know if it is under the jurisdiction
16  of the FAA, but the ground control controls the movement
17  area
18     Q.  Okay.  Let me have you look back at Exhibits 3
19  and 4, which were airport operations bulletins issued on
20  the dates indicated to all airlines which would include
21  ANA, and it looks -- under background -- in fact, if you
22  turn to the next page under procedures --
23         MR. TURNER:  Are you referring to 3 or 4?
24         MR. TORPEY:  Let's look at Exhibit 3 first.
25  And I guess let's start under definitions.
                                                    Page 107

1  point?
2      A.  That I did not know
3      Q.  If you look at the next line, procedures, it
4  says here, aircraft -- strike that.
5         The second paragraph under procedures, it says
6  here, unless otherwise directed, outbound taxiing
7  aircraft shall stop at respective reporting point prior
8  to contacting SFO air traffic control terminal for
9  further taxi instructions.  Do you see that?
10     A.  Yes.
11     Q.  On October 7, 2003, were you aware of that
12  requirement?
13     A.  Yes.
14     Q.  And how is it that you became aware of that
15  requirement on October 7, 2003, prior to that impact?
16     A.  It is written on the route manual.
17     Q.  All right.  This is the manual that goes with
18  the aircraft; correct?
19     A.  It is the manual that each individual has
20     Q.  And as the pilot in command or the flying
21  pilot, both you and your copilot were required to know
22  and follow that instruction; correct?
23     A.  Yes.
24     Q.  And if you turn the page again to the third
25  page of Exhibit 3, it states here that all airlines are
                                                    Page 109

28 (Pages 106 to 109)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  required to closely monitor and follow the clearances
2  provided by these towers as well as those of FAA, ATC
3  upon reaching reporting points which included spot 10
4      Do you see that?
5      A.  Yes.
6      Q.  And do you know what, if anything, ANA was
7  doing at any time prior to October 7, 2003, to monitor
8  or enforce the requirements to comply with those
9  clearances as that bulletin direction?
10     A.  There was nothing that was special but the
11  same thing is included in the route manual
12     Q.  Okay.  And I apologize if I asked you this
13  before.  The route manual would be carried on the
14  aircraft you were taxiing the day of this accident;
15  correct?
16     A.  Yes.
17         MR. TORPEY:  Let's mark this as Exhibit 6.
18         (Whereupon, Exhibit 6 was marked for
19         identification )
20         MR. TORPEY:  Q.  I'll represent to you,
21  Mr. Yamaguchi, that that was a partial transcript
22  prepared by ANA submitted to the NTSB as parts of its
23  investigation package with regard to their investigation
24  into the circumstance in this matter
25         Have you ever seen that partial transcript
                                                Page 110

1      Q.  And that would be consistent with -- strike
2  that
3         In other words, until you've got clearance
4  from ground or air traffic control, no part of your
5  aircraft, not the tip, not any part of your aircraft can
6  enter the movement area until you get clearance from
7  ground; correct?
8      A.  Yes.
9      Q.  Now, let's look at the second page of
10  Exhibit 6, and if you look at the time reference of
11  11:54:54 through 57, once again, you personally are now
12  calling this time ATC ground control; correct?
13     A.  Yes
14     Q.  And you asked at that point, you said you were
15  approaching spot 10 and you requested clearance to taxi,
16  in other words, to go now from spot 10 into the movement
17  area; correct?
18         MR. TURNER:  Objection as to form and
19  foundation and a misstatement of this written
20  transcript
21         MR. TORPEY:  Q.  Go ahead, Mr. Yamaguchi.
22     A  May I have the question once more
23         MR. TORPEY:  Read it back.
24         (Record read by the reporter )
25         THE WITNESS:  Yes.
                                                Page 112

1  before?
2      A.  Yes.
3      Q.  And you understand that that is, in fact, a
4  partial transcript of the ANA cockpit voice recording
5  from the day of this accident?
6      A.  Yes.
7      Q.  All right.  Let's turn to where it says ramp
8  time.  That's the middle column.  Let's go down to
9  11:53:51 through 57.
10         There's communication from ramp tower to
11  yourself and that would literally -- you were the one
12  talking to the ramp tower that day; correct?
13     A.  Yes
14     Q.  And the ramp tower responded to you by saying
15  Air Nippon 007, you are cleared to spot 10, please
16  Have a good day.  And then the very next line at
17  11:53:59, you personally would have responded to ramp
18  tower saying, cleared to spot 10.  Have a good day
19         MR. TURNER:  I just want to state for the
20  record that in your reading you omitted a few words from
21  the first reading.  At time 11:55:28 to 11:55:32.
22         MR. TORPEY:  Q.  Mr. Yamaguchi, you understood
23  that you were cleared only to go to, not beyond, spot 10
24  by ramp control; correct?
25     A.  Yes
                                                Page 111

