**Page 82**

1  A. I do not recall accurately.
2  Q. Well, do you recall anything at all about the
3  conversation in that regard?
4  A. I recall that we had the conversation, but I
5  do not recall the words that were spoken.
6  Q. Now, there's an area mike or microphones in
7  the cockpit, and those conversations would have been
8  recorded by the cockpit voice recorder; correct?
9  A. I have never heard it.
10 Q. That's not the question, Mr. Yamaguchi. The
11 question is would those discussions -- you were under
12 power, and therefore the cockpit voice recorder was
13 working at the time you had those discussions in the
14 cockpit; correct?
15 A. Yes.
16 Q. And so whatever was said by yourself or your
17 two fellow pilots, as far as you know would be recorded
18 on the cockpit voice recorder; correct?
19 A. I don't know. I've never heard it.
20 Q. Was the discussion in English or Japanese?
21 A. Japanese.
22 Q. Now, let's say, did you at any point ever turn
23 off the cockpit voice recorder while you were taxiing
24 prior to the impact?
25 A. No.

**Page 83**

1  Q. Now, you indicated you don't know what you
2  thought should be done back on October 7, 2003. So I
3  want to ask you, let's assume that today, okay, that
4  today you're taxiing at San Francisco Airport and
5  exactly the same situation presents itself to you as it
6  did on October 7 of 2003.
7      When you perceive a potential conflict or
8  collision hazard with the United aircraft, what do you
9  believe you should do at that point?
10     MR. TURNER: Objection as to form and
11 foundation, incomplete hypothetical and a misstatement
12 of this witness's prior testimony.
13     MR. TORPEY: Q. Go ahead.
14 A. In the first half of your question you stated,
15 quote, you indicated that you do not know what should be
16 done or what should have been done on October 7, 2003,
17 close quote.
18     I have never made such a statement.
19     MR. TORPEY: Q. Well, you indicated you don't
20 recall what you thought you should do.
21     MR. TURNER: Objection as to form and
22 foundation, misstatement of this witness's prior
23 testimony, and you're just arguing with the witness.
24     MR. TORPEY: Q. Mr. Yamaguchi, I want you to
25 assume that you, right this moment, are pilot in command

**Page 84**

1  and the captain of a 777 in San Francisco with 155 or
2  more people. I want you to assume that you, during that
3  taxi, see a United aircraft and you perceive that
4  could -- you don't know for sure -- but you perceive
5  that could be a collision hazard.
6      Do you understand my question to this point so
7  far, sir?
8      MR. TURNER: So far there's no question.
9  Objection as to form and foundation.
10     THE WITNESS: Are you asking me to assume?
11     MR. TORPEY: Q. Mr. Yamaguchi, I think, with
12 all due respect, my question was clear. I've only asked
13 you whether you understood my question to this point.
14     Do you understand my question to this point,
15 sir? That's the only thing I've asked you.
16 A. I don't know what question you are referring
17 to.
18 Q. Mr. Yamaguchi, we'll try another question
19 since apparently you won't answer that one.
20     MR. TURNER: There's no reason for those kind
21 of snide comments.
22     MR. TORPEY: I think the question was direct,
23 and I don't think it was answered, with all due respect
24 to Mr. Yamaguchi. And I will try another question
25 because apparently that's the thing to do at this point.

**Page 85**

1  Q. I'm asking you, sir, whether today when faced
2  with a potential collision hazard at San Francisco
3  airport what it is you, as the pilot in command, are
4  required to do? That's the question.
5  A. And naturally if I believe there will be a
6  collision, I will stop. But if I judge that there's no
7  potential for a collision, then I will continue to taxi.
8  Q. Now, if you're not sure whether or not you're
9  going to make it or clear, do you agree in that
10 situation that you should stop until you know, in fact,
11 you're not going to collide?
12 A. If there's a potential for a collision, then
13 naturally we will stop.
14 Q. And was that the understanding you had of what
15 you should do back on October 7 of 2003 as well?
16 A. When you ask me is that the understanding,
17 what understanding are you talking about?
18 Q. In response to two questions, you just told me
19 what you believed you should do today if faced with a
20 collision hazard. My question is would that be the same
21 answer that would apply back in October 7 of 2003, if
22 faced with the same situation I presented in my
23 hypothetical today?
24     MR. TURNER: Objection as to form and
25 foundation.

**Page 86**

1 THE WITNESS: Do you wish to inquire if we
2 should have stopped? Is that what you are trying to
3 ask?
4 MR. TORPEY: Q. Mr. Yamaguchi, do you agree
5 with me, sir, that if on October 7, 2003, you or any
6 member of your flight crew felt that you were going to
7 collide with the United aircraft, that it was incumbent
8 upon you to stop your aircraft? Do you agree with that?
9 A. If we had felt that there would be a
10 collision, then naturally we would have stopped, but we
11 did not think so. That is why we continued taxiing.
12 Q. Now, Mr. Yamaguchi, if on October 7, 2003, you
13 didn't know for sure whether or not you might collide
14 with the United aircraft, would you agree with me that
15 you should stop until you know for sure whether or not
16 you were going to collide with the United aircraft?
17 MR. TURNER: Objection to form and foundation.
18 THE WITNESS: I do not agree.
19 MR. TORPEY: Q. So even if you don't know
20 whether or not you're going to collide with the United
21 aircraft, you feel it's okay to continue taxiing until
22 you know for sure you're going to hit it?
23 MR. TURNER: Objection as to form and
24 foundation and a misstatement of this witness's prior
25 testimony.

**Page 87**

1 THE WITNESS: I would like the question again.
2 That is not so.
3 MR. TORPEY: Q. All right. So what you're
4 saying, Mr. Yamaguchi, is that if you're taxiing and you
5 don't know for sure whether or not you're going to clear
6 the conflict or the other aircraft, then until you do
7 know for sure that you can clear, you should stop.
8 Is that what you're saying?
9 MR. TURNER: Objection as to form and
10 foundation and a misrepresentation of this witness's
11 prior testimony.
12 THE WITNESS: Talking in generalities, that
13 would be the case.
14 MR. TORPEY: Q. Okay. And if on October 7,
15 2003, you or a member of your flight crew was uncertain
16 whether or not your aircraft, if it continued to taxi,
17 would be able to do so without hitting the United
18 aircraft, then the correct thing to do would have been
19 to stop the taxi until you could determine that you
20 would be able to avoid hitting it; correct?
21 A. That is not so.
22 Q. Well, then explain why that's not so.
23 A. There's another interpretation that is
24 possible and that is that the United aircraft intruded
25 into the path of our taxiing pathway.

**Page 88**

1 Q. So you believe that if United intruded into
2 the taxiing pathway, even if you have come to the
3 determination that you're not sure whether or not you
4 can clear the United aircraft, you are not obligated to
5 stop?
6 MR. TURNER: Objection as to form and
7 foundation and a misrepresentation of this witness's
8 prior testimony.
9 THE WITNESS: I have been repeatedly saying
10 that if we had judged that there was a possibility or
11 potential for a collision, we would have stopped. But
12 at that time our judgment that -- was that there was no
13 such possibility, therefore, we continued taxiing.
14 MR. TORPEY: Q. You've said that repeatedly,
15 Mr. Yamaguchi, and I'm not asking you about that, so you
16 don't have to tell me that yet another time.
17 I'm asking you now to switch to another
18 situation, that is if on October 7, 2003, you did not
19 know for sure -- and I'll repeat it -- you did not know
20 for sure that you would clear the United aircraft, in
21 that situation, Mr. Yamaguchi, you were required to
22 bring your aircraft to a stop until you knew for sure
23 that you would clear that conflict. True or false, sir?
24 MR. TURNER: Objection as to form and
25 foundation and incomplete hypothetical.