1         MR. TORPEY:  Q.  Okay  Now, in order for
2  you -- strike that.
3         If you go back to the first page of Exhibit 6,
4  after you asked ground -- strike that.
5         After you called the ramp tower, the United
6  ramp tower, and asked and understood you were cleared to
7  spot 10, that was the last time prior to impact you
8  attempted to contact United ramp control prior to the
9  impact; correct?  You never again made an attempt to
10  contact United ramp control?
11     A.  From this point to the point, time, is
12  11:56:29, I have not
13     Q.  So by 11:56:29, that's after the impact?
14     A.  No.  It's before the impact
15     Q.  I don't see here on Exhibit 6 where you tried
16  to contact ramp control after being cleared to spot 10.
17  Can you show me where you attempted to do that?
18     A.  To ramp control did you say?
19     Q   Yes.
20     A   That record is not here, so up to this point
21  there has been no communication to ramp control.
22     Q.  So is it fair to say then, Mr. Yamaguchi, that
23  once you received and understood you were cleared by
24  United ramp control to proceed to spot 10 that you did
25  not make any further attempts to contact ramp control
                                                Page 113

29 (Pages 110 to 113)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  for any reason at any time prior to the impact?
2     A.  Yes.
3     Q.  Now, once you do at 11:54:54 contact ground,
4  that's ATC ground, to do that you had to switch your VHF
5  radio from the frequency that you use to talk to your
6  United ramp control to a different frequency in order to
7  contact ATC ground; correct?
8     A.  Yes.
9     Q.  And would you have personally been the one to
10  make the frequency change on the radio?
11    A.  I believe it was me because I was responsible
12  for the radio communication.
13    Q.  And that would have been the left VHF?
14    A.  Ordinarily we use the left VHF, so probably it
15  was that at that time.
16    Q.  So isn't it fair to say, Mr. Yamaguchi, that
17  once you changed frequency after being cleared to
18  spot 10, up until the point of the impact, there was no
19  way for United ramp control to contact you or for you to
20  contact them at that point?
21    A.  In a way it is correct.  We were told and
22  instructed by the ramp control to taxi to spot 10 and
23  to contact ground, and then we changed the frequency in
24  this case this have a good day right here, means contact
25  ground
                                              Page 114

1     Q.  Mr. Yamaguchi, prior to the impact and after
2  being cleared to spot 10, you switched the frequency on
3  your radio and accordingly there was no way from that
4  point to the impact for United ramp control to call you
5  or for you to call them.  Is that a true statement, sir?
6     A.  No.  I don't think so.  Right here at
7  11:55:34 --
8        THE INTERPRETER:  The interpreter will
9  restate.
10       THE WITNESS:  Right here at 11:55:28 it says,
11  you are cleared to spot 10, please.  So they are telling
12  us that there is no obstacle to us up to spot 10.
13       MR. TORPEY:  Q.  Again move to strike.  That's
14  not the question, Mr. Yamaguchi.  The question had
15  nothing to do about what you interpreted it.  The
16  question has to do with whether, after you switched
17  frequencies so you're no longer talking to the ramp
18  control, you're talking to ground, from that point to
19  the impact there was no way for United ramp control to
20  contact you or you to contact them.  Is that true or is
21  that false?
22       MR. TURNER:  Objection as to form and
23  foundation.
24       THE WITNESS:  At this point it was no longer
25  necessary to monitor the frequency related to the ramp
                                              Page 115