**Page 89**

1 THE WITNESS: There seems to be a difference
2 in our mutual understanding of the situation. I judged
3 that the situation was clear, therefore, I continued
4 taxiing, but you are working on the premise that that
5 was not possible.
6 MR. TORPEY: Q. Mr. Yamaguchi, I'm going to
7 move to strike your answer as nonresponsive, and I'm
8 going to ask you one final time, and I'm not going to
9 ask it again. I'll take the matter up at another
10 time if need be.
11 MR. TURNER: I object to your comments to this
12 witness.
13 MR. TORPEY: Q. You've told us repeatedly
14 that you believe that you could clear. I am not asking
15 you about that. I'll let you translate that.
16 One last time, Mr. Yamaguchi, I want you to
17 assume -- I want you to assume that on October 7, 2003,
18 while your aircraft with 155 passengers was taxiing
19 under your command and you saw the United aircraft and
20 perceived a potential collision hazard, do you agree,
21 Mr. Yamaguchi, that you were obligated to stop if you
22 did not know whether or not you were going to clear, if
23 you did not know -- and I'll repeat -- if you did not
24 know you would clear, you were obligated to stop;
25 correct?

1    MR. TURNER: Objection as to form, foundation,
2    incomplete hypothetical.
3    THE WITNESS: I am afraid my answer is the
4    same. I did not believe that there would be a
5    collision. I judged that it was possible to taxi.
6    MR. TORPEY: All right. I'd ask the reporter
7    to mark that last two sequences of question and answer.
8    We need to have that portion of the transcript if we
9    need to go back to that.
10   I will move to strike, but again, I will take
11   that up at another time. I'm not going to argue with
12   the witness, and I'm not going to ask any further
13   questions. I have a number of follow-ups. That's a
14   critical issue, and I'm not going to go further in light
15   of the fact that the witness is being unresponsive.
16   MR. TURNER: I disagree with your comments and
17   believe the witness is answering your questions as best
18   he can. It's the questions that leave a lot to be
19   desired. It's up to you whether you want to continue on
20   this line or not.
21   MR. TORPEY: Well, I've said what I have to
22   say.
23   Q. Mr. Yamaguchi, I'm going to ask you something
24   different. You indicated that you thought that your
25   aircraft would clear and therefore you continued to taxi

Page 90

1    as opposed to stopping. Is that your position in this
2    case, sir?
3    A. Yes.
4    Q. Now, up until the actual moment when your
5    aircraft impacted the United aircraft, are you
6    testifying here under oath that you believed that your
7    aircraft was not going to hit the United aircraft, you
8    were a hundred percent certain up until the moment of
9    impact that you were not going to hit that United
10   aircraft? Is that your testimony?
11   MR. TURNER: Objection as to form and
12   foundation.
13   THE WITNESS: Yes.
14   MR. TORPEY: Q. And is it your understanding
15   your first officer and the observer pilot were also 100
16   percent certain up to the moment of impact that there
17   was not going to be a collision between the United
18   aircraft and your aircraft?
19   MR. TURNER: Objection as to form and
20   foundation.
21   THE WITNESS: They are other people, so I do
22   not know. But I was the PIC, so I rendered the ultimate
23   decision.
24   MR. TORPEY: Q. Well, but you also discussed
25   in Japanese with the other two whether or not you

Page 91

1    thought you were going to be able to clear, and based on
2    that discussion, is it your understanding that the other
3    two agreed with you that there was a 100 percent
4    certainty that you would clear the United aircraft and
5    therefore did not have to stop?
6    MR. TURNER: Objection as to form and
7    foundation. Just being repetitious and arguing with
8    this witness, but if you want to waste your time like
9    that, it's fine with me.
10   THE WITNESS: I am repeating myself, but I do
11   not have an accurate understanding of what other people
12   were thinking.
13   MR. TORPEY: Q. If hypothetically the flying
14   pilot, your copilot or the observer pilot had indicated
15   to you as the pilot in command that they're not certain
16   whether or not your aircraft was going to clear the
17   United aircraft, would you have continued to taxi, or
18   would you have ordered the aircraft to stop?
19   MR. TURNER: Objection as to form and
20   foundation and incomplete hypothetical.
21   THE WITNESS: If I can go back to four years
22   ago, perhaps I can give you an answer, but I cannot say
23   what was the thought, stopping or continuing.
24   MR. TORPEY: Again, I'll move to strike as
25   nonresponsive.

Page 92

1    Q. Mr. Yamaguchi, that wasn't my question. I
2    didn't ask you what you were thinking back then. I
3    asked you if your first officer or your observer pilot
4    had expressed to you concern to the effect that they
5    were not sure whether or not -- whether or not -- your
6    aircraft was going to clear.
7    If, hypothetically, they had said that to you,
8    as the pilot in command, you were obligated to bring
9    your aircraft to a stop until you knew whether or not
10   you were going to collide with the United aircraft?
11   MR. TURNER: Objection as to form and
12   foundation and incomplete hypothetical.
13   THE WITNESS: If there had been such a
14   statement, then I would have considered that statement.
15   But I do not know if we would have stopped or not. I'd
16   like to take a break at an appropriate time.
17   MR. TURNER: Good idea. This is an
18   appropriate time. We've been going for an hour and a
19   half since lunch.
20   THE VIDEOGRAPHER: Going off the record. The
21   time on the monitor is 3:33 p.m.
22   (Recess taken.)
23   THE VIDEOGRAPHER: Coming back on the record.
24   The time on the monitor is 3:47 p.m. Please begin.
25   MR. TORPEY: Q. Mr. Yamaguchi, we were

Page 93

24 (Pages 90 to 93)

1 talking before the break about the fact that you were
2 certain that you were not going to collide with United
3 aircraft, and that's why you did not order the aircraft
4 stopped prior to impact.
5     What did you or others in your flight crew do
6 to determine and come to the conclusion that you were
7 definitely not going to hit the United aircraft?
8   A.  First of all --
9     THE INTERPRETER: The interpreter will
10 restate.
11     THE WITNESS: First of all, from the cockpit
12 we saw that there was sufficient clearance or distance
13 and we had received the clearance to taxi and was
14 taxiing according to instructions. But from a certain
15 point in time it is no longer possible to see the rear
16 of the aircraft, therefore, from that point on, it is
17 not possible to judge what the opposing aircraft did.
18     MR. TORPEY: Q.  All right. Let me ask you.
19 Mr. Yamaguchi, what you're saying is at some point in
20 time you can't see the tip of your right wing tip as you
21 continue to taxi towards the United aircraft; correct?
22   A.  The wing tip cannot be seen from the cockpit.
23   Q.  And it was the wing tip --
24   A.  In a way.
25   Q.  I'm sorry. The right wing tip of your

Page 94

1 aircraft is what collided with the United aircraft;
2 correct?
3   A.  Yes.
4   Q.  And, in fact, even if you had looked out from
5 the first officer's position or your position or the
6 observer's position, even at the gate, you would still
7 not be able to see the wing tip of your aircraft;
8 correct?
9   A.  Yes.
10   Q.  So during the entire time you're taxiing from
11 the gate to the impact, the portion of your aircraft
12 that struck the United aircraft, was never visible to
13 you, the flying pilot or the observer pilot.
14     True statement?
15   A.  You mean our wing tip?
16     MR. TORPEY: Read back the question, please.
17     (Record read by the reporter.)
18     THE WITNESS: Yes.
19     MR. TORPEY: Q.  Now, there's a window on the
20 right-hand side of the cockpit that opens; correct?
21   A.  Yes.
22   Q.  Did anyone that day prior to the impact open
23 the window and try to look out to see the wing tip
24 before the impact?
25   A.  No.