1  control.  They said, have a good day.  It means change
2  the frequency.
3        MR. TORPEY:  Q.  Again move to strike,
4  Mr. Yamaguchi.  One last time.
5        You, after you were cleared to spot 10 by ramp
6  control, you were no longer listening to nor making
7  attempts to contact United ramp control prior to the
8  impact.  Is that a true statement, sir?
9        MR. TURNER:  Objection as to form and
10  foundation.
11       THE WITNESS:  Naturally we cannot hear the
12  instruction from the ramp control, but if necessary, we
13  could change the frequency from the ground control
14  frequency to the ramp control frequency once again.  But
15  in this case, it was not necessary to do so.
16       MR. TORPEY:  Q.  Now, in changing frequencies
17  from the ramp control to the ground control, you did
18  that prior to reaching spot 10; correct?
19    A.  Yes.
20       THE VIDEOGRAPHER:  Sorry.  I need to change
21  tape.
22       MR. TURNER:  Let's also take a break.  We have
23  been going for over an hour and 15 minutes.
24       MR. TORPEY:  No problem.
25       THE VIDEOGRAPHER:  This concludes Videotape 3
                                              Page 116

1  in the deposition of Eishin Yamaguchi.  The time on the
2  monitor is 5:02.
3        (Recess taken.)
4        THE VIDEOGRAPHER:  Here begins Videotape 4 in
5  the deposition of Eishin Yamaguchi.  Coming back on the
6  record.  The time on the monitor is 5:17.  Please begin.
7        MR. TORPEY:  Q.  Mr. Yamaguchi, you indicated
8  that the statements that I read to you earlier in
9  Exhibits 3 and 4 to the effect that you're supposed to
10  stop at spot 10 prior to contacting ground that there
11  was a similar instruction in your route or route manual;
12  correct?
13    A.  Yes.
14    Q.  And that was true on October 7 of 2003;
15  correct?
16    A.  Well, the manual has been revised since then,
17  but I believe that the content would be the same.
18    Q.  Okay.  Now, are the route manual policies,
19  including that one, considered company policies of ANA
20  which you and all company pilots are required to follow?
21    A.  Yes.
22    Q.  And switching frequencies and contacting ATC
23  ground before you got to spot 10, you violated the
24  company policy on October 7, 2003; correct?
25    A.  No, that is not so.
                                              Page 117

30 (Pages 114 to 117)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  Q. Why is that not so?
2  A. Exhibit 3, second paragraph under procedures
3  says, unless otherwise directed. And we were otherwise
4  directed. They said have a good day, which means you
5  may now change frequency
6  Q. Where is it written that have a good day means
7  that you can violate your company's policy against
8  switching frequencies before you get to spot 10?
9  MR. TURNER: Objection as to form and
10  foundation and a misstatement of this witness's prior
11  testimony
12  THE WITNESS: Between a pilot and a
13  controller, the intent of the phrase have a good day
14  means good-bye, so you can now change to a different
15  frequency. If that had not been the intent, then they
16  would have said to us, remain that frequency
17  MR. TORPEY: Q. Well, Mr. Yamaguchi, the fact
18  that there was no longer any need for the ramp
19  controller to talk to you further because they've
20  already cleared you to spot 10, that does not mean that
21  the ramp controller authorized you to stop monitoring
22  that frequency before you got to spot 10; correct?
23  MR. TURNER: Objection as to form and
24  foundation, misstatement of this witness's testimony and
25  you're just trying to argue with the witness

Page 118

1  command, 155 people on your airplane, you're taxiing
2  with the right wing tip you cannot see out the window.
3  Do you think, Mr. Yamaguchi, that for the
4  safety of your passengers it would have been a good idea
5  for you to contact ramp control once you saw the United
6  aircraft and asked ramp control whether or not your
7  aircraft was going to clear that United aircraft?
8  MR. TURNER: Objection as to form and
9  foundation
10  THE WITNESS: In this situation we did not do
11  that because it was not necessary
12  MR. TORPEY: Q. You believed it was not
13  necessary because you were a hundred percent certain
14  that you were not going to hit that aircraft, the United
15  aircraft; correct?
16  MR. TURNER: Objection as to form and
17  foundation.
18  THE WITNESS: Yes
19  MR. TORPEY: Q. What if you were not a
20  hundred percent certain? What if you were something
21  less than a hundred percent certain? Do you believe in
22  that situation, believe that for the safety of the 155
23  people on your aircraft that you as the pilot in
24  command, as the communicating pilot should have
25  attempted to contact United ramp control to determine if