Page 95

1   Q.  If you open the window on the right-hand side,
2 you'd be able to see the tip of the right wing, correct,
3 if you stick your head out and look?
4   A.  The potential for a collision wasn't that
5 imminent, therefore, that was not done. But even if
6 that window was opened and someone had looked out, it
7 would be difficult to gauge the distance between the
8 wing tip of our aircraft and the wing tip of the
9 opposing aircraft.
10     MR. TORPEY: And I'll move to strike.
11   Q.  The question, Mr. Yamaguchi, is if you looked
12 out the window, opened the window, put your head out and
13 looked out the window, you can see the wing tip on the
14 right-hand side of your aircraft. True statement, sir?
15   A.  The answer is the same. Since that was not
16 necessary, it was not done.
17   Q.  I didn't ask you that, Mr. Yamaguchi. Once
18 again, I'll move to strike, and for the last time I'll
19 ask you this question.
20     If you want to see the right wing tip of your
21 aircraft while you're sitting at the gate and you open
22 that right-hand window and stick your head out, you can
23 see the right wing tip of your aircraft, that 777
24 aircraft; correct?
25   A.  That may be possible, but that is not a usual

Page 96

1 procedure.
2   Q.  So you agree with me that if you wanted to
3 stick your head out the window as you were taxiing on
4 October 7, 2003, to see your right wing tip, you could
5 have done that, and you would have seen the right wing
6 tip; correct?
7   A.  In such a situation at that time it was not
8 necessary to open the window and see the right wing tip,
9 and, actually, it should not be done because naturally
10 our aircraft would come to a stop, and it would not be
11 necessary.
12   Q.  Are you testifying you have to stop the
13 aircraft to open that right window?
14   A.  Ordinarily the aircraft would be stopped.
15   Q.  Not asking you ordinarily, Mr. Yamaguchi. I'm
16 asking you whether you are testifying that in order to
17 physically open the right wing -- excuse me -- the right
18 window of your aircraft, that the aircraft must be at a
19 stop or you are unable to physically open that window?
20 Is that your testimony, sir?
21   A.  That is not so.
22   Q.  If you wanted to open the window -- I'm not
23 asking you whether you think you should. I'm asking you
24 if you wanted to open the window or have your flying
25 pilot open the window on October 7 of 2003, look out the

Page 97

25 (Pages 94 to 97)

**Page 98**

1  window and see the wing tip to determine if there would
2  be clearance between your aircraft and the United
3  aircraft, you could have done that; correct? That's the
4  only question. You could have done that; correct?
5     MR. TURNER: Objection to form and foundation.
6  And I would like the question read back.
7     (Record read by the reporter.)
8     THE WITNESS: I do not know if we could have,
9  but it was not necessary to do so. In fact, the United
10 aircraft people did not open that aircraft's window
11 either.
12    MR. TORPEY: Q. I'll move on to another
13 question, Mr. Yamaguchi. I'm not going to continue to
14 ask you the same thing and get the same answer, so let
15 me ask you this.
16    If, in fact, as you've testified you can't see
17 the right wing tip of your aircraft, then there is
18 absolutely no way you or your flying pilot or your
19 observer pilot can know for certain whether or not the
20 right wing tip is going to collide with the United
21 aircraft because you can't see it within the cockpit.
22 True statement?
23    A. The judgment of the --
24    THE INTERPRETER: The interpreter will
25 restate. The interpreter has to confirm one word.

**Page 99**

1     THE WITNESS: The space or distance was judged
2  before the collision took place. It is just like
3  someone who is driving a car from his left seat he
4  cannot see the front right wheel of his car when he's
5  driving.
6     MR. TORPEY: Q. Well, if there was an object
7  in front of the front right wheel of your car, and you
8  didn't know -- let's put it this way.
9     Let's say you're driving a car. Let's say
10 you're just driving into a driveway in your house and
11 let's say there's a bunch of nails in your driveway or
12 maybe some glass.
13    And let's say that you pull in but you can't
14 really see your right front tire so you don't know if
15 you are going to run it over and get a flat.
16    Would you keep going until you see if you can
17 make it, or would you stop, get out of the car and try
18 to the determine whether your tire was going to run over
19 it?
20    What would you do, sir?
21    MR. TURNER: Object as to form and foundation.
22    THE WITNESS: That would depend on the
23 situation. If I judge that it is dangerous, then I
24 would stop and remove them. But if I judge that I can
25 pass by, I would do so.

**Page 100**

1     MR. TORPEY: Q. And what if you couldn't make
2  a determination either way? Would you stop or would you
3  just drive up your driveway and see if you run over the
4  glass?
5     MR. TURNER: Objection as to form and
6  foundation and incomplete hypothetical.
7     THE WITNESS: Naturally, if I am in a
8  quandary, I would stop.
9     MR. TORPEY: Q. And let me ask you this,
10 Mr. Yamaguchi. If you or others in the cockpit cannot
11 see the wing tip of your aircraft as you're taxiing
12 towards the United Airlines on October 7, 2003, then
13 there's a portion of your aircraft that potentially is a
14 conflict hazard that you cannot rule out simply by
15 looking out the cockpit windows; correct?
16    A. That is a structural issue. As long as one
17 operates a vehicle of that structure, it cannot be
18 helped.
19    Q. I'm not asking you, Mr. Yamaguchi, if it can
20 be helped. I'm asking you once again, that since you
21 cannot see the right wing tip of your aircraft, it is
22 not possible -- it is impossible for you to see whether
23 or not your wing tip is going to clear the United
24 aircraft simply by looking out the windows in the
25 cockpit.

**Page 101**

1     Is that a true statement or false statement?
2  That's the question. Just say true or say false.
3  That's the question.
4     MR. TURNER: Objection as to form and
5  foundation and the witness is instructed to give the
6  appropriate answer that he believes is responsive.
7     MR. TORPEY: No. The witness is to answer
8  true or false. That's the question. You aren't to
9  instruct your witness to answer other than a way I've
10 asked the question.
11    MR. TURNER: You are not to instruct the
12 witness how to answer the question.
13    MR. TORPEY: Well, I'm not going to argue with
14 you, Marshall. If you want to instruct him not to
15 answer that question, you do so and you have a reason
16 for doing so if you do. But I've asked a question.
17 I've asked this witness whether he thinks it's a true
18 statement or a false statement. That's the only
19 question.
20    Now if you want to follow up and ask questions
21 additionally when you have a chance to do it, you can do
22 it.
23    Q. But right now, sir, all I want to know is what
24 I said to you is that a true statement or a false
25 statement? That's the question.

**Page 102**

1  MR. TURNER: The witness can give what he
2  believes is an appropriate responsive answer.
3  THE INTERPRETER: The interpreter will repeat
4  the question in Japanese.
5  THE WITNESS: We can see the right wing tip of
6  the UA aircraft from its location. We can judge if
7  there is sufficient clearance.
8  MR. TORPEY: I'll move to strike the answer.
9  That wasn't the question, and the witness did not give a
10  true or false statement, so I'm going to move to strike.
11  Q. I'm going to move on to something else because
12  apparently I cannot ask you with regard to that question
13  any further questions until we have a ruling on that.
14  Now, Mr. Yamaguchi, after the impact, what did
15  you and your other crew members do?
16  A. We confirmed that there was no fuel leakage.
17  Q. How did you do that?
18  A. The observer pilot looked in the window at the
19  right.
20  Q. Did he open the window?
21  A. No.
22  Q. Did you or the observer pilot or the flying
23  pilot of this aircraft get out and look around the
24  ground area where the collision occurred?
25  A. No.

**Page 103**

1  Q. So other than looking out the window by the
2  observer pilot to see whether there was any fuel
3  leaking, did you or the other members of your crew take
4  any other action other than simply leaving the airplane
5  and going directly into the terminal?
6  A. We received a report from the cabin.
7  Q. Who, and what was that report?
8  A. I don't recall who.
9  Q. From a flight attendant.
10  THE WITNESS (WITHOUT INTERPRETER): Yes.
11  MR. TORPEY: Q. And what did the flight
12  attendant say, if you recall?
13  A. The flight attendant reported that there was
14  nothing unusual in the cabin and the attendant reported
15  that there was no injury. He or she then inquired what
16  happened.
17  Q. And how were you all taken off the aircraft?
18  Did you go out a back stairway on to a bus, or was your
19  aircraft pulled back to the gate. How was it that you
20  ultimately got off the aircraft, you and the other crew
21  members?
22  A. The aircraft was tugged and pulled back to the
23  gate.
24  Q. So you never left -- you or your other crew
25  members never got off the airplane, after the impact?