Page 120

1  THE WITNESS: No I do not think so If it
2  had been necessary to maintain the frequency and monitor
3  the frequency with the ramp control, they would have
4  said, clear to spot 10, and then contact ramp
5  control -- they would have said.
6  THE INTERPRETER: The interpreter will
7  restate
8  THE WITNESS: If it had been necessary to
9  continue to monitor the ramp tower frequency, they would
10  have stated the clearance in this manner, quote, you are
11  cleared to spot 10. Contact ground at spot 10
12  MR. TORPEY: Q. Mr. Yamaguchi, do you believe
13  that there's any safety hazard to the 155 people on your
14  airplane whose lives you're responsible for by virtue of
15  the fact that you switched frequencies and are no longer
16  talking to ramp control which is the controller that is
17  monitoring the nonmovement area?
18  Do you think that that's dangerous that you've
19  switched that frequency when you're still in the
20  nonmovement area and can no longer hear or talk to the
21  ramp control?
22  MR. TURNER: Objection as to form and
23  foundation.
24  THE WITNESS: No, I do not
25  MR. TORPEY: Q. Now, you're the pilot in

Page 119

1  your aircraft was going to clear with other aircraft?
2  A. My answer will be the same. In that situation
3  we judged that we had a 100 percent understanding that
4  there was clearance, therefore, we continued to taxi and
5  stayed at the ground frequency.
6  Q. Again I'll move to strike, Mr. Yamaguchi.
7  That's totally unresponsive to my question. So as with
8  my other questions, I'm going to ask the court to look
9  at it, and I'll move on I can't obviously ask you
10  anything else about that at the moment, so I'm going to
11  turn to another topic.
12  On the day of the accident, Mr. Yamaguchi, as
13  the pilot in control and with 155 people in your
14  aircraft whose safety you're responsible for, if you
15  wanted to stop the taxi and call ramp control, you had
16  the ability to do that; correct?
17  MR. TURNER: Objection as to form and
18  foundation.
19  THE WITNESS: I had the ability, but I did not
20  believe that there was a necessity.
21  MR. TORPEY: Q. And had you stopped and
22  contacted ramp control to inquire whether your aircraft
23  could safely pass by the United aircraft, what would you
24  have had to have done in order to do that?
25  MR. TURNER: Objection as to form and

Page 121

31 (Pages 118 to 121)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  foundation.
2          THE WITNESS: I don't understand. Could I
3  have the question again.
4          MR. TORPEY: Read it back.
5          (Record read by the reporter.)
6          MR. TURNER: Same objection
7          THE WITNESS: We felt that there was no need
8  to take any action other than those that we took.
9          MR. TORPEY: Move to strike. Not responsive.
10  Q.   I didn't ask you, Mr. Yamaguchi, whether you
11  felt it necessary. I asked you -- you're an intelligent
12  man. I asked you specifically if you had chosen, not
13  whether you should have, but if you had chosen to stop
14  your aircraft and contact ramp control prior to
15  proceeding and colliding into the United aircraft, what
16  is it that you would have had to have done to do that?
17          MR. TURNER: Objection as to form and
18  foundation as well as to counsel's snide comments.
19          THE WITNESS: My answer is not about this
20  case, but in general terms. If there is a judgment that
21  there is a danger, then we would stop the aircraft.
22  Q.   Again move to strike. Final time,
23  Mr. Yamaguchi.
24          In order to stop the aircraft, what physically
25  has to be done? If you're taxiing on October 7, 2003,

Page 122

1  and you decided as the pilot in command to stop the taxi
2  and then contact ramp control, to stop the airplane,
3  physically, what do you do?
4          MR. TURNER: Objection as to form and
5  foundation.
6          THE WITNESS: In order to stop the aircraft,
7  it is necessary to apply the brakes.
8          MR. TORPEY: Q.   Okay. And how long would it
9  take to apply the brakes and stop the aircraft if you
10  had chosen to do that on October 7, 2003?
11  A.   One cannot say categorically. There are
12  various cases.
13  Q.   On the date and time you were taxiing on
14  October 7, 2003, from the engine-start line to the point
15  of impact, if prior to impact you decided to hit the
16  brake and stop, how long would it take for you to do
17  that?
18          MR. TURNER: Objection as to form and
19  foundation and incomplete hypothetical.
20          THE WITNESS: I would not know the exact
21  amount of time.
22          MR. TORPEY: Q.   Well, it only takes a few
23  seconds to touch the brake pedal; correct?
24  A.   If it's just touching, yes.
25  Q.   Well, let me ask you this Mr. Yamaguchi, if,