**Page 104**

1  Stayed on it, and ultimately it was tugged back to the
2  gate and that's where you got off. You walked directly
3  into the jetway again?
4  A. Yes.
5  Q. Now, when you impacted the United aircraft,
6  did your aircraft come virtually immediately to a stop?
7  A. Our aircraft did stop, but we don't know if it
8  is due to the impact or due to the braking by the flying
9  pilot.
10  Q. Okay. Did he apply brakes immediately upon
11  impact?
12  A. That I do not know.
13  Q. Did you do anything in terms of braking or
14  physically manipulating any of the controls at any time
15  on or after the impact?
16  A. No. I did not apply the brakes nor did I
17  manipulate any control.
18  MR. TORPEY: Now, let me show you -- let's
19  mark this as the next exhibit. In fact, the next two
20  exhibits.
21  (Whereupon, Exhibits 3 and 4 were marked for
22  identification.)
23  MR. TORPEY: Q. Have you had a chance,
24  Mr. Yamaguchi, to look at Exhibits 3 and 4, those being
25  airport operations bulletins of July 31, 2000, and

**Page 105**

1  August 7, 2001?
2  A. No.
3  Q. Have you ever seen those before?
4  A. No.
5  Q. Were you aware -- let me have you look at
6  Exhibit 3, for example. It says, to all airlines and
7  aeronautical support tenants.
8  On July 31, 2000, All Nippon Airways was
9  flying aircrafts into San Francisco Airport; correct?
10  THE INTERPRETER: May I have the question,
11  please.
12  MR. TORPEY: Let me ask you to mark this --
13  why don't you mark this as exhibit whatever is next, 5,
14  I guess.
15  MR. WORTHE: 5.
16  (Whereupon, Exhibit 5 was marked for
17  identification.)
18  MR. TORPEY: Q. Mr. Yamaguchi, you can see
19  that is -- let me represent to you that is a satellite
20  photograph of the terminal and ramp area at
21  San Francisco Airport that includes the area where the
22  taxi and impact occurred.
23  You'll see that there are designated areas for
24  nonmovement area and others that are called movement
25  areas. Are you familiar with what a movement area is

**Page 106**

1  versus a nonmovement area?
2  A. Yes.
3  Q. What is the difference or the distinction
4  between what would be considered the movement area and
5  the nonmovement area in Exhibit 5?
6  A. Nonmovement area is under the jurisdiction of
7  the ramp control, whereas the movement area is under the
8  jurisdiction of ground control.
9  Q. And ramp control is United ramp control in
10 this area; correct?
11 A. I don't know if it is United or not, but it is
12 called a ramp control.
13 Q. And the movement area is not under the control
14 of ramp control; correct?
15 A. Ordinarily that is so, but this particular
16 area is one where there is an overlap, so I don't know
17 what the true situation of the operation is.
18 Q. As a pilot for ANA are you saying that you do
19 not know the distinction at San Francisco International
20 Airport with regard to who has jurisdiction over the
21 movement versus the nonmovement area?
22 A. There's a guideline on the chart, but there is
23 no way that I would be able to know how the ramp control
24 and ground control actually operate.
25 Q. In order to taxi your aircraft onto any

**Page 107**

1  portion of a movement area at San Francisco, you have to
2  contact the Federal Aviation Administration, ATC ground
3  control; isn't that true?
4  A. I would like the question again, please.
5  Q. In order to taxi into any portion of a
6  movement area, you must get clearance from air traffic
7  control ground control; correct?
8  A. That's right.
9  Q. And you cannot get permission from ramp
10 control to go into a movement area; correct?
11 A. Yes.
12 Q. Now, the ground control, that is the Federal
13 Aviation Administration that are the ground controllers;
14 is that correct?
15 A. I do not know if it is under the jurisdiction
16 of the FAA, but the ground control controls the movement
17 area.
18 Q. Okay. Let me have you look back at Exhibits 3
19 and 4, which were airport operations bulletins issued on
20 the dates indicated to all airlines which would include
21 ANA, and it looks -- under background -- in fact, if you
22 turn to the next page under procedures --
23     MR. TURNER: Are you referring to 3 or 4?
24     MR. TORPEY: Let's look at Exhibit 3 first.
25 And I guess let's start under definitions.

**Page 108**

1  Q. And if you look at definitions, it describes
2  what a movement area is and a nonmovement area. Do you
3  see that?
4  A. Yes.
5  Q. And then under that there's something called
6  reporting point.
7  A. Yes.
8  Q. And it says numeric pavement marking located
9  on a taxiway that indicates a transition area from a
10 nonmovement to a movement area, and it includes
11 number 1, 2, 10, and 11. You see that?
12 A. Yes.
13 Q. Now, are you familiar with the reporting area
14 known as spot 10 at San Francisco Airport?
15 A. Yes.
16 Q. And is it your understanding that spot 10 --
17 in fact, if you look at Exhibit 5, that recon photo 1,
18 do you see that designation for spot 10 where the arrow
19 is pointing?
20 A. Yes.
21 Q. And do you understand that that's the
22 reporting point or the transition point between the
23 nonmovement to the movement area?
24 A. Yes.
25 Q. Do you know why spot 10 is called a reporting

**Page 109**

1  point?
2  A. That I did not know.
3  Q. If you look at the next line, procedures, it
4  says here, aircraft -- strike that.
5      The second paragraph under procedures, it says
6  here, unless otherwise directed, outbound taxiing
7  aircraft shall stop at respective reporting point prior
8  to contacting SFO air traffic control terminal for
9  further taxi instructions. Do you see that?
10 A. Yes.
11 Q. On October 7, 2003, were you aware of that
12 requirement?
13 A. Yes.
14 Q. And how is it that you became aware of that
15 requirement on October 7, 2003, prior to that impact?
16 A. It is written on the route manual.
17 Q. All right. This is the manual that goes with
18 the aircraft; correct?
19 A. It is the manual that each individual has.
20 Q. And as the pilot in command or the flying
21 pilot, both you and your copilot were required to know
22 and follow that instruction; correct?
23 A. Yes.
24 Q. And if you turn the page again to the third
25 page of Exhibit 3, it states here that all airlines are

28 (Pages 106 to 109)

**Page 110**

1  required to closely monitor and follow the clearances
2  provided by these towers as well as those of FAA, ATC
3  upon reaching reporting points which included spot 10.
4      Do you see that?
5    A.  Yes.
6    Q.  And do you know what, if anything, ANA was
7  doing at any time prior to October 7, 2003, to monitor
8  or enforce the requirements to comply with those
9  clearances as that bulletin direction?
10   A.  There was nothing that was special but the
11 same thing is included in the route manual.
12   Q.  Okay. And I apologize if I asked you this
13 before. The route manual would be carried on the
14 aircraft you were taxiing the day of this accident;
15 correct?
16   A.  Yes.
17      MR. TORPEY: Let's mark this as Exhibit 6.
18      (Whereupon, Exhibit 6 was marked for
19      identification.)
20      MR. TORPEY: Q. I'll represent to you,
21 Mr. Yamaguchi, that that was a partial transcript
22 prepared by ANA submitted to the NTSB as parts of its
23 investigation package with regard to their investigation
24 into the circumstance in this matter.
25      Have you ever seen that partial transcript

**Page 111**

1  before?
2    A.  Yes.
3    Q.  And you understand that that is, in fact, a
4  partial transcript of the ANA cockpit voice recording
5  from the day of this accident?
6    A.  Yes.
7    Q.  All right. Let's turn to where it says ramp
8  time. That's the middle column. Let's go down to
9  11:53:51 through 57.
10     There's communication from ramp tower to
11 yourself and that would literally -- you were the one
12 talking to the ramp tower that day; correct?
13   A.  Yes.
14   Q.  And the ramp tower responded to you by saying
15 Air Nippon 007, you are cleared to spot 10, please.
16 Have a good day. And then the very next line at
17 11:53:59, you personally would have responded to ramp
18 tower saying, cleared to spot 10. Have a good day.
19     MR. TURNER: I just want to state for the
20 record that in your reading you omitted a few words from
21 the first reading. At time 11:55:28 to 11:55:32.
22     MR. TORPEY: Q. Mr. Yamaguchi, you understood
23 that you were cleared only to go to, not beyond, spot 10
24 by ramp control; correct?
25   A.  Yes.