Page 123

1  let's say, halfway between the engine-start line and the
2  impact on October 7, 2003, you decided that you wanted
3  to stop the aircraft, change the frequency back, and
4  contact ramp control to determine if you had clearance
5  to get past the United aircraft, would you agree with
6  me, sir, you could have done that, you could have
7  accomplished that within a minute or less?
8          MR. TURNER: Objection as to form and
9  foundation and incomplete hypothetical.
10          THE WITNESS: I cannot answer as to
11  specifically how many seconds or minutes it takes to
12  make the judgment. Rather I do not know.
13          MR. TORPEY: Q.   How long does it take to
14  switch the frequency on your VHF radio?
15  A.   I think that could be done in a second.
16  Q.   And if you look at Exhibit 2, which is your
17  own company operations manual, page 2, why don't you
18  take a look at that, Mr. Yamaguchi, Exhibit 2.
19          If you look under taxiing at subpart 2, you
20  are required to be observant of all obstacles around you
21  and taxiing speed is such that you may bring the
22  airplane to an immediate and complete stop.
23          You see that? You see that, sir?
24  A.   It is so written here, but I do not know if
25  the Japanese manual that I have is identical to the

Page 124

1  English manual here.
2  Q.   Well, let's assume that it is identical for
3  purposes of this question and all of my questions on
4  this. Okay? You understand that Mr. Yamaguchi?
5  A.   But would that not be disadvantageous for me?
6  If the two manuals were different and I give my answer
7  based on the English version and say that that is the
8  ANA operation, that would be a disadvantage to me.
9  Q.   Well, Mr. Yamaguchi, I'm not going to comment
10  on what's an advantage and disadvantage. I'm here to
11  ask you questions under oath. Your counsel produced
12  what he produced. Now all I can do is ask you questions
13  with regard to what he produced to me not with what he
14  didn't produce to me. That's for another day and time.
15          I'm going to ask you to assume that the
16  operations manual that you have in Japanese is exactly
17  the same as the one your counsel produced to us in
18  English, which we've now marked as Exhibit 2
19          Do you understand me so far, Mr. Yamaguchi?
20          MR. TURNER: And I will instruct the witness
21  that he can make that assumption for the purpose of
22  Mr. Torpey's next question that the text of the manual
23  in the first two pages of Exhibit 2 is the same as his
24  manual for the same subjects in his Japanese operations
25  manual. He can make that assumption. Okay?

Page 125

32 (Pages 122 to 125)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

| | |
|---|---|
| 1      MR. TORPEY: Q. That being the case, | 1      MR. TORPEY: That's not a -- go ahead |

MR. TORPEY: Q. That being the case,
Mr. Yamaguchi, since your company policy in the
operations manual is that you're required to taxi at a
speed such that you can bring your aircraft to an
immediate stop, would you agree with me, sir, that if on
October 7, 2003, you chose as pilot in command for the
safety of the 155 people on your aircraft to stop the
taxi and contact United ramp, you could have done that
in less than 1 minute?
     MR. TURNER: Objection as to form and
foundation and an incomplete hypothetical.
     THE WITNESS: I did not have that thought
because I did not feel the necessity.
     MR. TORPEY: Q. Again, I'll move to strike.
That's completely unresponsive, and I'm going to move on
to another area since you will not respond to my
questions in this regard.
     Mr. Yamaguchi, is it true that the first time
you saw the United aircraft was when it began pushing
back from its gate? Is that the first point of contact
that you saw the United aircraft, when it initiated it's
push back?
     MR. TURNER: Objection as to form.
     THE WITNESS: I do not have a clear
recollection.

Page 126

     THE INTERPRETER: The interpreter will
restate.
     THE WITNESS: I do not have an accurate
recollection.
     MR. TORPEY: Q. So you don't recall at this
point whether the United aircraft had or had not started
it's pushback from the gate at the time that you
initially saw it; correct?
     A. Yes.
     MR. TORPEY: Okay. Let's mark this.
     (Whereupon, Exhibit 7 was marked for
     identification.)
     MR. TORPEY: Q. Let me show you what's marked
Exhibit 7. Do you recognize that document, sir?
     A. Yes.
     Q. Now, if you look under the section that says
started taxi and you look down to the third line, it
says approaching spot 10, I recognized UALB77 has
started pushout from gate 102. Do you see that?
     So reviewing that, does that refresh your
recollection that you first saw the United aircraft when
it initiated or started its pushback from the gate?
     MR. TURNER: Objection as to form and
foundation and a total misstatement of what you just
read.