**Page 112**

1    Q.  And that would be consistent with -- strike
2  that.
3      In other words, until you've got clearance
4  from ground or air traffic control, no part of your
5  aircraft, not the tip, not any part of your aircraft can
6  enter the movement area until you get clearance from
7  ground; correct?
8    A.  Yes.
9    Q.  Now, let's look at the second page of
10 Exhibit 6, and if you look at the time reference of
11 11:54:54 through 57, once again, you personally are now
12 calling this time ATC ground control; correct?
13   A.  Yes.
14   Q.  And you asked at that point, you said you were
15 approaching spot 10 and you requested clearance to taxi,
16 in other words, to go now from spot 10 into the movement
17 area; correct?
18     MR. TURNER: Objection as to form and
19 foundation and a misstatement of this written
20 transcript.
21     MR. TORPEY: Q. Go ahead, Mr. Yamaguchi.
22   A.  May I have the question once more.
23     MR. TORPEY: Read it back.
24     (Record read by the reporter.)
25     THE WITNESS: Yes.

**Page 113**

1      MR. TORPEY: Q. Okay. Now, in order for
2  you -- strike that.
3      If you go back to the first page of Exhibit 6,
4  after you asked ground -- strike that.
5      After you called the ramp tower, the United
6  ramp tower, and asked and understood you were cleared to
7  spot 10, that was the last time prior to impact you
8  attempted to contact United ramp control prior to the
9  impact; correct? You never again made an attempt to
10 contact United ramp control?
11   A.  From this point to the point, time, is
12 11:56:29, I have not.
13   Q.  So by 11:56:29, that's after the impact?
14   A.  No. It's before the impact.
15   Q.  I don't see here on Exhibit 6 where you tried
16 to contact ramp control after being cleared to spot 10.
17 Can you show me where you attempted to do that?
18   A.  To ramp control did you say?
19   Q.  Yes.
20   A.  That record is not here, so up to this point
21 there has been no communication to ramp control.
22   Q.  So is it fair to say then, Mr. Yamaguchi, that
23 once you received and understood you were cleared by
24 United ramp control to proceed to spot 10 that you did
25 not make any further attempts to contact ramp control

**Page 114**

1  for any reason at any time prior to the impact?
2     A.  Yes.
3     Q.  Now, once you do at 11:54:54 contact ground,
4  that's ATC ground, to do that you had to switch your VHF
5  radio from the frequency that you use to talk to the
6  United ramp control to a different frequency in order to
7  contact ATC ground; correct?
8     A.  Yes.
9     Q.  And would you have personally been the one to
10 make the frequency change on the radio?
11    A.  I believe it was me because I was responsible
12 for the radio communication.
13    Q.  And that would have been the left VHF?
14    A.  Ordinarily we use the left VHF, so probably it
15 was that at that time.
16    Q.  So isn't it fair to say, Mr. Yamaguchi, that
17 once you changed frequency after being cleared to
18 spot 10, up until the point of the impact, there was no
19 way for United ramp control to contact you or for you to
20 contact them at that point?
21    A.  In a way it is correct.  We were told and
22 instructed by the ramp control to taxi it to spot 10 and
23 to contact ground, and then we changed the frequency in
24 this case this have a good day right here, means contact
25 ground.

**Page 115**

1     Q.  Mr. Yamaguchi, prior to the impact and after
2  being cleared to spot 10, you switched the frequency on
3  your radio and accordingly there was no way from that
4  point to the impact for United ramp control to call you
5  or for you to call them.  Is that a true statement, sir?
6     A.  No.  I don't think so.  Right here at
7  11:55:34 --
8        THE INTERPRETER:  The interpreter will
9  restate.
10       THE WITNESS:  Right here at 11:55:28 it says,
11 you are cleared to spot 10, please.  So they are telling
12 us that there is no obstacle to us up to spot 10.
13       MR. TORPEY:  Q.  Again move to strike.  That's
14 not the question, Mr. Yamaguchi.  The question had
15 nothing to do about what you interpreted it.  The
16 question has to do with whether, after you switched
17 frequencies so you're no longer talking to the ramp
18 control, you're talking to ground, from that point to
19 the impact there was no way for United ramp control to
20 contact you or you to contact them.  Is that true or is
21 that false?
22       MR. TURNER:  Objection as to form and
23 foundation.
24       THE WITNESS:  At this point it was no longer
25 necessary to monitor the frequency related to the ramp

**Page 116**

1  control.  They said, have a good day.  It means change
2  the frequency.
3        MR. TORPEY:  Q.  Again move to strike,
4  Mr. Yamaguchi.  One last time.
5        You, after you were cleared to spot 10 by ramp
6  control, you were no longer listening to nor making
7  attempts to contact United ramp control prior to the
8  impact.  Is that a true statement, sir?
9        MR. TURNER:  Objection as to form and
10 foundation.
11       THE WITNESS:  Naturally we cannot hear the
12 instruction from the ramp control, but if necessary, we
13 could change the frequency from the ground control
14 frequency to the ramp control frequency once again.  But
15 in this case, it was not necessary to do so.
16       MR. TORPEY:  Q.  Now, in changing frequencies
17 from the ramp control to the ground control, you did
18 that prior to reaching spot 10; correct?
19    A.  Yes.
20       THE VIDEOGRAPHER:  Sorry.  I need to change
21 tape.
22       MR. TURNER:  Let's also take a break.  We have
23 been going for over an hour and 15 minutes.
24       MR. TORPEY:  No problem.
25       THE VIDEOGRAPHER:  This concludes Videotape 3

**Page 117**

1  in the deposition of Eishin Yamaguchi.  The time on the
2  monitor is 5:02.
3        (Recess taken.)
4        THE VIDEOGRAPHER:  Here begins Videotape 4 in
5  the deposition of Eishin Yamaguchi.  Coming back on the
6  record.  The time on the monitor is 5:17.  Please begin.
7        MR. TORPEY:  Q.  Mr. Yamaguchi, you indicated
8  that the statements that I read to you earlier in
9  Exhibits 3 and 4 to the effect that you're supposed to
10 stop at spot 10 prior to contacting ground that there
11 was a similar instruction in your route or route manual;
12 correct?
13    A.  Yes.
14    Q.  And that was true on October 7 of 2003;
15 correct?
16    A.  Well, the manual has been revised since then,
17 but I believe that the content would be the same.
18    Q.  Okay.  Now, are the route manual policies,
19 including that one, considered company policies of ANA
20 which you and all company pilots are required to follow?
21    A.  Yes.
22    Q.  And switching frequencies and contacting ATC
23 ground before you got to spot 10, you violated the
24 company policy on October 7, 2003; correct?
25    A.  No, that is not so.

**Page 118**

1  Q. Why is that not so?
2  A. Exhibit 3, second paragraph under procedures
3  says, unless otherwise directed. And we were otherwise
4  directed. They said have a good day, which means you
5  may now change frequency.
6  Q. Where is it written that have a good day means
7  that you can violate your company's policy against
8  switching frequencies before you get to spot 10?
9  MR. TURNER: Objection as to form and
10 foundation and a misstatement of this witness's prior
11 testimony.
12 THE WITNESS: Between a pilot and a
13 controller, the intent of the phrase have a good day
14 means good-bye, so you can now change to a different
15 frequency. If that had not been the intent, then they
16 would have said to us, remain that frequency.
17 MR. TORPEY: Q. Well, Mr. Yamaguchi, the fact
18 that there was no longer any need for the ramp
19 controller to talk to you further because they've
20 already cleared you to spot 10, that does not mean that
21 the ramp controller authorized you to stop monitoring
22 that frequency before you got to spot 10; correct?
23 MR. TURNER: Objection as to form and
24 foundation, misstatement of this witness's testimony and
25 you're just trying to argue with the witness.