Page 127

     MR. TORPEY: That's not a -- go ahead.
     THE WITNESS: Upon reading this sentence, that
is the case.
     MR. TORPEY: Q. Okay. So your first -- and
you were in the left-hand seat; correct?
     A. Yes.
     Q. And when you first saw United start to push
back, did you say anything at that point to anybody else
in the cockpit of your aircraft?
     A. We may have conversed, but I do not recall
what we said.
     Q. Okay. In the cockpit there's an area
microphone; correct?
     A. Are you talking about the cockpit voice
recorder?
     Q. There are microphones that are connected, if
you will, to the cockpit voice recorder so that whatever
is spoken in the cockpit of your aircraft can be
recorded by the cockpit voice recorder; correct?
     A. I don't know if there is a microphone, but the
conversation in the cockpit is recorded.
     Q. Okay. Mr. Yamaguchi, you indicated you saw
the United aircraft start to push. At some point did
you see the United aircraft stop its pushback?
     A. I recall that it was a very slow speed, a

Page 128

stopping speed.
     Q. So does that mean that you did witness the
point at which the United aircraft stopped its push?
     A. No. That's not the case.
     Q. At some point did you note -- well, let me ask
you this.
     While the United aircraft was being pushed, in
other words, after the start of the push that you
indicated you saw, during the push, did you watch the
United aircraft?
     A. I was watching what I could see from the
cockpit.
     Q. So from your position in the cockpit, you
could see the pushback of the United aircraft; correct?
     A. Yes.
     Q. And could your flying pilot also see that? Do
you know?
     A. Naturally I think he could.
     Q. And how about the observer pilot?
     A. I think he could see if he had tried, but I
don't know.
     Q. Fair enough. At some point did you observe
that the United aircraft had stopped pushing back?
     A. You're inquiring if it stopped. I didn't see
it stop. Before that, I could no longer see it.

Page 129

33 (Pages 126 to 129)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1    Q.  Well, are you saying that you continually
2  watched the United aircraft -- strike that
3        Are you saying there came a point in time when
4  you were no longer able to see any portion of the United
5  aircraft because you had continued to taxi to a point
6  that you could no longer see it?  Is that what you're
7  saying?
8        MR. TURNER:  Objection as to form.
9        THE WITNESS:  No.  That's not what I'm saying
10  While I could see the United aircraft, I judged the
11  relative positions of our aircraft and the United
12  aircraft.  That is why we continued to taxi
13        MR. TORPEY:  Q.  Mr. Yamaguchi, from the time
14  you first saw the United aircraft start to push until
15  the impact, is it your testimony that you at all times
16  had in your field of view some portion of the United
17  aircraft?
18        MR. TURNER:  Objection as to form and
19  foundation.
20        THE INTERPRETER:  The interpreter will repeat
21  the question in Japanese.
22        THE WITNESS:  No.  That is not so.  The United
23  aircraft was no longer in my view before the impact for
24  some time, although I don't know how many seconds that
25  was.

Page 130

1  this witness in 15 minutes  I can occupy the next 15
2  minutes to ask more questions, but there's no way I'll
3  finish this deposition in 15 minutes.
4        MR. TURNER:  Are you willing to go -- right
5  now it's 6:05.  Are you willing to go to 6:15?  Are you
6  okay?
7        THE WITNESS (WITHOUT INTERPRETER):  Yes.
8        MR. TURNER:  Okay.  Go for another 10 minutes,
9  and this deposition is then over.
10        MR. TORPEY:  Well, we'll ask the court to rule
11  on that  I think it's up to her and not you
12        MR. TURNER:  It's up to you.  You don't have
13  to ask the same questions ten times.
14        MR. TORPEY:  Q.  Mr. Yamaguchi, take a look at
15  your statement, Exhibit 7, and you say here that the
16  pilot flying maneuvered slightly to the left side of the
17  center line.  It looked to me that the maneuver was to
18  increase the margin of clearance from United B777
19        Do you see that?
20    A.  Yes.
21    Q.  Did you understand that there was a potential
22  conflict or a potential collision hazard and that was
23  the reason why the turn to the left was initiated?
24        MR. TURNER:  Objection as to form and
25  foundation and a misstatement of what you just read from