**Page 119**

1  THE WITNESS: No. I do not think so. If it
2  had been necessary to maintain the frequency and monitor
3  the frequency with the ramp control, they would have
4  said, clear to spot 10, and then contact ramp
5  control -- they would have said.
6  THE INTERPRETER: The interpreter will
7  restate.
8  THE WITNESS: If it had been necessary to
9  continue to monitor the ramp tower frequency, they would
10 have stated the clearance in this manner, quote, you are
11 cleared to spot 10. Contact ground at spot 10.
12 MR. TORPEY: Q. Mr. Yamaguchi, do you believe
13 that there's any safety hazard to the 155 people on your
14 airplane whose lives you're responsible for by virtue of
15 the fact that you switched frequencies and are no longer
16 talking to ramp control which is the controller that is
17 monitoring the nonmovement area?
18 Do you think that that's dangerous that you've
19 switched that frequency when you're still in the
20 nonmovement area and can no longer hear or talk to the
21 ramp control?
22 MR. TURNER: Objection as to form and
23 foundation.
24 THE WITNESS: No, I do not.
25 MR. TORPEY: Q. Now, you're the pilot in

**Page 120**

1  command, 155 people on your airplane, you're taxiing
2  with the right wing tip you cannot see out the window.
3  Do you think, Mr. Yamaguchi, that for the
4  safety of your passengers it would have been a good idea
5  for you to contact ramp control once you saw the United
6  aircraft and asked ramp control whether or not your
7  aircraft was going to clear that United aircraft?
8  MR. TURNER: Objection as to form and
9  foundation.
10 THE WITNESS: In this situation we did not do
11 that because it was not necessary.
12 MR. TORPEY: Q. You believed it was not
13 necessary because you were a hundred percent certain
14 that you were not going to hit that aircraft, the United
15 aircraft; correct?
16 MR. TURNER: Objection as to form and
17 foundation.
18 THE WITNESS: Yes.
19 MR. TORPEY: Q. What if you were not a
20 hundred percent certain? What if you were something
21 less than a hundred percent certain? Do you believe in
22 that situation, believe that for the safety of the 155
23 people on your aircraft that you as the pilot in
24 command, as the communicating pilot should have
25 attempted to contact United ramp control to determine if

**Page 121**

1  your aircraft was going to clear with other aircraft?
2  A. My answer will be the same. In that situation
3  we judged that we had a 100 percent understanding that
4  there was clearance, therefore, we continued to taxi and
5  stayed at the ground frequency.
6  Q. Again I'll move to strike, Mr. Yamaguchi.
7  That's totally unresponsive to my question. So as with
8  my other questions, I'm going to ask the court to look
9  at it, and I'll move on. I can't obviously ask you
10 anything else about that at the moment, so I'm going to
11 turn to another topic.
12 On the day of the accident, Mr. Yamaguchi, as
13 the pilot in control and with 155 people in your
14 aircraft whose safety you're responsible for, if you
15 wanted to stop the taxi and call ramp control, you had
16 the ability to do that; correct?
17 MR. TURNER: Objection as to form and
18 foundation.
19 THE WITNESS: I had the ability, but I did not
20 believe that there was a necessity.
21 MR. TORPEY: Q. And had you stopped and
22 contacted ramp control to inquire whether your aircraft
23 could safely pass by the United aircraft, what would you
24 have had to have done in order to do that?
25 MR. TURNER: Objection as to form and

31 (Pages 118 to 121)

1  foundation.
2       THE WITNESS: I don't understand. Could I
3  have the question again.
4       MR. TORPEY: Read it back.
5       (Record read by the reporter.)
6       MR. TURNER: Same objection.
7       THE WITNESS: We felt that there was no need
8  to take any action other than those that we took.
9       MR. TORPEY: Move to strike. Not responsive.
10     Q.  I didn't ask you, Mr. Yamaguchi, whether you
11  felt it necessary. I asked you -- you're an intelligent
12  man. I asked you specifically if you had chosen, not
13  whether you should have, but if you had chosen to stop
14  your aircraft and contact ramp control prior to
15  proceeding and colliding into the United aircraft, what
16  is it that you would have had to have done to do that?
17      MR. TURNER: Objection as to form and
18  foundation as well as to counsel's snide comments.
19      THE WITNESS: My answer is not about this
20  case, but in general terms. If there is a judgment that
21  there is a danger, then we would stop the aircraft.
22     Q.  Again move to strike. Final time,
23  Mr. Yamaguchi.
24         In order to stop the aircraft, what physically
25  has to be done? If you're taxiing on October 7, 2003,

Page 122

1  and you decided as the pilot in command to stop the taxi
2  and then contact ramp control, to stop the airplane,
3  physically, what do you do?
4       MR. TURNER: Objection as to form and
5  foundation.
6       THE WITNESS: In order to stop the aircraft,
7  it is necessary to apply the brakes.
8       MR. TORPEY: Q. Okay. And how long would it
9  take to apply the brakes and stop the aircraft if you
10  had chosen to do that on October 7, 2003?
11     A.  One cannot say categorically. There are
12  various cases.
13     Q.  On the date and time you were taxiing on
14  October 7, 2003, from the engine-start line to the point
15  of impact, if prior to impact you decided to hit the
16  brake and stop, how long would it take for you to do
17  that?
18      MR. TURNER: Objection as to form and
19  foundation and incomplete hypothetical.
20      THE WITNESS: I would not know the exact
21  amount of time.
22      MR. TORPEY: Q. Well, it only takes a few
23  seconds to touch the brake pedal; correct?
24     A.  If it's just touching, yes.
25     Q.  Well, let me ask you this. Mr. Yamaguchi, if,

Page 123

1  let's say, halfway between the engine-start line and the
2  impact on October 7, 2003, you decided that you wanted
3  to stop the aircraft, change the frequency back, and
4  contact ramp control to determine if you had clearance
5  to get past the United aircraft, would you agree with
6  me, sir, you could have done that, you could have
7  accomplished that within a minute or less?
8       MR. TURNER: Objection as to form and
9  foundation and incomplete hypothetical.
10      THE WITNESS: I cannot answer as to
11  specifically how many seconds or minutes it takes to
12  make the judgment. Rather I do not know.
13      MR. TORPEY: Q. How long does it take to
14  switch the frequency on your VHF radio?
15     A.  I think that could be done in a second.
16     Q.  And if you look at Exhibit 2, which is your
17  own company operations manual, page 2, why don't you
18  take a look at that, Mr. Yamaguchi, Exhibit 2.
19         If you look under taxiing at subpart 2, you
20  are required to be observant of all obstacles around you
21  and taxiing speed is such that you may bring the
22  airplane to an immediate and complete stop.
23         You see that? You see that, sir?
24     A.  It is so written here, but I do not know if
25  the Japanese manual that I have is identical to the

Page 124

1  English manual here.
2      Q.  Well, let's assume that it is identical for
3  purposes of this question and all of my questions on
4  this. Okay? You understand that Mr. Yamaguchi?
5      A.  But would that not be disadvantageous for me?
6  If the two manuals were different and I give my answer
7  based on the English version and say that that is the
8  ANA operation, that would be a disadvantage to me.
9      Q.  Well, Mr. Yamaguchi, I'm not going to comment
10  on what's an advantage and disadvantage. I'm here to
11  ask you questions under oath. Your counsel produced
12  what he produced. Now all I can do is ask you questions
13  with regard to what he produced to me not with what he
14  didn't produce to me. That's for another day and time.
15         I'm going to ask you to assume that the
16  operations manual that you have in Japanese is exactly
17  the same as the one your counsel produced to us in
18  English, which we've now marked as Exhibit 2.
19         Do you understand me so far, Mr. Yamaguchi?
20      MR. TURNER: And I will instruct the witness
21  that he can make that assumption for the purpose of
22  Mr. Torpey's next question that the text of the manual
23  in the first two pages of Exhibit 2 is the same as his
24  manual for the same subjects in his Japanese operations
25  manual. He can make that assumption. Okay?