Page 132

1        MR. TURNER:  Just want to point out,
2  Mr Torpey, it is now after 6:00 p.m.  We started this
3  deposition at 10:00 a.m.  We had just under an hour for
4  lunch.  The deposition has therefore been in progress
5  for in excess of seven hours.  How much time do you
6  expect to continue this evening with this witness?
7        MR. TORPEY:  Well, will you produce him again
8  in the morning?
9        MR. TURNER:  No  No  He's schedule to go
10  back tomorrow, and there is another witness scheduled to
11  begin tomorrow.  As a matter of fact, you had said to me
12  when we were planning that you may not even need a whole
13  day for the witness.
14        MR. TORPEY:  Well, once again, Mr. Turner, I
15  don't know what you're referring to, but we have
16  additional questions.  I'm not done with this witness,
17  and I intended to continue as long as we have to and if
18  need be tomorrow or some other day.
19        I'm not near finishing, and obviously there
20  are issues with regard to document production that we'll
21  take up with the court, but I have a number of other
22  questions to ask this witness
23        MR. TURNER:  Can you finish with this witness
24  in another 15 minutes if he's willing to stay?
25        MR. TORPEY:  Certainly I cannot finish with

Page 131

1  Exhibit 7
2        MR. TORPEY:  And that's a speaking objection
3        THE WITNESS:  I do not know if the pilot
4  flying judged whether or not there was a potential
5  collision hazard at this point.
6        MR. TORPEY:  Q  Well, Mr. Yamaguchi, your
7  statement says that it looked to you that that maneuver
8  was to increase the margin of clearance from UAL777.
9  That's your statement, correct, sir?
10    A.  This present question is about me, but the
11  question previous to this one was about pilot flying
12  Therefore I said that I cannot tell what the pilot
13  flying thought.
14    Q.  Mr. Yamaguchi, I move to strike that.
15        I asked you a specific question.  I'm not
16  asking about the question before that.  I'll ask it one
17  more time.
18        That is your statement that it looked to you,
19  Mr Yamaguchi, that the maneuver was to increase the
20  margin of clearance.  That's your statement.
21        My question to you, sir, is did you understand
22  in your mind as the pilot in command that day that the
23  reason your flying pilot turned to the left was because
24  there was a perceived collision hazard so he wanted to
25  increase the clearance or distance between the two

Page 133

34 (Pages 130 to 133)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1  aircrafts.
2       Was that your thought in your mind when you
3  made that statement?
4       MR. TURNER: Objection as to form and
5  foundation, and you're simply arguing, arguing with the
6  witness. You're not asking him questions here. As a
7  matter of fact -- well, I said we'd go to 6:15. I'll
8  allow this nonsense to continue for another 6 minutes.
9       THE WITNESS: Yes.
10      MR. TORPEY: Q. And on the next line of your
11  statement you say you asked the pilot flying whether the
12  clearance was inadequate -- or adequate. Do you see
13  that? Let me withdraw it, and I'll restate it.
14      Your statement says that you asked your pilot
15  flying whether the clearance was adequate. Isn't it
16  true, sir, that the reason you asked that question is
17  that you as the pilot in command perceived a potential
18  conflict or collision hazard with the United aircraft.
19      MR. TURNER: Objection as to form and
20  foundation.
21      THE WITNESS: I recall that it was not because
22  of a potential for collision but rather because I
23  thought that the clearance was closer than usually.
24      MR. TORPEY: Q. Whether it was closer than
25  usual or not is irrelevant unless there's a collision

Page 134

1  pilot about the clearance between your aircraft and the
2  United aircraft. Is that a true statement, sir?
3       MR. TURNER: Objection as to form and
4  foundation. Objection as to form and foundation.
5       THE WITNESS: I do not recall that I perceived
6  any potential conflict.
7       MR. TURNER: It's now more than past 6:15.
8  This deposition has been going for 8 hours and
9  15 minutes with a one-hour break for lunch. This
10  deposition is now over.
11      MR. TORPEY: Well, for the record, it's not
12  over, and we don't even have seven hours of testimony,
13  Mr. Turner. So I want it to be clear that we are not
14  only going to move that this deposition continue but the
15  cost of having to come back here. So if you want to
16  terminate this deposition, you do so at your own risk.
17      I've got my client here. Jeff Worthe is here.
18  You made us come up from Los Angeles needlessly. We're
19  going to have to come back here. And if you want to
20  terminate this deposition at this point with less than
21  seven hours of deposition testimony.
22      And, Mr. Reporter, how much time has actually
23  been used with testimony.
24      THE VIDEOGRAPHER: 6 hours and 34 minutes on
25  the record.