Page 125

**Page 126**

1  MR. TORPEY: Q. That being the case,
2  Mr. Yamaguchi, since your company policy in the
3  operations manual is that you're required to taxi at a
4  speed such that you can bring your aircraft to an
5  immediate stop, would you agree with me, sir, that if on
6  October 7, 2003, you chose as pilot in command for the
7  safety of the 155 people on your aircraft to stop the
8  taxi and contact United ramp, you could have done that
9  in less than 1 minute?
10       MR. TURNER: Objection as to form and
11  foundation and an incomplete hypothetical.
12       THE WITNESS: I did not have that thought
13  because I did not feel the necessity.
14       MR. TORPEY: Q. Again, I'll move to strike.
15  That's completely unresponsive, and I'm going to move on
16  to another area since you will not respond to my
17  questions in this regard.
18       Mr. Yamaguchi, is it true that the first time
19  you saw the United aircraft was when it began pushing
20  back from its gate? Is that the first point of contact
21  that you saw the United aircraft, when it initiated it's
22  push back?
23       MR. TURNER: Objection as to form.
24       THE WITNESS: I do not have a clear
25  recollection.

**Page 127**

1       THE INTERPRETER: The interpreter will
2  restate.
3       THE WITNESS: I do not have an accurate
4  recollection.
5       MR. TORPEY: Q. So you don't recall at this
6  point whether the United aircraft had or had not started
7  it's pushback from the gate at the time that you
8  initially saw it; correct?
9   A. Yes.
10      MR. TORPEY: Okay. Let's mark this.
11      (Whereupon, Exhibit 7 was marked for
12      identification.)
13      MR. TORPEY: Q. Let me show you what's marked
14  Exhibit 7. Do you recognize that document, sir?
15  A. Yes.
16  Q. Now, if you look under the section that says
17  started taxi and you look down to the third line, it
18  says approaching spot 10, I recognized UALB77 has
19  started pushout from gate 102. Do you see that?
20      So reviewing that, does that refresh your
21  recollection that you first saw the United aircraft when
22  it initiated or started its pushback from the gate?
23      MR. TURNER: Objection as to form and
24  foundation and a total misstatement of what you just
25  read.

**Page 128**

1       MR. TORPEY: That's not a -- go ahead.
2       THE WITNESS: Upon reading this sentence, that
3  is the case.
4       MR. TORPEY: Q. Okay. So your first -- and
5  you were in the left-hand seat; correct?
6  A. Yes.
7  Q. And when you first saw United start to push
8  back, did you say anything at that point to anybody else
9  in the cockpit of your aircraft?
10 A. We may have conversed, but I do not recall
11 what we said.
12 Q. Okay. In the cockpit there's an area
13 microphone; correct?
14 A. Are you talking about the cockpit voice
15 recorder.
16 Q. There are microphones that are connected, if
17 you will, to the cockpit voice recorder so that whatever
18 is spoken in the cockpit of your aircraft can be
19 recorded by the cockpit voice recorder; correct?
20 A. I don't know if there is a microphone, but the
21 conversation in the cockpit is recorded.
22 Q. Okay. Mr. Yamaguchi, you indicated you saw
23 the United aircraft start to push. At some point did
24 you see the United aircraft stop its pushback?
25 A. I recall that it was a very slow speed, a

**Page 129**

1  stopping speed.
2  Q. So does that mean that you did witness the
3  point at which the United aircraft stopped its push?
4  A. No. That's not the case.
5  Q. At some point did you note -- well, let me ask
6  you this.
7       While the United aircraft was being pushed, in
8  other words, after the start of the push that you
9  indicated you saw, during the push, did you watch the
10 United aircraft?
11 A. I was watching what I could see from the
12 cockpit.
13 Q. So from your position in the cockpit, you
14 could see the pushback of the United aircraft; correct?
15 A. Yes.
16 Q. And could your flying pilot also see that? Do
17 you know?
18 A. Naturally I think he could.
19 Q. And how about the observer pilot?
20 A. I think he could see if he had tried, but I
21 don't know.
22 Q. Fair enough. At some point did you observe
23 that the United aircraft had stopped pushing back?
24 A. You're inquiring if it stopped. I didn't see
25 it stop. Before that, I could no longer see it.

1  Q. Well, are you saying that you continually
2  watched the United aircraft -- strike that.
3      Are you saying there came a point in time when
4  you were no longer able to see any portion of the United
5  aircraft because you had continued to taxi to a point
6  that you could no longer see it? Is that what you're
7  saying?
8      MR. TURNER: Objection as to form.
9      THE WITNESS: No. That's not what I'm saying.
10 While I could see the United aircraft, I judged the
11 relative positions of our aircraft and the United
12 aircraft. That is why we continued to taxi.
13     MR. TORPEY: Q. Mr. Yamaguchi, from the time
14 you first saw the United aircraft start to push until
15 the impact, is it your testimony that you at all times
16 had in your field of view some portion of the United
17 aircraft?
18     MR. TURNER: Objection as to form and
19 foundation.
20     THE INTERPRETER: The interpreter will repeat
21 the question in Japanese.
22     THE WITNESS: No. That is not so. The United
23 aircraft was no longer in my view before the impact for
24 some time, although I don't know how many seconds that
25 was.

Page 130

1      MR. TURNER: Just want to point out,
2  Mr. Torpey, it is now after 6:00 p.m. We started this
3  deposition at 10:00 a.m. We had just under an hour for
4  lunch. The deposition has therefore been in progress
5  for in excess of seven hours. How much time do you
6  expect to continue this evening with this witness?
7      MR. TORPEY: Well, will you produce him again
8  in the morning?
9      MR. TURNER: No. No. He's schedule to go
10 back tomorrow, and there is another witness scheduled to
11 begin tomorrow. As a matter of fact, you had said to me
12 when we were planning that you may not even need a whole
13 day for the witness.
14     MR. TORPEY: Well, once again, Mr. Turner, I
15 don't know what you're referring to, but we have
16 additional questions. I'm not done with this witness,
17 and I intended to continue as long as we have to and if
18 need be tomorrow or some other day.
19     I'm not near finishing, and obviously there
20 are issues with regard to document production that we'll
21 take up with the court, but I have a number of other
22 questions to ask this witness.
23     MR. TURNER: Can you finish with this witness
24 in another 15 minutes if he's willing to stay?
25     MR. TORPEY: Certainly I cannot finish with

Page 131

1  this witness in 15 minutes. I can occupy the next 15
2  minutes to ask more questions, but there's no way I'll
3  finish this deposition in 15 minutes.
4      MR. TURNER: Are you willing to go -- right
5  now it's 6:05. Are you willing to go to 6:15? Are you
6  okay?
7      THE WITNESS (WITHOUT INTERPRETER): Yes.
8      MR. TURNER: Okay. Go for another 10 minutes,
9  and this deposition is then over.
10     MR. TORPEY: Well, we'll ask the court to rule
11 on that. I think it's up to her and not you.
12     MR. TURNER: It's up to you. You don't have
13 to ask the same questions ten times.
14     MR. TORPEY: Q. Mr. Yamaguchi, take a look at
15 your statement, Exhibit 7, and you say here that the
16 pilot flying maneuvered slightly to the left side of the
17 center line. It looked to me that the maneuver was to
18 increase the margin of clearance from United B777.
19     Do you see that?
20 A.  Yes.
21 Q.  Did you understand that there was a potential
22 conflict or a potential collision hazard and that was
23 the reason why the turn to the left was initiated?
24     MR. TURNER: Objection as to form and
25 foundation and a misstatement of what you just read from