Page 136

1  hazard; correct?
2       MR. TURNER: Objection as to form and
3  foundation.
4       THE INTERPRETER: The question. Can you read
5  the question again.
6       THE WITNESS: No, that's not so.
7       MR. TORPEY: Q. So even if there's no
8  collision hazard and in this case you believe there was
9  none, but you still were interested in knowing what the
10  clearance was. Is that what you're telling this jury?
11      A   Wanted to know.
12      Q.  Mr. Yamaguchi it's very simple. In all
13  honesty, if you had not perceived the collision hazard,
14  you would not have inquired of the pilot flying whether
15  or not there was clearance; isn't that true?
16      MR. TURNER: Objection as to form and
17  foundation and I object that you're just arguing with
18  the witness.
19      THE WITNESS: It was not imminent like a
20  potential for a collision.
21      MR. TORPEY: Again I'll move to strike.
22      Q.  The question, Mr. Yamaguchi, was not timing or
23  the imminent nature. The question is you must have
24  perceived a potential conflict, potential, or you would
25  not as the pilot in command have inquired to your flying

Page 135

1       MR. TURNER: This deposition is over.
2       MR. TORPEY: We'll take it up with the court.
3       MR. TURNER: All you're doing is arguing with
4  the witness.
5       MR. TORPEY: Are you moving for a protective
6  order?
7       MR. TURNER: The deposition is over.
8       MR. TORPEY: Is it over because you're moving
9  for a protective order? I'll take that as a no. That
10  you're just terminating the deposition with no basis.
11  So if that is the case, we'll take it up with the court.
12      MR. TURNER: The deposition is over because
13  we've exceeded the seven hours. You've wasted hours
14  just asking the same questions over and over again and
15  arguing with the witness. Deposition is over.
16      THE VIDEOGRAPHER: Shall I go off the record?
17      MR. TURNER: It's not over. If you're going
18  to represent that you're going to finish with this
19  witness in the next 30 minutes, I'll permit him to stay,
20  but you've refused to do this.
21      Can you finish with the witness in the next
22  30 minutes?
23      MR. TORPEY: I've already made my position
24  clear, Mr. Turner, and if you're -- I'll ask 30 more
25  minutes of questions, but I won't be done in 30 minutes

Page 137

35 (Pages 134 to 137)

7ca02e95-9401-455d-8a64-f2666796c47a

Eishin Yamaguchi

1    So if you're terminating it, I'm prepared to continue.
2    I'm prepared to continue for an hour  I'm prepared to
3    come back tomorrow morning.  I'm prepared to come --
4          THE WITNESS:  This witness is on a totally
5    different time schedule from you and all you're doing is
6    abusing the witness when he's been entirely helpful and
7    courteous to you.  You've been entirely discourteous to
8    him  This deposition is over.
9          THE VIDEOGRAPHER:  Shall we go off the record?
10         MR. TORPEY:  Apparently, since he's leaving,
11   we're, I guess, going to be done.
12         (Whereupon, the deposition adjourned at
13         6:17 p.m.)
14              --oOo--
15         I declare under penalty of perjury that the
16   foregoing is true and correct.  Subscribed at
17   _____, California, this ____ day
18   of _____, 2007.
19
20
21
22         EISHIN YAMAGUCHI
23
24
25

Page 138

1          CERTIFICATE OF REPORTER
2          I, BRANDON D. COMBS, a Certified Shorthand
3    Reporter, hereby certify that the witness in the
4    foregoing deposition was by me duly sworn to tell the
5    truth, the whole truth, and nothing but the truth in the
6    within-entitled cause;
7          That said deposition was taken in shorthand by
8    me, a disinterested person, at the time and place
9    therein stated, and that the testimony of the said
10   witness was thereafter reduced to typewriting, by
11   computer, under my direction and supervision;
12         That before completion of the deposition,
13   review of the transcript was not requested  If
14   requested, any changes made by the deponent (and
15   provided to the reporter) during the period allowed are
16   appended hereto.
17         I further certify that I am not of counsel or
18   attorney for either or any of the parties to the said
19   deposition, nor in any way interested in the event of
20   this cause, and that I am not related to any of the
21   parties thereto.
22         DATED: November 29, 2007.
23
24
25         BRANDON D. COMBS, CSR 1297

Page 139

36 (Pages 138 to 139)