Page 132

1  Exhibit 7.
2      MR. TORPEY: And that's a speaking objection.
3      THE WITNESS: I do not know if the pilot
4  flying judged whether or not there was a potential
5  collision hazard at this point.
6      MR. TORPEY: Q. Well, Mr. Yamaguchi, your
7  statement says that it looked to you that that maneuver
8  was to increase the margin of clearance from UAL777.
9  That's your statement, correct, sir?
10 A.  This present question is about me, but the
11 question previous to this one was about pilot flying.
12 Therefore I said that I cannot tell what the pilot
13 flying thought.
14 Q.  Mr. Yamaguchi, I move to strike that.
15     I asked you a specific question. I'm not
16 asking about the question before that. I'll ask it one
17 more time.
18     That is your statement that it looked to you,
19 Mr. Yamaguchi, that the maneuver was to increase the
20 margin of clearance. That's your statement.
21     My question to you, sir, is did you understand
22 in your mind as the pilot in command that day that the
23 reason your flying pilot turned to the left was because
24 there was a perceived collision hazard so he wanted to
25 increase the clearance or distance between the two

Page 133

34 (Pages 130 to 133)

```
 1  aircrafts.
 2          Was that your thought in your mind when you
 3  made that statement?
 4          MR. TURNER: Objection as to form and
 5  foundation, and you're simply arguing, arguing with the
 6  witness. You're not asking him questions here. As a
 7  matter of fact -- well, I said we'd go to 6:15. I'll
 8  allow this nonsense to continue for another 6 minutes.
 9          THE WITNESS: Yes.
10          MR. TORPEY: Q. And on the next line of your
11  statement you say you asked the pilot flying whether the
12  clearance was inadequate -- or adequate. Do you see
13  that? Let me withdraw it, and I'll restate it.
14          Your statement says that you asked your pilot
15  flying whether the clearance was adequate. Isn't it
16  true, sir, that the reason you asked that question is
17  that you as the pilot in command perceived a potential
18  conflict or collision hazard with the United aircraft.
19          MR. TURNER: Objection as to form and
20  foundation.
21          THE WITNESS: I recall that it was not because
22  of a potential for collision but rather because I
23  thought that the clearance was closer than usually.
24          MR. TORPEY: Q. Whether it was closer than
25  usual or not is irrelevant unless there's a collision
                                                  Page 134
```

```
 1  hazard; correct?
 2          MR. TURNER: Objection as to form and
 3  foundation.
 4          THE INTERPRETER: The question. Can you read
 5  the question again.
 6          THE WITNESS: No, that's not so.
 7          MR. TORPEY: Q. So even if there's no
 8  collision hazard and in this case you believe there was
 9  none, but you still were interested in knowing what the
10  clearance was. Is that what you're telling this jury?
11       A. Wanted to know.
12       Q. Mr. Yamaguchi it's very simple. In all
13  honesty, if you had not perceived the collision hazard,
14  you would not have inquired of the pilot flying whether
15  or not there was clearance; isn't that true?
16          MR. TURNER: Objection as to form and
17  foundation and I object that you're just arguing with
18  the witness.
19          THE WITNESS: It was not imminent like a
20  potential for a collision.
21          MR. TORPEY: Again I'll move to strike.
22       Q. The question, Mr. Yamaguchi, was not timing or
23  the imminent nature. The question is you must have
24  perceived a potential conflict, potential, or you would
25  not as the pilot in command have inquired to your flying
                                                  Page 135
```

```
 1  pilot about the clearance between your aircraft and the
 2  United aircraft. Is that a true statement, sir?
 3          MR. TURNER: Objection as to form and
 4  foundation. Objection as to form and foundation.
 5          THE WITNESS: I do not recall that I perceived
 6  any potential conflict.
 7          MR. TURNER: It's now more than past 6:15.
 8  This deposition has been going for 8 hours and
 9  15 minutes with a one-hour break for lunch. This
10  deposition is now over.
11          MR. TORPEY: Well, for the record, it's not
12  over, and we don't even have seven hours of testimony,
13  Mr. Turner. So I want it to be clear that we are not
14  only going to move that this deposition continue but the
15  cost of having to come back here. So if you want to
16  terminate this deposition, you do so at your own risk.
17          I've got my client here. Jeff Worthe is here.
18  You made us come up from Los Angeles needlessly. We're
19  going to have to come back here. And if you want to
20  terminate this deposition at this point with less than
21  seven hours of deposition testimony.
22          And, Mr. Reporter, how much time has actually
23  been used with testimony.
24          THE VIDEOGRAPHER: 6 hours and 34 minutes on
25  the record.
                                                  Page 136
```

```
 1          MR. TURNER: This deposition is over.
 2          MR. TORPEY: We'll take it up with the court.
 3          MR. TURNER: All you're doing is arguing with
 4  the witness.
 5          MR. TORPEY: Are you moving for a protective
 6  order?
 7          MR. TURNER: The deposition is over.
 8          MR. TORPEY: Is it over because you're moving
 9  for a protective order? I'll take that as a no. That
10  you're just terminating the deposition with no basis.
11  So if that is the case, we'll take it up with the court.
12          MR. TURNER: The deposition is over because
13  we've exceeded the seven hours. You've wasted hours
14  just asking the same questions over and over again and
15  arguing with the witness. Deposition is over.
16          THE VIDEOGRAPHER: Shall I go off the record?
17          MR. TURNER: It's not over. If you're going
18  to represent that you're going to finish with this
19  witness in the next 30 minutes, I'll permit him to stay,
20  but you've refused to do this.
21          Can you finish with the witness in the next
22  30 minutes?
23          MR. TORPEY: I've already made my position
24  clear, Mr. Turner, and if you're -- I'll ask 30 more
25  minutes of questions, but I won't be done in 30 minutes.
                                                  Page 137
```

35 (Pages 134 to 137)

1  So if you're terminating it, I'm prepared to continue.
2  I'm prepared to continue for an hour. I'm prepared to
3  come back tomorrow morning. I'm prepared to come --
4      THE WITNESS: This witness is on a totally
5  different time schedule from you and all you're doing is
6  abusing the witness when he's been entirely helpful and
7  courteous to you. You've been entirely discourteous to
8  him. This deposition is over.
9      THE VIDEOGRAPHER: Shall we go off the record?
10     MR. TORPEY: Apparently, since he's leaving,
11 we're, I guess, going to be done.
12     (Whereupon, the deposition adjourned at
13 6:17 p.m.)
14              --oOo--
15     I declare under penalty of perjury that the
16 foregoing is true and correct. Subscribed at
17 _____, California, this ____ day
18 of _____, 2007.
19
20
21     _____
22     EISHIN YAMAGUCHI
23
24
25

Page 138

        CERTIFICATE OF REPORTER
1
2      I, BRANDON D. COMBS, a Certified Shorthand
3  Reporter, hereby certify that the witness in the
4  foregoing deposition was by me duly sworn to tell the
5  truth, the whole truth, and nothing but the truth in the
6  within-entitled cause;
7      That said deposition was taken in shorthand by
8  me, a disinterested person, at the time and place
9  therein stated, and that the testimony of the said
10 witness was thereafter reduced to typewriting, by
11 computer, under my direction and supervision;
12     That before completion of the deposition,
13 review of the transcript was not requested. If
14 requested, any changes made by the deponent (and
15 provided to the reporter) during the period allowed are
16 appended hereto.
17     I further certify that I am not of counsel or
18 attorney for either or any of the parties to the said
19 deposition, nor in any way interested in the event of
20 this cause, and that I am not related to any of the
21 parties thereto.
22     DATED: November 29, 2007.
23
24     _____
25     BRANDON D. COMBS, CSR 1297

Page 139